Kyle W. Roche
Edward Normand
Stephen Lagos
(*pro hac vice applications forthcoming*)
ROCHE FREEDMAN LLP
99 Park Avenue, 19th Floor
New York, NY 10016
Tel.: 646-970-7509
Email: kyle@rcfllp.com

Katherine Eskovitz (SBN 255105)
ROCHE FREEDMAN LLP
1158 26th Street No. 175
Santa Monica, CA 90403
Tel.: 646-791-6883
Email: keskovitz@rcfllp.com

*Counsel for Plaintiff Junhan Jeong*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

JUNHAN JEONG, individually and on behalf of all others similarly situated,

Plaintiff,

v.

NEXO FINANCIAL LLC, NEXO FINANCIAL SERVICES LTD., NEXO SERVICES OÜ, NEXO AG, and NEXO CAPITAL INC.,

Defendants.

No. _____

**COMPLAINT**

**CLASS ACTION**

**JURY TRIAL DEMANDED**

Individually and on behalf of all others similarly situated, Plaintiff Junhan Jeong bring this action against Defendants Nexo Financial LLC, Nexo Financial Services Ltd., Nexo Services OÜ, Nexo AG, and Nexo Capital Inc. (collectively, "Nexo"). Plaintiff's allegations are based upon personal knowledge as to himself and his own acts, and upon information and belief as to other

1   matters based on the investigation conducted by his attorneys. Plaintiff believes that reasonable

2   discovery will identify substantial additional evidence for the allegations set forth herein.

## I.   INTRODUCTION

3   1.   Plaintiff seeks redress for the nationwide harm resulting from Nexo's intentional

4   and unjustified suspension on December 23, 2020, of a critical repayment option on its platform

5   for using cryptoassets to borrow cash and from the resulting liquidation of the collateral of

6   hundreds of Nexo customers, causing well over $5 million in damages.

7   2.   Since April 2018, Nexo has maintained and operated a website through which

8   customers can use their cryptoassets as collateral to borrow cash. Using Nexo's "Crypto Credit,"

9   a customer takes out a "fiat loan" by staking any of a variety of cryptoassets in their "Credit Line

10  Wallet" to serve as collateral and by funding a "Savings Wallet" to serve as back-up collateral. As

11  of December 23, the accepted collateral included the digital asset Ripple, also known as "XRP."

12  3.   The customer can borrow as much cash as they want as long as they maintain a

13  particular loan-to-value ("LTV") ratio, the ratio between the amount of cash borrowed and the

14  value of the collateral held in the customer's Credit Line Wallet. The value of that collateral

15  fluctuates with the price of the cryptoassets held as collateral.

16  4.   Accordingly, the customer sometimes must stake more digital assets or pay back

17  on its loan, through the Nexo platform, to maintain the requisite LTV ratio. If the customer's LTV

18  ratio rises above a certain threshold, Nexo will—after providing notice to the customer—sell the

19  collateral to bring the LTV ratio back in line. These sales may result in the liquidation of all of the

20  customer's cryptoassets held in the Credit Line Wallet and Savings Wallet.

21  5.   On December 22, 2020, the Securities Exchange Commission ("SEC") announced

22  its action against Ripple Labs Inc. and two of its executives, alleging that since 2013 they had

raised over $1.3 billion through their unregistered, ongoing securities offering of XRP. On December 23, the price of XRP dropped from approximately $0.45 to $0.21 within a few hours.

6.     Seeing the price of XRP thus drop significantly, on December 23, Nexo suspended customers' use of XRP to stake as collateral or pay down on loans, and did so without providing notice of the suspension. Nexo did so because it did not want to be left holding XRP at its substantially decreased value—not because Nexo believed that the SEC's announcement counseled against the use or sale of XRP.

7.     Indeed, within hours of this suspension, exercising a purported contractual right of "ownership" over its customers' collateral—a claimed right that is precisely the *opposite* of Nexo's extensive advertisement that its credit service does *not* involve any transfer of ownership of the customer's digital assets—Nexo proceeded to *sell* massive quantities of the XRP collateral. Nexo thus had no genuine concerns with transfers of XRP for value.

8.     Nexo's suspension of XRP payments and failure to provide notice of it were material breaches of the Nexo "Borrow Terms and Conditions" governing the relationship between Nexo and its customers. As to the hundreds of Nexo customers who could have used XRP to maintain their LTV ratios, Nexo's material breaches deprived them of the benefit of their bargain and excused any obligation to maintain their LTV ratios, whether by posting more digital assets as collateral or by paying down on their loans.

9.     Many Nexo customers who nevertheless sought to maintain their LTV ratios on the heels of the XRP suspension, moreover, were effectively locked out of doing so. Customers who had used XRP as collateral could neither use their XRP to pay down their loans nor sell their XRP on the market and use the proceeds to maintain their LTV ratios: any customer who removed their XRP from the Credit Line Wallet risked causing their LTV ratio to increase such that Nexo would

liquidate that collateral. Customers who could have used XRP to post as supplemental collateral or to pay down their loans were unable to do so; Nexo liquidated their collateral and kept the proceeds for itself. Nexo thus effectively prohibited these customers from maintaining their LTV ratios and then punished them for not maintaining their LTV ratios.

10.     Nexo's suspension of XRP payments and liquidation of these customers' collateral therefore were unlawful, and these customers are entitled to recover the value of their XRP when Nexo suspended its use and the value of their liquidated collateral as of breach (less the outstanding loan amounts on that collateral). Nexo customers are also entitled to the value of the digital assets taken from their Savings Wallets, and the value of the digital assets or cash that they transferred to their Credit Line Wallets, to maintain their LTV ratios during the suspension of customer use of XRP, because any obligation to maintain those ratios had been excused.

11.     Nexo's suspension of XRP payments and failure to provide notice of it also constituted unlawful and unfair business acts and practices under California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.* On this independent basis, Nexo's many affected customers in California are entitled to restitution of the value of their property that Nexo claimed and liquidated (less the outstanding loan amounts on that collateral as of breach) on the unlawful premise that they held "ownership" over that collateral.

12.     In addition to this monetary recovery, and considering Nexo's public insistence on December 30, 2020, that it was contractually entitled to act as it did, Plaintiff seeks the appropriate equitable relief, including an order declaring the parties' respective contractual rights and obligations and enjoining Nexo from engaging in similar conduct in the future.

13.     Under California's Consumers Legal Remedies Act, for example, any provision of Nexo's "Borrow Terms and Conditions" purporting to afford Nexo the unfettered right to suspend

Crypto Credit or any of its features or content without notice to its customers and for any reason at all, and the provision purporting to afford Nexo "ownership" of a customer's collateral while they are using Nexo's Crypto Credit, are unconscionable and otherwise unenforceable. Cal. Bus. & Prof. Code § 1770(a)(19), 27(b)(1).

14.     A declaration regarding the parties' contractual rights is necessary because the rights and obligations at issue are central to the very operation and use of the Nexo Crypto Credit, and because Nexo's public statements demonstrate that the parties have a fixed and genuine dispute over those rights and obligations, including whether Nexo customers should be entitled to use XRP for payment. Such an injunction is necessary because, given the uncertain regulatory status of many digital assets and Nexo's evident, self-serving financial motivation, Nexo's misconduct is likely to repeat itself and threatens irreparable harm.

15.     On behalf of the Classes and Subclasses defined herein, Plaintiff seeks a declaration that Nexo (a) does not possess the unfettered right to change any material conditions for the use of the Nexo Crypto Credit, to suspend the provision of the Crypto Credit, or to change, suspend, disable, or discontinue any features or content of the Crypto Credit; (b) does not possess the contractual right to take any such steps without notice to its customers; (c) does not acquire "ownership" over the customers' collateral; and (d) within its credit services, cannot refuse to accept XRP from its customers. Plaintiff also seeks to enjoin Nexo from taking any such actions.

## II.     PARTIES

### A.     <u>Plaintiff</u>

16.     Plaintiff Junhan Jeong is a resident of California. On December 23, 2020, as a result of Nexo's misconduct described herein, Plaintiff lost his collateral of 598,384.6188 XRP, at a market value of approximately $269,300 (less his outstanding loan amount of approximately $169,400); and used these digital assets in these amounts to pay down his loans: 47,190.47043

XLM (Lumen) (market value of approximately $6,000), 0.009255 BTC (bitcoin) (market value of approximately $215), 6.1673 ETH (Ether) (market value of approximately $3,600), and 168.18851 LINK (market value of approximately ($1,800).

**B.   Defendants**

17.   Defendant Nexo Financial LLC ("Nexo Financial") was incorporated in Delaware in June 2018 and maintains the registered agency address of 251 Little Falls Drive, Wilmington, Delaware. Nexo is registered with the U.S. Financial Crimes Enforcement Network as a money services business (or "MSB") for activity in all fifty states and operates through branches in at least twenty-four states, including California.

18.   Defendant Nexo Financial Services Ltd. ("Nexo Financial Services") is based in London, England, at 1 Canada Square Floor 39, Canary Wharf, and since May 2020 has supported Nexo Services OÜ in offering and maintaining the "Nexo" services advertised and available on the Nexo website and through the Nexo website platform.

19.   Defendant Nexo Services OÜ ("Nexo Services") is incorporated in Estonia and holds a crypto exchange license and the crypto wallet license required for a company to control a client's virtual assets under the European Anti-Money Laundering Directive 5 (AMLD5). Nexo Services has operations in both Estonia and Bulgaria, but neither country has authorized Nexo Services to conduct business there. Nexo Services has been the headquarters for Nexo's Crypto Credit services.

20.   Defendant Nexo AG is incorporated in Switzerland with the listed address of c/o Sibla Services AG, Grafenaustrasse 15, Zug, ZUG, 6300. Nexo AG's board members and authorized signatories include Nexo co-founders Kosta Kantchev and Antoni Trenchev.

21.   Defendant Nexo Capital Inc. ("Nexo Capital") is a Cayman Island corporation, with the address Two Artillery, 161 Shedden Road, 2nd Floor, George Town, P.O. Box 799, Grand

Cayman KY KY1-1103, that has its principal place of business and headquarters in London, England, at the same address as Nexo Financial Services.

22.    Nexo Financial, Nexo Financial Services, Nexo Services, Nexo AG, and Nexo Capital Inc., collectively operating and maintaining the Nexo website and offering the Nexo services advertised on that website and through the Nexo whitepaper, are subject to single-enterprise liability.

23.    *First*, there is such a unity of interest and ownership among these entities that any separate corporate personalities are merged, such that one corporation is a mere adjunct of another and they form a single enterprise. On information and belief, for example:

   a.  Nexo was founded and is, in Nexo's words, "powered" by Credissimo, a European Financial/Technological (or "FinTech") Group based in Bulgaria, and the majority shareholders and founders of Credissimo—Kosta Kantchev, Georgi Shulev, and Antoni Trenchev—are the majority shareholders and founders of Nexo.

   b.  Nexo co-founders Kantchev, Shulev, and Trenchev identify themselves, and are publicly identified, as "co-founders" and "managing partners" of "Nexo," without distinguishing among the Nexo corporate entities.

   c.  These Nexo entities commingle funds and assets, failing to segregate funds among the separate entities. These entities thus treat the ostensible funds and assets of one entity as the funds and assets of the other.

   d.  These Nexo entities do not maintain distinct minutes or corporate records, instead confusing the records of these entities.

e. These Nexo entities share similar if not effectively identical equitable ownership, in that Nexo co-founders Kantchev, Shulev, and Trenchev collectively hold most of the equity in each entity.

f. These Nexo entities share similar if not effectively identical supervision and management, in that some combination of Kantchev, Shulev, and Trenchev is responsible for such oversight for each of the entities.

g. One or more of Nexo Financial, Nexo Financial Services, and Nexo AG may serve as a mere shell, instrumentality, or conduit for the Nexo Services business based and operating in Bulgaria and Estonia.

h. These Nexo entities do not honor corporate formalities, do not maintain arm's length relationships, and treat the employees of any particular entity as working for "Nexo" as a whole.

24.    Nexo co-founder Trenchev underscored the single-enterprise character of the Nexo corporate entities in an interview with Bloomberg on February 6, 2021, responding to a question concerning who "regulates" Nexo: "We are a global enterprise. We are operating in any jurisdiction, apart from the sanctioned countries, so this varies from country to country. We are regulated as a financial institution in Estonia, we have various consumer lending licenses in the US, we are pending authorization by the FCA in London. So it really depends on the jurisdiction and where you are based. In Switzerland we are part of a self-regulatory organization, so it is quite an endeavor on that front, but the team is great and we have had quite some successes."

25.    In an August 2018 interview with Crypto Rand, Trenchev made similar comments underlining Nexo's single-character quality, stating that "it is important to know that Nexo is SEC-compliant and adheres to all relevant European legislation" and citing the "great talent over at the

helm of Nexo—Kosta has terrific analytical abilities to see the bigger trends and sharp business acumen to respond to them in the most efficient manner; Georgi is perhaps the most methodological and diligent person I know when it comes to finishing a mission and he is a real 'Excel' wizard." (Trenchev acknowledged that "humility might not really be our strong suit.")

26.     Nexo's recently granted license to operate as a finance lender in California, and Nexo's announcement of that event, further underscore the single-enterprise character of the Nexo corporate entities. The licensee is Nexo Financial (the Delaware entity), but the listed address of Nexo Financial is the London address of both Nexo Financial Services (the U.K. entity) and Nexo Capital (the Cayman Islands entity).

27.     In its recent press release announcing that this license had been granted, moreover, Nexo made statements illustrating its single-enterprise character. For example:

    a.   Nexo refers to itself in the collective: "Nexo, the leading regulated financial institution for digital assets with over $5 billion in assets under management, today announced it has obtained a California Finance Lender (CFL) License, applicable to lenders and brokers of commercial loans in the United States, from the California Department of Business Oversight (DBO)." (https://apnews.com/press-release/business-wire/technology-sports-cfl-football-north-america-football-bcecd0320e16478b97cce3c7c659a846.)

    b.   Nexo co-founder Trenchev is quoted describing Nexo as a collective, "global" entity: "'The CFL License is a significant milestone in serving both our expanding client base and the next generation of crypto adopters within California State's regulatory framework.,' said Antoni Trenchev, Co-founder and Managing Partner of Nexo. 'Our latest lender's license in the U.S., it further

showcases our commitment to building a fully compliant and sustainable business globally and sets the bar high for the industry.'" (*Id.*)

28.     In addition, notwithstanding that this California finance lender license specifies Nexo Financial as the Nexo lending entity, Nexo Capital is the Nexo entity that recently brought suit in the United States against a customer for allegedly defaming "Nexo" in criticizing Nexo's online lending platform and overall operations.

29.     *Second,* inequitable results would follow if the misconduct and acts in question in this action were treated as those of any one corporate entity alone. For example:

a.   If the Europe-based entities disclaimed any connection to the U.S.-based entity doing business and maintaining a branch in California, or if those entities disclaimed any connection to the operation and maintenance of the Nexo website and whitepaper published in the United States, Plaintiff might be unable to establish personal jurisdiction over the European-based entities.

b.   If these entities were to claim distinctly to oversee and operate different aspects of the Nexo Crypto Credit services made available on the Nexo website published in the United States, then Plaintiff, Class, and Subclass members might have to bring different suits in different jurisdictions to establish liability.

c.   If Nexo's actions on December 23, 2020, and thereafter were treated as only the actions of one or both of the Europe-based entities, then Plaintiff, Class, and Subclass members might be forced to litigate in Estonia or the United Kingdom, which would be inequitable given the substantial presence and activities of Nexo in the United States through Nexo Financial.

### III.   JURISDICTION AND VENUE

30.   Jurisdiction of this Court is founded upon 28 U.S.C. § 1332(d) because the matter in controversy exceeds the value of $5,000,000, exclusive of interests and costs, there are more than 100 class members, and the matter is a class action in which any member of a class of plaintiffs is a citizen of a State different from any defendant. This amount in controversy includes the damages and restitution to which Plaintiff and the Class and Subclass members are entitled; the attorneys' fees that will be incurred and that Plaintiff stands to recover by statute; and Nexo's cost of compliance with the equitable relief sought herein.

31.   This Court has personal jurisdiction over Nexo, operating as a single enterprise, with each corporate entity acting as the agent of the other, because for purposes of inducing customers to use the Nexo Crypto Credit, Nexo solicited and solicits customers, including Plaintiff and Class and Subclass Members, through substantial contacts with California; and because Plaintiff's claims arise out of the business that Nexo conducted and the substantial contacts that it maintained with California.

32.   Nexo conducted such business and maintained such conducts, giving rise to Plaintiff's claims, in that Nexo offers its services in general and its Nexo Crypto Credit in particular through a highly interactive website, nexo.io, that Nexo made and makes readily available in California and that California residents, including Plaintiff and Class and Subclass members, accessed and heavily interacted with in using Nexo Crypto Credit.

33.   Nexo's website was and is highly interactive, sufficient to satisfy considerations of fairness and due process in subjecting Nexo to jurisdiction in this Court, in that Nexo intended and intends to make the website available to California, which it was and is, and in at least the following further respects:

a.   The website links to Nexo's whitepaper, which served and serves to describe and advertise in California Nexo's business and services for the purpose of inducing California residents to use that business and those services.

b.   In his August 2018 interview cited above, Nexo co-founder Trenchev stated that "our roadmap is a key element of our whitepaper and has been instrumental in raising some $52.5 million earlier in 2018."

c.   The website allows the user to clink into any of several detailed descriptions of and effective advertisements for Nexo's business and services for the purpose of inducing California residents to use that business and those services.

d.   The website has multiple links to the "Terms and Conditions" binding the customer's use of Nexo's crypto-related services and of the website itself, for the purpose of relating those terms to California residents and of binding them to the applicable terms if they decide to use any of Nexo's services.

e.   Nexo's customers use Nexo's services through a website, which may be accessed through Nexo applications, on which Nexo's customers access information and input critical to their use of the services. With respect to the Nexo Crypto Credit, for example, Nexo's customers use a Nexo-maintained website to post collateral, take a loan, monitor the need to pay down a loan or post more collateral, and close out an account.

f.   With Nexo's knowledge and intent, in short, the Class and Subclass members who reside in California have used and use Nexo's website for the regular, repeated transmission of computer files and data, including substantial funds in the form of digital assets or fiat currency, over the internet. Nexo's users register

on the website, maintain accounts through the website, engage in commercial transactions through the website, and make payments through the website.

34.     Plaintiff's claims arise out of Nexo's forgoing contacts directed at, advertising to, and maintenance of a highly interactive website available to California residents in that he read and considered the Nexo whitepaper and description of the Nexo business and services on the Nexo website before deciding to use the Nexo Crypto Credit service; in that he proceeded to use the Nexo Crypto Credit service from California, using the highly interactive Nexo website; and in that he suffered his losses as a result of Nexo's forgoing contacts with California intended to induce California residents to use Nexo's services.

35.     In short, but for Nexo's advertising and maintenance of a highly interactive website made available in California, Plaintiff would not have used Nexo's services and would not have suffered the losses he did. The same is true of all of the Class and Subclass members who are residents of California and who suffered losses from Nexo's misconduct. California residents' use of Nexo's services did not and do not result from Nexo's random, fortuitous, or attenuated contacts with the state, or from the residents' unilateral activity.

36.     In addition to such substantial contacts that Nexo directed toward California, giving rise to Plaintiff's claims and claims of Class and Subclass members, Nexo is fairly and reasonably subject to personal jurisdiction in California because it has availed itself of and subjected itself to California's laws in maintaining a branch in California and in licensing itself to do business in California as an MSB.

37.     Nexo is also fairly and reasonably subject to personal jurisdiction in California because it has availed itself of and subjected itself to California's laws in undertaking activities sufficient to seek, and to have obtained, a license in California, from the California Department of

Business Oversight, to operate as a finance lender within the state. Nexo was acting as a finance lender in connection with its activities in California giving rise to Plaintiff's claims, and will be acting as a licensed finance lender in California in its activities for which Plaintiff seeks forward-looking equitable relief.

38.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), because, as explained above, a substantial part of the events giving rise to Plaintiff's claims occurred in this district.

39.     Nexo's Borrow Terms and Conditions purport to include a forum-selection clause, but the provision is so ambiguous as to fail to give notice of Nexo's intent, and therefore is unenforceable under the applicable common law, and it otherwise fails to set forth any alternative forum for resolving this dispute.

40.     Nexo drafted its Borrow Terms and Conditions. Referring to themselves as the "General Terms," the Borrow Terms and Conditions state: "Any dispute arising out of or in connection with the Agreement (the General Terms), unless amicably settled between the Parties, shall be referred to the competent court or other dispute resolution authority, determined as per the procedural law of Nexo jurisdiction." (Nexo Borrow Terms & Conditions Art. XV.2.)

41.     These General Terms, however, nowhere define "Nexo jurisdiction." On this basis alone, properly interpreted against Nexo as the drafter, the Nexo Borrow Terms and Conditions contain no enforceable forum-selection clause governing the parties' disputes arising out of or relating to the Nexo Crypto Credit.

42.     In addition, construed against Nexo—which has a branch in California and does substantial business in California as a registered MSB and licensed finance lender in the state, and whose website is used by state residents—the Borrow Terms and Conditions are reasonably read to reflect the parties' consent to jurisdiction in California as the "Nexo jurisdiction."

43. The general Nexo Terms and Conditions, available through a separate link on the Nexo website from the Borrow Terms and Conditions, similarly fail to identify the applicable forum in the purported forum-selection clause: "These Terms will be governed by and construed in accordance with the laws of the Website Owner's jurisdiction, and you submit to the non-exclusive jurisdiction of the Website Owner's jurisdiction for the resolution of any disputes." (Nexo General Terms & Conditions Art. 13.) But these terms and conditions do not define "Website Owner" or identify the "Website Owner's jurisdiction." In addition, these terms and conditions do not govern a customer's use of the Crypto Credit.

44. Nexo thus fails to provide any clear notice of any alternative applicable forum to govern a dispute between the parties arising out of or relating to the Nexo Crypto Credit.

## IV. FACTUAL ALLEGATIONS

### A. The Nexo Crypto Credit Service

45. Since April 2018, Nexo has maintained and operated a website through which customers can use their cryptoassets as collateral to borrow cash. Nexo touts this service as allowing customers to spend the value of their "crypto" without having to sell it, without having to deal with credit checks, and without triggering taxes for capital gains. Nexo claims to have over a million users and over $5 billion in assets under management, and that its services are available in over 200 jurisdictions.

46. In order to use the Nexo Crypto Credit service, a customer must accept the Borrow Terms and Conditions that Nexo imposes on those choosing to use that service. These Borrow Terms and Conditions are adhesion contracts. There is no negotiation, let alone meaningful negotiation, between Nexo and any prospective customer. The customer must either accept the Borrow Terms and Conditions or else not use any Nexo service.

47.     Using Nexo's "Crypto Credit," a customer takes out a "fiat loan" by staking any of a variety of cryptoassets in their "Credit Line Wallet" to serve as collateral and by funding a "Savings Wallet" to serve as back-up collateral. The list of accepted collateral has included such major digital assets as Bitcoin, Ethereum, Litecoin, Stellar, Bitcoin Cash, EOS, and many others—including Ripple, also known as "XRP."

48.     The size of the customer's Crypto Credit line is a function of the staked collateral and its value. In particular, the customer can borrow as much cash as they want as long as they maintain a particular loan-to-value ("LTV") ratio. The applicable LTV ratio varies from digital asset to digital asset.

49.     In the case of a digital asset for which Nexo requires an LTV ratio of 50% for example, if the value of the customer's staked collateral is $50,000, the customer may use as much as $25,000 in Crypto Credit. If the value of that collateral decreases (due to, for example, a decrease in the market price of the digital asset being used for collateral), then the customer may be required to stake more digital assets or pay back on its loan, through the Nexo platform, to maintain the requisite LTV ratio.

50.     If the customer's LTV ratio rises above a certain threshold, moreover, then Nexo will, after providing notice to the customer, sell the collateral to the extent necessary to bring the LTV ratio back in line—which sales may result in the liquidation of all of the customer's cryptoassets designated as collateral.

51.     Nexo sets this LTV threshold for liquidation at 83.3%. With respect to the $25,000 Crypto Credit referenced above, for example, Nexo will move assets to cover the requisite LTV ratio if the value of the customer's staked collateral falls below approximately $30,000 and the customer, after given notice, does not supplement the collateral or pay down on the loan.

**B.      Nexo's Suspension of XRP Payments on December 23, 2020**

52.      On December 22, 2020, the SEC announced its action against Ripple Labs Inc. and two of its executives, alleging that since 2013 they had raised over $1.3 billion through their unregistered, ongoing securities offering of XRP. This announcement caused the price of XRP to drop from approximately $0.45 to $0.21 within a few hours on the following day.

53.      Seeing the price of XRP drop on December 23, Nexo immediately suspended customers' use of XRP to stake or pay down on loans, and did so without providing notice of the suspension. That is, in Nexo's subsequent words, it imposed "a temporary suspension of the repayments of Nexo crypto credits and the standard Nexo exchange service related to XRP." This suspension in fact has remained in place since December 23.

54.      Nexo initiated the suspension of XRP payments because it did not want to be left holding XRP at its decreased value—not because the SEC's announcement had in any way precluded the use or sale of XRP. Indeed, within hours of this suspension, Nexo proceeded to *sell* massive quantities of the XRP held as customer collateral; and Nexo initiated the suspension regardless of the jurisdiction in which the customer was located—which was plainly unnecessary to account for any purported regulatory implications for U.S.-based customers.

**C.      Nexo's Breach of Contract**

55.      Nexo's suspension of XRP payments on December 23, 2020, breached the terms of the parties' agreement, and the implied covenant of good faith and fair dealing thereunder, regarding the customer's maintenance of LTV ratios.

56.      A Nexo customer's contractual right to post collateral or pay down on their loan to maintain the requisite LTV ratio is set forth in the following terms:

a. "Nexo will grant you a Nexo Crypto Credit in Digital Assets, if you provide the required Digital Assets as collateral by transferring them into the Nexo Account ('Collateral')." (Nexo Borrow Terms & Conditions Art. IV.1.)

b. "Digital Assets means any digital assets (such as cryptocurrencies, stablecoins and tokenized assets), accepted by Nexo." (*Id*. Art. II.2.)

c. All such Digital Assets are indicated on the Nexo Platform and in the Nexo Account and are subject to revision from time to time." (*Id*. Art. IV.1.)

d. "The value of the Nexo Crypto Credit shall be calculated by the loan-to-value ratio, as indicated on the Nexo Platform and subject to revision from time to time, ('LTV'), against the value of the Collateral at the time of granting." (*Id*. Art. IV.2.)

e. "You shall at all times maintain the necessary Collateral in accordance with the LTV." (*Id*. Art. IV.3.)

f. "If the LTV increases above certain thresholds, as indicated on the Nexo Platform, you shall, at our request, provide additional Collateral and/or make the required repayments to rebalance the Nexo Crypto Credit." (*Id*. Art. VI.1.)

g. The Borrow Terms and Conditions elsewhere refer to the customer's "obligation to maintain Digital Assets with Nexo considered by Nexo to be acceptable and adequate pursuant to these General Terms." (*Id*. X.1.(b).)

57.   As to the consequences if the customer fails to maintain the requisite LTV ratio: "If the LTV increases above the maximum payment threshold, as indicated on the Nexo Platform, Nexo shall, after notifying you, liquidate the necessary amount of Collateral to rebalance your Nexo Crypto Credit." (*Id*. Art. VI.2.)

58.     Nexo's Borrow Terms and Conditions thus permit the Nexo customer to maintain the requisite LTV ratio by posting additional collateral and/or making repayments with the digital assets indicated on the Nexo Platform—subject, in Nexo's view, to its discretion regarding what digital assets will be "accepted" and "acceptable."

59.     As of December 23, 2020, Nexo had long "accepted" XRP as collateral and payment and thus held massive quantities of XRP as customers' collateral. As of that date, XRP was "indicated" on the "Nexo Platform" as a Digital Asset. To the extent that XRP remained thus indicated on the Nexo Platform as a Digital Asset throughout the day, Nexo breached the plain terms of its contract by precluding its customers from using XRP to post additional collateral and/or make repayments.

60.     Just as fundamental, if Nexo acted in bad faith on December 23 by removing XRP as an "acceptable" Digital Asset on the Nexo Platform, then it breached the implied covenant of good faith and fair dealing that restricts Nexo's discretion to determine the "accepted" Digital Assets on any given day. Plaintiff shows below that Nexo did act in bad faith.

61.     Nexo also breached the following material term of the parties' agreement: "You may repay at any time prior to the Maturity Date and any amount: (i) by transferring into the Nexo Account the same Digital Assets as the Nexo Crypto Credit granted, or other Digital Assets acceptable to Nexo; (ii) with the Collateral; or (iii) by combination of (i) and (ii)." (Nexo Borrow Terms & Conditions Art. VIII.2.)

62.     Nexo's suspension of XRP payments on December 23 also constituted a breach of contract because Nexo failed to provide any notice to customers of the suspension of XRP payments, in the following form: "Any notice required or made under these General Terms from Nexo to the Client shall be considered validly received when addressed to the Client's last-used e-

mail address, mailing address or phone number. Additionally, we may provide notices through posting on the Nexo Platform." (Nexo Borrow Terms & Conditions Art. XIV.1.)

63.     These material breaches of contract, under well-established principles of contract law that apply under state common law, excused the contractual obligations of Nexo customers affected thereby—namely, the hundreds of Nexo customers who could have used XRP to maintain their LTV ratios. In particular, Nexo's breaches excused any obligation these customers had to maintain their LTV ratios.

64.     In seeking to defend its suspension of XRP payments, Nexo publicly insisted on December 30, 2020, that it had the contractual right to do so and that it met all of its contractual obligations. Nexo's protestations are wrong for at least three main reasons.

65.     *First*, Nexo did not have the unfettered right to suspend XRP payments for any reason of Nexo's choosing. Nexo says the following in its Borrow Terms & Conditions: "At any time, at our sole and absolute discretion, without liability to you, we can: (i) refuse your request for granting of a Nexo Crypto Credit; (ii) change the conditions for entering into the Agreement or use of the Nexo Crypto Credit; (iii) suspend the provision of the Nexo Crypto Credit or of all or part of the other Nexo services; or (iv) change, update, remove, cancel, suspend, disable or discontinue any features, component, content, incentive or referral plan of the Nexo Crypto Credit." (Nexo Borrow Terms & Conditions Art. III.3.)

66.     Under the common law across states, however, a provision affording such discretion is subject to the implied covenant of good faith and fair dealing. This is because, absent such an implied covenant, a provision affording one counterparty the sole discretion whether to take actions fundamental to the agreement would render the agreement illusory and reflect that the counterparty had given no consideration at all.

67.     In short, if Nexo were afforded the right under the law indefinitely to "suspend the provision of the Nexo Crypto Credit or of all or part of the other Nexo services" or "suspend . . . any features . . . of the Nexo Crypto Credit" at any time and for any reason, then any contractual rights that Nexo customers have regarding the Nexo Crypto Credit would be merely illusory and Nexo would have given no consideration.

68.     This same analysis applies to other provisions in the Borrow Terms and Conditions that Nexo cited on December 30 (and called the "GTC") in seeking to defend its conduct. According to Nexo's statement, the relevant provisions provided in sum that "it shall be emphasized that the GTC provide for Nexo's right to change the conditions for use of the Nexo crypto credits; suspend the provision of the Nexo crypto credits or of all or part of the other Nexo services; change, update, remove, cancel, suspend, disable or discontinue any feature, aspect, component, content, incentive or referral plan of the Nexo crypto credits at any time, without any liability to its clients, without notice and for whatever reason, including in order to comply with any applicable law, regulator's requirement or act of a court."

69.     If Nexo were afforded such unlimited and expansive rights under the law with respect to the Nexo Crypto Credit, at any time and for any reason, then any contractual rights that Nexo customers have regarding Nexo Crypto Credit would be merely illusory and Nexo would have given no consideration.

70.     *Second*, Nexo imposed the suspension in bad faith and dishonestly. The implied covenant of good faith and fair dealing imposed on Nexo the obligation to act fairly and honestly and not to take any steps that would have the effect of destroying the contractual rights of its customers or to prevent its customers from receiving the fruits of their contractual relationship

with Nexo. These standards thus apply to Nexo's discretion to determine what Digital Assets will be deemed "accepted" for posting collateral and/or making repayments to maintain LTV ratios.

71.    Nexo did not meet these standards. Instead, Nexo acted in an unfair and dishonest manner: Nexo suspended XRP payments on the premise that it would not treat XRP as a store of value to permit customers to reduce their loan exposure—but then *itself* proceeded to sell off XRP for substantial value to reduce its *own* loan exposure.

72.    Indeed, Nexo's own account of its conduct, set out in its December 30 public statement seeking to justify its decisions on December 23, was that because Nexo "acquires the ownership of the collateral while the Nexo crypto credit is outstanding, when liquidations are effected, Nexo disposes of its own digital assets."

73.    Nexo thus had no issue with the sales of XRP as such through the Nexo platform; it just wanted to reserve for *itself* the capacity to make such sales, at its customers' expense, without disclosing such intent. Nexo's motivation in imposing the suspension of XRP payments thus was not to protect the Nexo service or other Nexo customers, but rather—at the expense of its customers—to minimize its own prospective losses from accepting or holding XRP.

74.    If Nexo had acted in good faith and honestly on December 23, either it would not have precluded customers from using XRP to pay back on their loans, or having made the decision to preclude such payments, it would not then have sold customers' XRP held as collateral towards maintaining the requisite LTV ratios.

75.    If Nexo had acted in good faith and honestly on December 23, in short, it would have treated XRP as a viable, transferrable store of value for either neither counterparty or both counterparties. Nexo's asymmetrical treatment of XRP, to Nexo's benefit and its customers' detriment, was unprincipled, unjustified, and in bad faith.

76.     If Nexo had acted in good faith and honestly on December 23, it would have not suspended transactions for international consumers. The fact that it did not limit its actions to U.S. customers evidences that Nexo's intent was to benefit and enrich itself to its customers' detriment.

77.     Nexo's December 30 public statement seeking to justify the suspension served only to underscore their lack of good faith, because Nexo repeatedly and incorrectly suggested that the suspension was legally necessary to account for XRP's legal status.

78.     Nexo thus referenced in its December 30 statement "compliance issues," "adhering to the applicable laws and regulations in the jurisdictions we operate in," any "adverse effect on our regulatory status," potential exposure to "administrative and court proceedings involving digital assets supported by us," "significant uncertainty as to the treatment of the SCRP and the transactions with it," and the prospect that "numerous transactions with the above type of digital asset between different market participants may need to be reversed, which will lead to chaos in the blockchain space and claims for damages suffered by all of them."

79.     These suggestions that the SEC's announcement of its allegations against Ripple indicated that it would somehow be unlawful or legally risky for Nexo to permit XRP payments or for customers to initiate them—but somehow lawful and legally riskless for *Nexo* to *sell* XRP— were false, and Nexo knew or recklessly failed to know that they were false. These pretextual, false explanations for Nexo's motives to suspend XRP payments on December 23 thus underscore Nexo's bad faith in imposing the suspension.

80.     *Third*, Nexo failed to provide customers with notice of the suspension of XRP payments, and its failure to do so was in bad faith. Nexo did not send any notice to customers' emails or phone numbers (nor send any notice to customers' mailing addresses), and did not provide notice on the "Nexo Platform" that it had suspended XRP payments.

81.     This notice requirement, if not set forth in the applicable terms and conditions, existed under the implied covenant of good faith and fair dealing.

82.     As to an express notice requirement, Nexo's Borrow Terms and Conditions provide: "If the LTV increases above certain thresholds, as indicated on the Nexo Platform, you shall, at our request, provide additional Collateral and/or make the required repayments to rebalance the Nexo Crypto Credit." (Nexo Borrow Terms & Conditions Art. VI.1.)

83.     The Borrow Terms and Conditions further state: "If the LTV increases above the maximum permitted threshold, as indicated on the Nexo Platform, Nexo shall, after notifying you, liquidate the necessary amount of Collateral to rebalance your Nexo Crypto Credit." (*Id.* Art. VI.2.)

84.     Nexo did not provide its customers with notice on December 23 that it would liquidate their XRP collateral to rebalance their Nexo Crypto Credits.

85.     The Borrow Terms & Conditions further provide: "We may be forced to suspend or discontinue or to change aspects of the Nexo Crypto Credit or any of our services in any jurisdictions if demanded by the regulators or Applicable Law, without notice and for whatever reason. In such case the Digital Assets in your Nexo Account may be frozen for an indefinite period of time until the matter is resolved." (Nexo Borrow Terms & Conditions Art. XI.3.)

86.     The SEC's announcement, however, did not constitute any demand by the regulators or by any Applicable Law to suspend XRP payments. The condition precedent in the forgoing provision thus was not met, and therefore Nexo's suspension of XRP payments required notice. In addition, Nexo did not proceed to freeze the Digital Assets in customers' Nexo Accounts; instead, to maintain the requisite LTV ratios, Nexo proceeded to sell customers' XRP.

87.     Independent of the forgoing, moreover, under basic principles of contract interpretation, the specific provisions in the Borrow Terms and Conditions promising notice of

increasing LTV ratios approaching the applicable thresholds and prospective liquidations, addressed above, trumps the general provision regarding the suspension, discontinuance, or changes in aspects of the Nexo Crypto Credit.

88.     As to a notice requirement under the implied covenant, if Nexo were afforded the absolute right to suspend services regarding Nexo Crypto Credit—as purportedly reflected in Nexo's Borrow Terms and Conditions and public summary of those purported rights on December 30—without any notice to its customers, then any contractual rights that Nexo customers have regarding Nexo Crypto Credit would be merely illusory.

89.     Without notice of the suspension of XRP payments, or its potential consequences, Nexo customers did not understand that they were precluded from using XRP to pay down their loans and that, if they wanted to avoid losses on or liquidations of their cryptoassets on Nexo, they needed to find other assets with which to pay down their loans or supplement their collateral.

90.     Without notice of the suspension of XRP payments, Nexo customers unwittingly failed to use other digital assets or cash to post collateral or pay down their loans and thereby maintain the requisite LTV ratios, resulting in losses on and liquidations of their cryptoassets.

91.     Nexo's failure to provide such notice was thus unfair, had the effect of destroying the contractual rights of Nexo customers, and prevented Nexo customers from receiving the fruits of their contractual relationship with Nexo.

92.     Indeed, in its December 30 public statement seeking to justify the suspension of XRP payments, Nexo did not even *attempt* to explain why it was unable to provide notice, or how its failure to provide such notice was not problematic from any legal perspective. This is because, at bottom, there was no good-faith reason for Nexo to decline to provide such notice.

93.     Nexo's forgoing breaches of contract harmed at least hundreds of Nexo's customers. Many Nexo customers who nevertheless sought to maintain their LTV ratios on the heels of the XRP suspension, moreover, were effectively locked out of doing so. Customers who had used XRP as collateral could neither use their XRP to pay down their loans nor sell their XRP on the market and use the proceeds to maintain their LTV ratios: any customer who removed their XRP from the Credit Line Wallet risked causing their LTV ratio to increase such that Nexo would liquidate that collateral. Customers who could have used XRP to post as supplemental collateral or to pay down their loans were unable to do so; Nexo liquidated their collateral and kept the proceeds for itself. Nexo thus effectively prohibited these customers from maintaining their LTV ratios and then punished them for not maintaining their LTV ratios.

94.     Many Nexo customers whose collateral was not entirely liquidated on December 23 as a result of the XRP suspension, for example, were nevertheless foreseeably locked into unfavorable LTV ratios in the days that followed. The process of converting digital assets into cash and then using that cash on the Nexo platform to pay down loans takes as much as a week. Accordingly, whatever their cash reserves (many of which were insufficient in any event), many customers who were not entirely liquidated on December 23, but whose Nexo wallets or other accounts did not contain digital assets other than XRP to post as sufficient collateral, were liquidated when the price of XRP continued to fall—for example, to $0.17 on December 29.

### D.     Nexo's Sale of Customer Collateral

95.     Nexo was not entitled, following the XRP suspension on December 23, 2020, to liquidate the collateral of customers who could have used XRP to supplement their collateral or pay down on their loans. This is true for two reasons.

96.     *First*, Nexo sold this XRP on the premise that its affected customers that day were obligated to have maintained their LTV ratios on pain of liquidation of their collateral, but, as

shown above, Nexo's material breaches of contract in connection with suspending the use of XRP for payment meant that its affected customers were *not* obligated to maintain their LTV ratios.

97.     *Second*, Nexo sold this XRP on the further premise that in doing so it was exercising the rights of "ownership" over the collateral that it had purportedly acquired when its customers posted the collateral, but under the law Nexo held no such rights.

98.     The affected Nexo customers therefore are entitled to recover the value of their XRP as of the suspension and of their collateral that Nexo liquidated as a result of the suspension, both to afford them the benefit of their bargain under the Borrow Terms and Conditions and to give them the full restitution of the value of their property that Nexo unlawfully claimed and monetized for itself.

99.     In its public statement on December 30, Nexo claimed it was entitled to sell XRP as it did on December 23 because it supposedly owned the XRP held as collateral: "Taking into consideration the fact that by virtue of the GTC Nexo acquires the ownership of the collateral while the Nexo crypto credit is outstanding, when liquidations are effected, Nexo disposes of its own digital assets rather than rendering services to its clients, as it is the case with the repayments and the standard Nexo exchange service."

100.     Nexo thus referred to the following provision in the Nexo Borrow Terms and Conditions: "Unless prohibited by any Applicable Law, by virtue of this Agreement Nexo acquires the ownership of the Collateral while the Nexo Crypto Credit is outstanding." (Nexo Borrow Terms & Conditions IV.4.) Nexo's reliance on this provision is unavailing for three main reasons.

101.     *First*, especially when applied in the context of other Borrow Terms and Conditions, the provision regarding Nexo's "ownership" of collateral is unconscionable and thus no defense to Nexo's improper disposition of its customers' XRP collateral.

102.   If Nexo were to acquire the "ownership" of the cryptoassets that Nexo customers post as collateral, this would be an extremely unfair result that unreasonably favors Nexo over its customers and that resulted from the Nexo customer's lack of reasonable choice or negotiating power over the terms and conditions that Nexo imposes on customers without any negotiation.

103.   Nexo's acquisition of such "ownership" would be extremely unfair and unreasonably favorable to Nexo as a threshold matter because of the patently unfair price at which Nexo would have acquired such ownership. At an LTV ratio of 50%, for example, using market prices on which the counterparties agree, a Nexo customer posts $50,000 worth of cryptoassets for $25,000 in cash. If Nexo has thereby acquired the "ownership" of such cryptoassets, it had done so for merely *half* of its agreed-upon market value. This would be an absurd result.

104.   This extreme unfairness and absurdity is even more pronounced when considered in the context of the further rights that Nexo claims, and has sought to make enforceable in its agreements with customers, "to change the conditions for use of the Nexo crypto credits; suspend the provision of the Nexo crypto credits or of all or part of the other Nexo services; change, update, remove, cancel, suspend, disable or discontinue any feature, aspect, component, content, incentive or referral plan of the Nexo crypto credits at any time, without any liability to its clients, without notice and for whatever reason, including in order to comply with any applicable law, regulator's requirement or act of a court."

105.   If these contractual provisions were collectively enforceable, then Nexo would have secured, for example, the contractual right to (a) buy the Nexo customer's supposed crypto "collateral" for half of its market value; (b) suspend the customer's right to recover the supposed "collateral," contrary to what the parties had agreed, for any reason that Nexo saw fit; (c) not give the customer any notice of this suspension; and (d) then sell the supposed "collateral" at its market

value for any reason that Nexo saw fit. Indeed, by its lights, Nexo could do this from day-to-day and from customer-to-customer. This illustrates how the contractual rights that Nexo claims under the Borrow Terms and Conditions are unconscionable and unenforceable.

106.    *Second*, the provision regarding Nexo's "ownership" of collateral is completely ambiguous and thus unenforceable on that additional basis.

107.    Under the provision, as noted, Nexo purports to acquire "ownership of the Collateral while the Nexo Crypto Credit is outstanding," but with the caveat "Unless prohibited by any Applicable Law." Accordingly, to know whether they are selling their crypto to Nexo for their Crypto Credit, Nexo customers would need to be able identify the "Applicable Law" and the substance of that law.

108.    The Nexo Borrow Terms and Conditions, however, neither identify any "Applicable Law" nor provide any facts by which Nexo customers could identify such law. Referring to themselves as the "General Terms," the Borrow Terms and Conditions state in relevant part: "The Agreement shall be governed exclusively by the substantive law of Nexo jurisdiction." (Nexo Borrow Terms & Conditions Art. XV.1.) The Borrow Terms and Conditions, however, nowhere define "Nexo jurisdiction."

109.    The general Nexo Terms and Conditions, separate from the Borrow Terms and Conditions, are no more helpful. They state: "These Terms will be governed by and construed in accordance with the laws of the Website Owner's jurisdiction, and you submit to the non-exclusive jurisdiction of the Website Owner's jurisdiction for the resolution of any disputes." (Nexo General Terms & Conditions Art. 13.) These terms and conditions, however, do not define "Website Owner" or identify the "Website Owner's jurisdiction."

110.    Nexo thus does not provide any clear notice of what may constitute the "Nexo jurisdiction," or thus of what may constitute the "Applicable Law" under which Nexo may not have acquired ownership of the customers' posted "collateral," and there is no basis for deeming the parties to have reached any meeting of the minds regarding any "Applicable Law."

111.    In short, a Nexo customer cannot reasonably discern from the applicable contract whether Nexo has or has not acquired ownership of the customer's collateral in exchange for the Crypto Credit. This ambiguity in the provision, and in the assessment of Nexo customers' contractual rights, makes the provision unenforceable, including because there is no evidence that the parties reached any meeting of the minds on the state of their respective rights—or even how to determine the law that would resolve those rights.

112.    *Third*, under Nexo's interpretation of the provision regarding Nexo's "ownership" of collateral, the Borrow Terms and Conditions as a whole, including as coupled with Nexo's other advertising, were likely to mislead a reasonable consumer and Nexo's imposition of them violated and violate California's Unfair Competition Law.

113.    Nexo's homepage touts the following: "Instant Crypto Credit Lines. Borrow cash or Stablecoins from 5.9% APR, without selling your crypto." https://nexo.io/borrow. The homepage then provides a link to "Start Borrowing." Addressing the assets that can be used for such borrowing, the homepage identifies the "Supported Assets" it accepts with this further advertising: "Get cash, keep your crypto using a variety of supported collateral options." (*Id*.) This language in no way suggests that posting collateral will grant Nexo "ownership" over that collateral; the language presupposes the *opposite*.

114.    This homepage advertising is consistent with Nexo's whitepaper, available on the Nexo.io website, which identifies the following "crucial inefficiency for the crypto world. Up to

this very moment, no alternatives existed for digital asset owners to enjoy their crypto wealth except selling them." (https://nexo.io/assets/downloads/Nexo-Whitepaper.pdf.)

115.    The Nexo whitepaper thus identifies "Loss of Ownership" as the central "Problem" to be solved, in that "to benefit from the intrinsic value of their digital asset, the owners only have the limited option of selling them for fiat currencies." *Id*. The whitepaper then proposes as the "Solution" the following: "Clients retain 100% ownership of their digital assets. By making use of Nexo's instant crypto loan rather than selling, they keep the entire capital gains and accompanying benefits from their digital assets. Nexo's clients can enjoy their crypto wealth immediately, without having to sell their digital assets." (*Id*.)

116.    Comparing "Nexo vs. Traditional Lending," the whitepaper distinguishes "Nexo Instant Crypto-backed Loans" as having this advantage (among others): "Keep Asset Ownership." *Id*. Comparing "Nexo vs. Alternative Financing Options," the whitepaper distinguishes the "Nexo Crypto-backed Loan" as *not* involving the following: "Sell Asset & Buy Back Later." *Id*. "The cost efficiency of the Nexo instant crypto loans, the flexibility of available funds whenever the customer needs them, and the retained ownership of the digital asset all make Nexo a much better choice to instantly unlock the value of digital assets." (*Id*.)

117.    Consistent with these themes of Nexo's whitepaper, Nexo co-founder Trenchev emphasized in an August 2018 interview with Crypto Rand—which interview Nexo approved and participated in as a form of advertisement intended to reach the United States—that Nexo's service does not require any transfer of ownership: "In the broader sense, we offer digital asset holders immediate access to liquid funds without selling. This allows them to keep the ownership over their holdings and enjoy any potential future appreciation of their value, so anyone really who has crypto assets is a potential client."

118.     Consistent with this language and advertising, Nexo's Borrow Terms and Conditions repeatedly use "collateral" consistent with its well-established definition as "property that is pledged as security against a debt." *Black's Law Dictionary* 297 (9th ed. 2009). These terms and conditions state to customers:

a.   Nexo will provide you with "Crypto Credit" in digital assets "if you provide the required Digital Assets as collateral." (Nexo Borrow Terms & Conditions Art. IV.1.) This is the "Collateral." (*Id.*)

b.   Nexo will calculate the value of your Crypto Credit based on "the loan-to-value ratio," calculated "against the value of the Collateral at the time of granting." (*Id.* Art. IV.2.)

c.   Nexo requires: "You shall at all times maintain the necessary Collateral in accordance with the LTV." (*Id.* Art. IV.3.)

d.   Nexo further requires: "If the LTV increases above certain thresholds, as indicated on the Nexo Platform, you shall, at our request, provide additional Collateral and/or make the required payments to rebalance the Nexo Crypto Credit." (*Id.* Art. VI.1.)

e.   Nexo further provides: "If the LTV increases above the maximum permitted threshold, as indicated on the Nexo Platform, Nexo shall, after notifying you, liquidate the necessary amount of Collateral to rebalance your Nexo Crypto Credit." (*Id.* Art. VI.2.)

f.   "Once the Nexo Crypto Credit has been repaid in full, all remaining Collateral shall be transferred back to the Client's Nexo Account." (*Id.* Art. VIII.4.)

119.    All of the forgoing terms and conditions convey to a reasonable Nexo customer that they are pledging their cryptoassets as security against the debt reflected in the Crypto Credit— not that they are *selling* their cryptoassets to Nexo.

120.    This impression is consistent with still further statements in Nexo's whitepaper, explaining how the Nexo borrowing services avoids tax problems associated with the sale of digital assets. The whitepaper explains that "selling a digital asset triggers tax liabilities"; that selling a given digital asset "results in a substantial decrease of the realized profit"; that this reality "renders the entire approach of selling a digital asset to meet a short-term need for liquidity an expensive and tax-inefficient solution"; that "the process of selling leaves the crypto owner in search of a better alternative to unlock the value of his or her digital assets"; and that Nexo's services offer that better alternative. (https://nexo.io/assets/downloads/Nexo-Whitepaper.pdf.)

121.    The provision in the Nexo Borrow Terms and Conditions regarding Nexo's purported "ownership" of collateral hardly changes this reasonable impression, because the provision acknowledges that such ownership may not exist under "Applicable Law" and then, as noted, fails to permit a reasonable customer even to discern what Nexo regards as such law.

122.    Indeed, in an interview on February 6, 2020, Nexo co-founder Trenchev echoed these themes in the advertisement of Nexo's Crypto Credit service in stating during a Bloomberg interview that a "great" aspect of Nexo's "crypto-backed loans" is that "you tap into your crypto wealth without actually having to sell your crypto."

123.    In short, if the provision regarding Nexo's purported "ownership" of collateral were for some reason deemed enforceable, then in violation of California's Unfair Competition Law, Nexo would have imposed Borrow Terms and Conditions that were likely to mislead reasonable

customers into concluding that they had posted their cryptoassets with Nexo as collateral, not conveyed to Nexo "ownership" of those assets.

124.    The notion that Nexo acquires "ownership" of its customers' digital assets during their use of the Nexo Crypto Credit not only is completely inconsistent with this advertising, but— as Nexo's own whitepaper indicates—would raise serious questions about the tax consequences for both Nexo and its customers if such a change in ownership were actually effected.

125.    These questions are of a national scope, because they concern the tax consequences for Nexo's thousands of customers throughout the country who must file their taxes with the Internal Revenue Service ("IRS"). That is, Nexo has not claimed merely a right to rehypothecate posted collateral; it has claimed "ownership" over the collateral.

126.    Under the well-established "substance over form" doctrine, which both the IRS and the courts apply, if Nexo regards itself as having acquired rights of "ownership" over customer collateral assets while the corresponding Crypto Credit is in place, then it would follow that in substance the customer has *sold* those assets to Nexo.

127.    If such a sale occurs when a Nexo customer posts their collateral, the sale—as Nexo itself notes in its whitepaper—"triggers tax liabilities." The price at which the customer bought the assets and the price at which Nexo has acquired rights of "ownership" over them would dictate whether the customer has realized a "loss" or a "gain" on the sale of those assets.

128.    And when the Nexo customer stops using the Crypto Credit, the customer regains the rights of "ownership" over those digital assets: "Once the Nexo Crypto Credit has been repaid in full, all remaining Collateral shall be transferred back to the Client's Nexo Account." (Nexo Borrow Terms & Conditions Art. VIII.4.) In that event, as a matter of substance, it would follow that Nexo has sold those assets to the customer, in the amount of the value of those assets.

129.   This sale would again trigger "tax liabilities." The price at which Nexo bought the assets and the price at which the customer has acquired rights of "ownership" over them would dictate whether Nexo has realized a "loss" or a "gain" on the sale of those assets.

130.   Under this "substance over form" analysis, moreover, Nexo's claim of "ownership" must be read in conjunction with its purported rights to "to change the conditions for use of the Nexo crypto credits; suspend the provision of the Nexo crypto credits or of all or part of the other Nexo services; change, update, remove, cancel, suspend, disable or discontinue any feature, aspect, component, content, incentive or referral plan of the Nexo crypto credits at any time, without any liability to its clients, without notice and for whatever reason, including in order to comply with any applicable law, regulator's requirement or act of a court."

131.   In a scenario in which Nexo claims to have "ownership" rights at the same time that it can, without notice, change any aspect or feature of the crypto credits such that the Nexo customer is not even entitled to recover their posted collateral, then in "substance"—and by its own lights—Nexo may freely exercise all of the attributes and enjoy all of the benefits of "ownership" over the customers' digital assets posted as collateral.

132.   The conscionable interpretation of the Nexo Borrow Terms and Conditions, as set forth above, is that Nexo is not entitled to exercise such rights of "ownership" over digital assets posted as "collateral" for loans, and that it is not entitled to change any material conditions for the use of the Nexo Crypto Credit; to suspend the provision of the Crypto Credit; or to change, suspend, disable, or discontinue any features or content of the Crypto Credit for any reason it chooses and without providing notice of such changes to its customers.

133.   The question of whether Nexo acquires rights of "ownership" of the customer collateral posted in support of the customer's Crypto Credit thus presents an important economic and tax-related issue for Nexo and its customers alike.

E.   **Plaintiff's Damages and Right to Relief**

134.   Plaintiff suffered damages from and is entitled to full restitution for Nexo's misconduct on December 23, 2020, and thereafter and from the resulting harm.

135.   Plaintiff lost his collateral of 598,384.6188 XRP, at a market value of approximately $269,300 (less his outstanding loan amount of approximately $169,400); and used the following digital assets in the following amounts to pay down his loans: 47,190.47043 XLM (Lumen) (market value of approximately $6,000), 0.009255 BTC (bitcoin) (market value of approximately $215), 6.1673 ETH (Ether) (market value of approximately $3,600), and 168.18851 LNK (Link) (market value of approximately ($1,800).

136.   If Plaintiff had received the benefit of his bargain with Nexo, he would not have suffered these losses. Instead, he would have had the full value of the XRP held as his collateral and of his other digital assets.

137.   Plaintiff's losses and entitlement to restitution are typical of similarly affected Class and Subclass members. That is, the affected Nexo customers are entitled to recover the value of their liquidated collateral both to afford them the benefit of their bargain under the Borrow Terms and Conditions and to give them the full restitution of the value of their property that Nexo unlawfully claimed and monetized for itself.

138.   On behalf of the Classes and Subclasses, Plaintiff is also entitled, on the grounds set forth further below, to declaratory and injunctive relief.

139.   Plaintiff is entitled to a declaration regarding the parties' respective contractual rights and obligations under the Borrow Terms and Conditions, under circumstances in which the

suspension of XRP payments remains in place and in which Nexo is imminently likely to invoke the disputed Terms and Conditions in its favor and against their interests.

140.    Plaintiff is entitled to an injunction because he faces the imminent prospect of irreparable harm in the likely event—including because of the uncertain regulatory status of many currently "acceptable" digital assets on the Nexo platform—that Nexo invokes the unconscionable provisions of the Nexo Borrow Terms and Conditions that it invoked on December 30, 2020.

141.    As to the equitable relief that Plaintiff seeks, moreover, as Nexo itself indicated in a recent press release, there is "increased demand for Nexo services from California-based retail customers and institutions." (https://apnews.com/press-release/business-wire/technology-sports-cfl-football-north-america-football-bcecd0320e16478b97cce3c7c659a846.) This fact underscores the customer and public interest in the declaratory and injunctive relief that Plaintiff seeks.

## V.    CLASS ALLEGATIONS

142.    Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 and seeks certification of the following classes and subclasses:

> Damages Class: All persons who reside in the United States who suffered damages from breach of contract arising from Nexo's suspension of XRP payments on December 23, 2020, and thereafter.

> Equitable-Relief Class: All persons who reside in the United States and who are using Nexo's Crypto Credit.

> The California UCL Subclass: All persons in the Damages Class who reside in California and who are entitled to restitution under California's Unfair Competition Law.

> The California CLRA Subclass: All persons in the Equitable-Relief Class who reside in California and who seek injunctive relief under the California Consumer Legal Remedies Act.

143.     Defendants, their officers and directors, their legal representatives, members of Defendants' immediate families, Defendants' heirs, successors and assigns, and any entity in which Defendants have or had a controlling interest are excluded from the Classes and Subclasses.

144.     Plaintiff may amend the Class and Subclass definitions if investigation or discovery indicate that the definitions should be narrowed, expanded, or otherwise modified.

145.     The Class and Subclass members are so numerous that joinder of all members is impracticable.  The precise number of Class and Subclass members is unknown to Plaintiff at this time, but it is believed to be in the thousands.

146.     The Class and Subclass members are readily ascertainable and identifiable. They may be identified through online contacts and fora. They may be notified of the pendency of this action by electronic mail using a form of notice customarily used in class actions.

147.     Plaintiff's claims are typical of the claims of the Class and Subclass members, who are similarly affected by Defendants' respective wrongful conduct.  Plaintiff does not have any interest that is in conflict with the interests of the Class or Subclass members.

148.     Plaintiff has fairly and adequately protected, and will continue to fairly and adequately protect, the interests of the Class and Subclass members and has retained counsel competent and experienced in class actions and cryptocurrency-related litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Classes or Subclasses.

149.     Common questions and answers of law and fact exist as to the Class and Subclass members and predominate over any questions solely affecting individual Class or Subclass members, including but not limited to the following:

- Whether Nexo has breached its Borrow Terms and Conditions, including the implied covenant of good faith and fair dealing thereunder, by suspending XRP payments as it did;

- Whether Nexo breached its Borrow Terms and Conditions, including the implied covenant of good faith and fair dealing thereunder, on December 23, 2020, by failing to give notice of its suspension of XRP payments;

- Whether Nexo was entitled to exercise purported contractual rights of ownership over Nexo customers' XRP posted as collateral;

- Whether Nexo is obligated to pay to Plaintiff and the Damages Class as damages the value of the collateral that Nexo liquidated as a result of the suspension of the use of XRP for payment, and whether the California UCL Subclass is entitled to such value as restitution;

- Whether Nexo's Crypto Credit customers in the United States are entitled to a declaration that Nexo does not have the right to suspend XRP payments;

- Whether Nexo's Crypto Credit customers in the United States are entitled to a declaration that Nexo does not have the unfettered right to change any material conditions for the use or provision of the Nexo Crypto Credit, or to change, suspend, disable, or discontinue any features or content of the Crypto Credit without providing notice of such changes to its customers;

- Whether Nexo's Crypto Credit customers in the United States are entitled to a declaration that Nexo does not have the unfettered right to suspend Crypto Credit or any of its features or content without notice to its customers and for any reason at all;

- Whether Nexo's Crypto Credit customers in the United States are entitled to a declaration that Nexo does not acquire ownership over their posted collateral;

- Whether Nexo's Crypto Credit customers in the United States are entitled to an injunction precluding Nexo from changing any material conditions for the use or provision of the Nexo Crypto Credit, or changing, suspending, disabling, or discontinuing any features or content of the Crypto Credit, without providing notice of such changes to its customers (and whether the California CLRA Subclass is entitled to such relief); and

- Whether Nexo's Crypto Credit customers in the United States are entitled to an injunction precluding Nexo from exercising any rights of ownership over their collateral (and whether the California CLRA Subclass is entitled to such relief).

150.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. In addition, because the damages suffered by many individual Class or Subclass members may be relatively small, the expense and burden of individual litigation makes it impossible for Class or Subclass members to

individually redress the wrongs done to them or to prevent the wrongs that may be done to them in the future. There will be no difficulty in the management of this action as a class action.

151.    Plaintiff therefore seeks to certify the forgoing Classes and Subclasses pursuant to Rule 23(b)(1)(A), Rule 23(b)(2), and Rule 23(b)(3). Rule 23(b)(1)(A) applies because, with respect to the equitable relief sought herein, individual actions would create a risk of establishing incompatible standards of conduct for the Defendants. Rule 23(b)(2) applies because the equitable relief sought herein is appropriate and applies generally to the Equitable-Relief Class. Rule 23(b)(3) applies because common legal and factual questions predominate over questions affecting only individual class members.

152.    Nexo's Borrow Terms and Conditions purport to include a class action waiver, without any corresponding provision for arbitration, but by its own terms the waiver does not apply. In addition, it reflects no meeting of the minds; is so ambiguous as to fail to give notice to a reasonable reader of Nexo's intent; and is otherwise unenforceable under the applicable common law because it is unconscionable.

153.    The Nexo Borrow Terms and Conditions state in relevant part: "You agree that any dispute resolution proceeding subject to the Applicable Law under the preceding sentence shall be conducted only on an individual basis and not as a plaintiff or class member in any purported class, consolidated or representative action or proceeding. No court or other dispute resolution authority can consolidate or join more than one claim and can otherwise preside over any form of a consolidated, representative, or class proceeding. Any relief awarded cannot affect other Clients of Nexo." (Nexo Borrow Terms & Conditions Art. XV.2.)

154.    These Terms and Conditions further state: "Applicable Law means any law, statute, regulation, ordinance, treaty, guideline, policy and act issued by any governmental or regulatory

authority, including but not limited to the governing law under Art. XV.1. and Art. XV.2. of these General Terms." (Nexo Borrow Terms & Conditions Art. II.1.) These provisions do not preclude Plaintiff's proposed class action.

155.     *First*, the class action waiver is not triggered in the first place, because this action is not a "dispute resolution proceeding subject to the Applicable Law." The Nexo Borrow Terms and Conditions, as explained above, do not specify the "Nexo jurisdiction," so the reference to "the substantive law of Nexo jurisdiction in Art. XV.1," and the reference to "Applicable Law" in Art. XV.2, do not set out any "Applicable Law."

156.     *Second*, as a related point, the Borrow Terms and Conditions do not provide Nexo customers with adequate notice of the class action waiver because, by its own terms, the waiver applies only with respect to a proceeding "subject to the Applicable Law," and there is no specified "Applicable Law." The customer thus cannot reasonably determine the scope of the applicability of the waiver, and there is no basis for concluding that the parties reached any meeting of the minds regarding its applicability. On this independent basis, properly interpreted against Nexo as the drafter, the Nexo Borrow Terms and Conditions set forth no enforceable class action waiver.

157.     *Third*, independent of the forgoing points, the class action waiver in the Nexo Borrow Terms and Conditions is unenforceable. Under the applicable common law, the provision is both procedurally and substantively unconscionable.

158.     The provision is procedurally unconscionable because Nexo presents its Borrow Terms and Conditions on a "take it or leave it" basis. Nexo does not negotiate the Terms and Conditions with its customers. If the prospective customer wants to use the Nexo Crypto Credit, it must agree to the Borrow Terms and Conditions. Nexo and its prospective customers do not have remotely equal bargaining power.

159.    The provision is substantively unconscionable because, untethered to any arbitration provision, it effectively precludes Nexo customers from bringing their claims, which is a harsh and oppressive result, including because it would be economically challenging or even cost-prohibitive for many Nexo customers to bring a claim.

160.    This effective cost prohibition exists not only because of the general background costs of litigation, but also because with defendants based in Bulgaria, Estonia, and Switzerland, each of which requires translation of pleadings under the Hague Convention, the cost of such translation and of serving the defendants would easily exceed many thousands of dollars.

161.    On information and belief, many Damages Class members suffered losses of less than $5,000 from Nexo's misconduct on December 23, 2020, and continued suspension of XRP payments, such that it would be cost-prohibitive for them to bring individual claims against Nexo.

162.    Nexo makes its class action waiver even further substantively unconscionable by coupling it with the following provision: "In no event will our aggregate liability for any loss or damage arising in connection with the Nexo Crypto Credit exceed the fees you paid to Nexo for your use of the services during the 12 month period immediately preceding the event giving rise to the claim for liability." (Nexo Borrow Terms & Conditions Art. XII.5.) This is a harsh and oppressive result as well. On information and belief, many members of the Damages Class paid less than $2,500 in such fees, such that it would be cost-prohibitive for such customers to bring individual claims against Nexo. (Plaintiff does not, of course, concede that this one-sided limitation on aggregate liability will be enforceable.)

163.    Indeed, given Nexo's bad faith in suspending XRP payments, as shown above, the evidence compels the reasonable inference that having imposed on customers a contract of adhesion through the Nexo Borrow Terms and Conditions, Nexo has carried out a scheme to

deliberately cheat large numbers of customers out of individually small sums of money. Nexo understood, for example, that many customers unable to avoid liquidations would not suffer sizeable losses and therefore would face cost-prohibitive individual lawsuits.

164.    As to public policy, moreover, California's consumer-protection statutes serve to redress and preclude precisely this type of misconduct, making Nexo's attempt to preclude any class action under those statutes substantively unconscionable. Nexo should not be permitted, in any significant part, to insulate itself from responsibility for its willful injury to its customers' property. A counterparty may not, through an adhesion contract, require a California resident to waive their right to proceed under California's consumer-protection statutes through a class action.

165.    With respect to California's Unfair Competition Law, for example, if Nexo could contract away its customers' rights to proceed by class action, then Nexo would gain an unfair advantage over its competitors, including in finance lending. With respect to California's Consumer Legal Remedies Act, as a further example, if Nexo could include unconscionable contractual provisions and then contract away its customers' rights to proceed by class action to preclude the enforcement of such provisions, then Nexo would have subverted the policy of precluding the use of unconscionable contractual provisions on a customer-wide basis.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

### BREACH OF CONTRACT
**(On Behalf of the Damages Class)**

166.    Plaintiff incorporates the allegations above.

167.    The Damages Class comprises Nexo customers who suffered damages from Nexo's suspension of XRP payments, from Nexo's failure to give notice of the suspension, or from both.

168.    Nexo's suspension of XRP payments constituted a breach of contract because Nexo failed to provide any notice to customers of the suspension of XRP payments. (Nexo Borrow Terms & Conditions Arts. VI.1, VI.2 & XI.1.)

169.    Nexo's suspension of XRP payments also breached the Nexo Borrow Terms and Conditions, and the implied covenant of good faith and fair dealing thereunder, allowing Nexo customers to use XRP to post collateral or pay down on their loans to maintain the requisite LTV ratio. (Nexo Borrow Terms & Conditions Arts. II.2, IV.1, IV.2, IV.3, VI.1.)

170.    With respect to any member of the Damages Class who sought to pay off their loan with XRP but were precluded from doing so, moreover, Nexo's suspension of XRP payments breached the Nexo Borrow Terms and Conditions on that independent basis. (Nexo Borrow Terms & Conditions Art. VIII.2.)

171.    Nexo's forgoing material breaches of contract excused any obligation by the members of the Damages Class to maintain their LTV ratios. Nexo's subsequent liquidation of the collateral of members of the Damages Class was thus unlawful on that basis, and on the additional basis that Nexo was not entitled to sell off XRP on the purported basis that Nexo owned it. (Nexo Borrow Terms & Conditions Art. IV.4.)

172.    Nexo's forgoing breaches of contract were done intentionally and deliberately, and they deprived Plaintiff and the Damages Class of the benefit of their bargain under the Nexo Borrow Terms and Conditions. Nexo's bad faith precludes the imposition of any exclusion from or limitation of liability in the Nexo Borrow Terms and Conditions.

173.    Accordingly, on behalf of the Damages Class, Plaintiff seeks to recover as damages the value of their bargain under the Nexo Borrow Terms and Conditions, including the full value

of the collateral that Nexo liquidated as a result of the XRP suspension and/or Nexo's failure to give notice of the suspension (less the outstanding loan amounts on that collateral as of breach).

## SECOND CAUSE OF ACTION

### DECLARATORY JUDGMENT
### 28 U.S.C. § 2201(a)
### (On Behalf of the Equitable-Relief Class)

174.    Plaintiff incorporates the allegations above.

175.    Under 28 U.S.C. § 2201(a), an actual controversy exists between the parties with respect to their respective contractual rights.

176.    Nexo has taken the position, including in public statements on December 30, 2020, that it is entitled to suspend customer use of XRP for payments. Plaintiff has disputed Nexo's position publicly and dispute Nexo's position herein.

177.    This dispute, for all the reasons alleged above, frames an important issue of the parties' respective rights and obligations under the Borrow Terms and Conditions.

178.    Accordingly, on behalf of the Equitable-Relief Class, Plaintiff reasonably seeks a declaratory judgment that Nexo is not entitled to suspend customer use of XRP for payments.

179.    Nexo has taken the position, citing advice of counsel, that under its agreement with its borrowing customers, Nexo is entitled to "change the conditions for use of the Nexo crypto credits; suspend the provision of the Nexo crypto credits or of all or part of the other Nexo services; change, update, remove, cancel, suspend, disable or discontinue any feature, aspect, component, content, incentive or referral plan of the Nexo crypto credits at any time, without any liability to its clients, without notice and for whatever reason, including in order to comply with any applicable law, regulator's requirement or act of a court."

180.    Plaintiff and the Equitable-Relief Class, including Nexo customers since this controversy arose on December 23, 2020, dispute that Nexo possesses those rights under its agreement with its borrowing customers, asserting in particular that Nexo may not take any such steps "for whatever reason," without regard to its good faith; and that Nexo may not take any such steps "without notice" to its customers.

181.    Nexo's conduct on December 23 and thereafter was consistent with its forgoing assertion of its purported rights under its agreement with its borrowing customers; and Plaintiff's assertions in this Complaint are consistent with their disagreement with Nexo's claimed rights.

182.    In addition, given that the operation of these contractual rights are central to the relationship between Nexo and its Crypto Credit customers, including Plaintiff and members of the Equitable-Relief Class, and given the uncertain regulatory status of many of the digital assets that Nexo currently deems "acceptable" for use on its platform, the question of the extent of Nexo's contractual rights in this regard is highly likely to continue to arise between the parties.

183.    Accordingly, on behalf of the Equitable-Relief Class, Plaintiff also reasonably seeks a declaratory judgment that, in sum, Nexo does not possess the unfettered right to change any material conditions for the use of the Nexo Crypto Credit; to suspend the provision of the Crypto Credit; or to change, suspend, disable, or discontinue any features or content of the Crypto Credit; and that Nexo may not take any such steps, even in good faith, without providing notice of such steps to its customers.

184.    Nexo has further taken the position, citing advice of counsel, that under its agreement with its borrowing customers, with respect to the collateral they have posted, "Nexo acquires the ownership of the collateral while the Nexo crypto credit is outstanding."

185.    Nexo thus referred to the following provision: "Unless prohibited by any Applicable Law, by virtue of this Agreement Nexo acquires the ownership of the Collateral while the Nexo Crypto Credit is outstanding." (Nexo Borrow Terms & Conditions IV.4.)

186.    Nexo's conduct on December 23 and thereafter was consistent with this forgoing assertion of its purported rights under its agreement with its borrowing customers; and Plaintiff's assertion in this Complaint are consistent with their disagreement with Nexo's claimed rights.

187.    In addition, as noted, the provision on which Nexo has relied contains the express caveat that "Applicable Law" may prohibit its claimed ownership over customer collateral; and, as show above, there is no agreement between the parties as to the "Applicable Law."

188.    In addition, given that the operation of the forgoing contractual rights are central to the relationship between Nexo and its Crypto Credit customers, including Plaintiff and members of the Equitable-Relief Class, the question of the extent of Nexo's contractual rights in this regard is highly likely to continue to arise between the parties.

189.    Accordingly, on behalf of the Equitable-Relief Class, Plaintiff also reasonably seeks a declaratory judgment that, in sum, under the applicable common law, with respect to the collateral that Nexo's customers have posted, Nexo does not acquire the ownership of the collateral while the Nexo Crypto Credit is outstanding.

## THIRD CAUSE OF ACTION

### CALIFORNIA UNFAIR COMPETITION LAW
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(On Behalf of the California UCL Subclass)**

190.    Plaintiff incorporates the preceding paragraphs.

191.    Nexo is a "person" and since December 23, 2020, has engaged in "unlawful" and "unfair" business acts under California's Unfair Competition Law (the "UCL"), Cal. Bus. & Prof.

Code §§ 17200, *et seq.*, by suspending in bad faith XRP payments on Nexo, without notice to Nexo customers, and by liquidating collateral on the purported basis that Nexo owned it.

192.    Nexo's conduct on December 23 and thereafter has been "unlawful" because it constituted breach of contract under the applicable common law. In the alternative, if Nexo's conduct did not constitute such a breach, it was unlawful because it was based on unconscionable contractual provisions in Nexo's Borrow Terms and Conditions.

193.    That is, under California's Consumers Legal Remedies Act, Cal. Bus. & Prof. Code § 1770(a)(19), 27(b)(1), any contractual provision purporting to afford Nexo the unfettered right to suspend Crypto Credit or any of its features or content without notice to its customers and for any reason at all is unconscionable and unenforceable, as is the contractual provision purporting to afford Nexo "ownership" over the cryptoassets that Nexo customers post as "collateral."

194.    Nexo's suspension of XRP payments was "unfair" because Nexo's reasons, justifications, and motives for its conduct did not counterbalance its substantial financial impact on its victims. Nexo's suspension of XRP payments was substantially injurious to its customers and unscrupulous, and Nexo initiated the suspension in bad faith, for its own financial benefit at the expense of Nexo customers, without any need to do so under any applicable law or regulatory requirement. Nexo's subsequent efforts on December 30, 2020, to suggest otherwise served to underscore the unfairness of its conduct.

195.    Nexo's failure to provide notice of the suspension of XRP payments on December 23 was also "unfair." Nexo's failure to do so was substantially injurious to its customers and unscrupulous, in that providing such notice would not have been burdensome and there was no justifiable reason to decline to provide such notice in regard to any applicable law or regulatory requirement, or in regard to the protection of Nexo's customers as a whole.

196.    Nexo also engaged in "deceptive" and "misleading" advertising, as shown above, by using language on its website, in its whitepaper, and in online interviews likely to deceive reasonable customers into concluding that in using the Nexo Crypto Credit, they would be pledging their cryptoassets as security against the debt reflected in the Crypto Credit—not *selling* their cryptoassets to Nexo by afford Nexo "ownership" over the assets.

197.    The provision in Nexo's Borrow Terms and Conditions regarding Nexo's purported "ownership" of Collateral hardly changes this reasonable impression, because the provision acknowledges that no such ownership may exist under "Applicable Law" and then, as noted, fails to permit a reasonable customer even to discern what Nexo regards as such law.

198.    The California UCL Subclass is entitled to restitutionary disgorgement for Nexo's unlawful and unfair acts; for reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; and for equitable relief.

199.    The California UCL Subclass is entitled to restitutionary disgorgement for the value of the collateral over which the members retained ownership and that Nexo wrongly liquidated resulting from the suspension of XRP payments (less the outstanding loan amounts on that collateral as of breach).

200.    The California UCL Subclass is entitled to an injunction precluding Nexo from suspending its borrowing services in bad faith and without notice, and precluding Nexo from liquidating Nexo customers' collateral on the purported basis that Nexo owns it.

201.    If an injunction is not issued, the California UCL Subclass members will suffer irreparable injury, and lack an adequate legal remedy, in the event of Nexo's subsequent invocation of the contractual provisions at issue against the interests of the Subclass.

202.     The risk of Nexo invoking these provisions, given their centrality to the Nexo Crypto Credit service, and given the uncertain regulatory status of many of the digital assets that Nexo currently deems "acceptable" for use on its platform, is real and substantial. If another such invocation occurs, Subclass members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

203.     The economic hardship to the Subclass members if an injunction does not issue exceeds the hardship to Nexo if an injunction is issued. The cost to Nexo of complying with an injunction by not enforcing these contractual provisions is far less than the loss to the Subclass if Nexo is permitted to liquidate its customers positions without notice in the future.

204.     Issuance of the requested injunction will not disserve the public interest, because the public comprises a substantial number of current and prospective Nexo customers, all of whom are likely to benefit personally from enjoining Nexo's reliance on contractual provisions that are extremely unfair and that unduly serve to benefit Nexo.

205.     Accordingly, on behalf of the California UCL Subclass, Plaintiff seeks the forgoing relief under the UCL, as well as attorneys' fees for conferring a benefit on a large class of persons.

### FOURTH CAUSE OF ACTION

### CALIFORNIA CONSUMER LEGAL REMEDIES ACT
**Cal. Civ. Code §§ 1750, *et seq*.**
**(On Behalf of the California CLRA Subclass)**

206.     Plaintiff incorporates the preceding paragraphs.

207.     Nexo is a "person" under the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1761(c) and 1770 and, with respect to the Nexo Crypto Credit, has provided "services" under the Act, *id*. §§ 1761(b) and 1770.

208.   Indeed, Nexo states on its website that it offers a "leading credit line service for digital assets"; that a customer's "Nexo Account" allows them to "use the Nexo Crypto Credit and other Nexo services"; that Nexo may "suspend the provision of the Nexo service to you"; that Nexo may "suspend the provision of the Nexo Crypto Credit or of all or part of the other Nexo services"; and refers to the customer's "use of the Nexo Crypto Credit or any of our services."

209.   The California Subclass members are "consumers," Cal. Civ. Code §§ 1761(d) and 1770, and have engaged in "transactions," *id*. §§ 1761(e) and 1770.

210.   In offering for sale its Crypto Credit service and subsequently invoking certain contractual provisions as justification for its conduct on December 23, 2020, and thereafter, Nexo has violated the CLRA in connection with transactions resulting in the sale of services by having inserted unconscionable contractual provisions in a contract. Cal. Civ. Code § 1770(a)(19).

211.   The first unconscionable contractual provision, as explained above, is the one by which Nexo claimed the unfettered right to suspend Crypto Credit or any of its features or content without notice to its customers and for any reason at all.

212.   The second unconscionable contractual provision, as explained above, is the one by which Nexo claims to have acquired "ownership" over a Nexo customer's "collateral" during the time in which the customer uses the Nexo Crypto Credit.

213.   Although the California CLRA Subclass is entitled to restitutionary disgorgement from Nexo's invocation of these contractual provisions, Plaintiff does not seek in this Complaint to recover such restitution, but rather seeks only to enjoin Nexo from invoking these provisions in the future in connection with its Nexo Crypto Credit service for California residents.

214.   Accordingly, on behalf of the California CLRA Subclass, Plaintiff seeks such injunctive relief, as well as attorneys' fees.

## **PRAYER FOR RELIEF**

On behalf of himself, the Class, and the Subclasses, Plaintiff requests as follows:

     (a) That the Court determines that this action may be maintained as a class action, that Plaintiff be named as Class Representative of the Classes and Subclasses, and that notice of this action be given to Class and Subclass members;

     (b) That the Court award Plaintiff, the Damages Class, and the California UCL Subclass damages and restitutionary disgorgement, respectively, in an amount to be determined at trial;

     (c) That the Court award Plaintiff, the Damages Class, and the California UCL Subclass pre- and post-judgment interest (including pursuant to statutory rates of interest set under State law);

     (d) That the Court issue the equitable relief against Defendants to which the Equitable-Relief Class and the California CLRA Subclass are entitled;

     (e) That the Court award Plaintiff and the Class and Subclasses their reasonable attorneys' fees and costs of suit, both for conferring a substantial benefit on a large class of persons and as the prevailing parties; and

     (f) That the Court award any and all other such relief as the Court may deem just and proper under the circumstances.

## **JURY TRIAL**

Plaintiff respectfully demands a trial by jury for all claims.

Dated: April 1, 2021

Respectfully submitted,

*/s/ Katherine Eskovitz*
Kyle W. Roche
Edward Normand
Stephen Lagos
(*pro hac vice applications forthcoming*)
ROCHE FREEDMAN LLP
99 Park Avenue, Suite 1910
New York, NY 10016
Tel.: 646-970-7509

kyle@rcfllp.com
tnormand@rcfllp.com
slagos@rcfllp.com

Katherine Eskovitz (SBN 255105)
ROCHE FREEDMAN LLP
1158 26th Street No. 175
Santa Monica, CA 90403
Tel.: 646-791-6883
keskovitz@rcfllp.com

*Counsel for Plaintiff Junhan Jeong*