EVERSHEDS SUTHERLAND (US) LLP
Ian S. Shelton (SBN 264863)
ianshelton@eversheds-sutherland.com
500 Capitol Mall, Suite 1750
Sacramento, CA 95814
Telephone:     (916) 844-2965
Facsimile:     (916) 241-0501

EVERSHEDS SUTHERLAND (US) LLP
Michael Bahar (*PHV* pending)
michaelbahar@eversheds-sutherland.com
700 Sixth Street, NW, Suite 700
Washington, DC  20001-3980
Telephone:  (202) 383-0882
Facsimile:   (202) 637-3593

*Attorneys for Defendants Nexo Financial LLC, Nexo*
*Financial Services Ltd., Nexo Services OÜ, Nexo AG,*
*and Nexo Capital Inc.*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUNHAN JEONG, individually and on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NEXO FINANCIAL LLC, NEXO FINANCIAL SERVICES LTD., NEXO SERVICES OÜ, NEXO AG, and NEXO CAPITAL INC.,<br><br>Defendants. | CASE NO. 5:21-CV-02392-BLF<br><br>The Honorable Beth Labson Freeman<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)**<br><br>Hearing Date:  November 18, 2021<br>Hearing Time:  9:00 a.m.<br><br>Courtroom:  No. 3, 5th Floor<br>Address:      U.S. Courthouse<br>                   280 South 1st Street<br>                   San Jose, CA 95113 |

# NOTICE OF MOTION

PLEASE TAKE NOTICE that on November 18, 2021, at 9:00 a.m., or as soon thereafter as the matter may be heard in the above-entitled Court, located at San Jose Courthouse, Courtroom 3 – 5th Floor, 280 South 1st Street, San Jose, California 95113, Defendants Nexo Financial LLC, Nexo Financial Services Ltd., Nexo Services OÜ, Nexo AG, and Nexo Capital Inc. ("Defendants") will move this Court to dismiss the Complaint filed by Plaintiff Juhan Jeong pursuant Federal Rule of Civil Procedure 12(b).  In particular, Defendants seek the following relief:

1.  Defendants seek dismissal of Nexo Financial LLC, Nexo Financial Services Ltd., Nexo Services OÜ, and Nexo AG for lack of personal jurisdiction under Rule 12(b)(2).

2.  Defendants seek dismissal of all claims for lack of Article III standing under Rule 12(b)(1).

3.  Defendants seek dismissal of the claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory relief under Rule 12(b)(6) because the Terms and Conditions at issue expressly authorize the complained-of conduct, meaning there was no breach.  These claims are also not plausible because Plaintiff's theory that Nexo's non-existent breach "excused any obligation" for Plaintiff to maintain the required margin on his credit line has no support in the contract or law.

4.  Defendants seek dismissal of the claim for declaratory relief under Rule 12(b)(6) because it is duplicative of the breach of contract claim and seeks an advisory opinion on hypothetical issues not properly before the Court.

5.  Defendants seek dismissal of the CLRA claim under Rule 12(b)(6) because the CLRA does not apply to extensions of credit or loans.

6.  Defendants seek dismissal of the equitable UCL and CLRA claims under Rule

12(b)(6) because Plaintiff pleads he has an adequate remedy at law through his breach of contract claim.

7.  Defendants seek dismissal of the UCL claim under Rule 12(b)(6) because Plaintiff does not plausibly allege breach of contract or any other predicate violation of law.

This Motion is based on this Notice, the accompanying Memorandum of Points and Authorities, the Declaration of Antoni Trenchev; the pleadings and other papers on file in this action; and such other declarations, evidence and argument as may be presented before or at the hearing.

DATED:   July 12, 2021                    EVERSHEDS SUTHERLAND (US) LLP

                                          By */s/ Ian S. Shelton*
                                          Ian S. Shelton

                                          *Attorneys for Defendants Nexo Financial LLC,*
                                          *Nexo Financial Services Ltd., Nexo Services OÜ,*
                                          *Nexo AG, and Nexo Capital Inc.*

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 3

ARGUMENT .................................................................................................................. 7

    I.    THE COURT SHOULD DISMISS THE EUROPEAN NEXO ENTITIES AND NEXO FINANCIAL LLC FOR LACK OF PERSONAL JURISDICTION. ............................................................................................. 7

        A.    Legal Standard. ......................................................................... 7

        B.    Jeong Fails to Plausibly Plead a Single-Enterprise Theory. .......................... 9

    II.    THE COURT SHOULD DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION. .................................................................... 12

        A.    The Rule 12(b)(1) Legal Standard. ........................................... 12

        B.    Article III Standing Requirements. .......................................... 13

        C.    Jeong Fails to Plausibly Plead a Traceable Injury. ..................................... 14

        D.    Jeong Fails to Plausibly Plead a Concrete Injury-in-Fact with Respect to his Lack-of-Notice Theory. ...................................... 16

    III.    THE COURT SHOULD DISMISS FOR FAILURE TO STATE A CLAIM. ....... 16

        A.    The Court should Dismiss the Breach of Contract Claim. ......................... 16

        B.    The Court should Dismiss the Declaratory Judgment Claim. ..................... 20

        C.    The Court should Dismiss the CLRA Claim because the CLRA Does Not Apply to Extensions of Credit. ................................... 21

        D.    The Court should Dismiss Jeong's UCL and CLRA Claims because Jeong Pleads an Adequate Remedy at Law. ................................. 24

        E.    The Court should Dismiss Jeong's UCL claim because he Fails to Plead a Plausible Predicate Violation of Law. ............................. 25

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adobe Sys., Inc. Privacy Litig.*,
   66 F. Supp. 3d 1197 (N.D. Cal. 2014) ...............................................................................13, 16

*Alborzian v. JPMorgan Chase Bank, N.A.*,
   235 Cal. App. 4th 29 (2015)................................................................................................22, 23

*AM Tr. v. UBS AG*,
   681 F. App'x 587 (9th Cir. 2017)................................................................................................8

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...................................................................................................................10

*Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*,
   733 F.3d 939 (9th Cir. 2013)......................................................................................................13

*Ball v. FleetBoston Fin. Corp.*,
   164 Cal. App. 4th (2008).............................................................................................................22

*Barnum Timber Co. v. Envtl. Prot. Agency*,
   633 F.3d 894 (9th Cir. 2011)......................................................................................................13

*Berry v. Am. Express Publ'g, Inc.*,
   147 Cal. App. 4th 224 (2007).....................................................................................................22

*Burbank-Glendale-Pasadena Airport Authority v. City of Burbank*,
   136 F.3d 1360 (9th Cir. 1998).......................................................................................................4

*In re California Gasoline Spot Mkt. Antitrust Litig.*,
   2021 WL 1176645 (N.D. Cal. Mar. 29, 2021)............................................................................24

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*,
   20 Cal. 4th 163 (1999)................................................................................................................25

*Chandler v. State Farm Mut. Auto. Ins. Co.*,
   598 F.3d 1115 (9th Cir. 2010).....................................................................................................12

*Clapper v. Amnesty Intern. USA*,
   568 U.S. 398 (2013) ...................................................................................................................13

*Consumer Sols. REO, LLC v. Hillery*,
   658 F. Supp. 2d 1002 (N.D. Cal. 2009) .....................................................................................22

*Corcoran v. CVS Health*,
   169 F. Supp. 3d 970 (N.D. Cal. 2016) .......................................................................................10

MOTION TO DISMISS BASED ON FRCP 12(B)

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014) ................................................................................10

*Doe v. Epic Games, Inc.*,
    435 F. Supp. 3d 1024 (N.D. Cal. 2020) ..................................................23

*Doe v. Unocal Corp.*,
    248 F.3d 915 (9th Cir. 2001).................................................................7, 11

*Enhanced Athlete Inc. v. Google LLC*,
    2020 WL 4732209 (N.D. Cal. Aug. 14, 2020)........................................20

*In re Facebook, Inc., Consumer Privacy User Profile Litig.*,
    402 F. Supp. 3d 767 (N.D. Cal. 2019) ...................................................20

*Fairbanks v. Superior Court*,
    46 Cal. 4th 56 (2009)..............................................................................23

*I.B. ex rel. Fife v. Facebook, Inc.*,
    905 F. Supp. 2d 989 (N.D. Cal. 2012) ...............................................23, 24

*Ford Motor Co. v. Montana Eighth Judicial Dist. Court*,
    141 S. Ct. 1017 (2021) ..............................................................................8

*Gerritsen v. Warner Bros. Ent. Inc.*,
    116 F. Supp. 3d 1104 (C.D. Cal. 2015)..................................................11

*Hamilton Beach Brands, Inc. v. Metric & Inch Tools, Inc.*,
    614 F. Supp. 2d 1080 (C.D. Cal. 2009)....................................................9

*Harris Rutsky & Co. Ins. Servs. Inc. v. Bell & Clements Ltd.*,
    328 F.3d 1122 (9th Cir. 2003)...................................................................7

*In re Holl*,
    925 F.3d 1076 (9th Cir. 2019)...................................................................3

*Julian v. TTE Tech., Inc.*,
    2020 WL 6743912 (N.D. Cal. Nov. 17, 2020)........................................24

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................................................................13

*In re MacBook Keyboard Litig.*,
    2020 WL 6047253 (N.D. Cal. Oct. 13, 2020).........................................24

*Mallen v. Alphatec Holdings, Inc.*,
    861 F. Supp. 2d 1111 (S.D. Cal. 2012) .....................................................4

*Mazonas v. Nationstar Mortgage LLC*,
    2016 WL 2344196 (N.D. Cal. May 4, 2016) ..........................................24

*McGeachy v. Pinto Valley*,
    2017 WL 3130639 (D. Ariz. 2017) ...................................................................10

*In re Nexus 6P Prods. Liab. Litig.*,
    2018 WL 827958 (N.D. Cal. Feb. 12, 2018) ........................................................8

*Nguyen v. Barnes & Noble Inc.*,
    763 F.3d 1171 (9th Cir. 2014) .............................................................................3

*Pitt v. Metro Tower Life Ins. Co.*,
    2020 WL 1557429 (N.D. Cal. 2020) ..................................................................10

*Pokemon Co. v. Shopify, Inc.*,
    2017 WL 697520 (N.D. Cal. 2017) ....................................................................10

*Ranza v. Nike, Inc.*,
    793 F.3d 1059 (9th Cir. 2015) .....................................................................8, 9, 10

*Razuki v. Caliber Home Loans, Inc.*,
    2018 WL 6018361 (S.D. Cal. 2018) ...................................................................14

*Reynolds v. Binance Holdings Ltd.*,
    481 F. Supp. 3d 997 (N.D. Cal. 2020) ...........................................................9, 11

*Reynoso v. Paul Fin., LLC*,
    2009 WL 3833298 (N.D. Cal. Nov. 16, 2009) ...................................................24

*Rockridge Tr. v. Wells Fargo, N.A.*,
    985 F. Supp. 2d 1110 (N.D. Cal. 2013) .............................................................20

*Sanders v. Brown*,
    504 F.3d 903 (9th Cir. 2007) ...............................................................................3

*Schroeder v. United States*,
    569 F.3d 956 (9th Cir. 2009) .............................................................................24

*Sharma v. Volkswagen AG*,
    2021 WL 912271 (N.D. Cal. Mar. 9, 2021) .......................................................24

*Skurkis v. Montelongo*,
    2016 WL 4719271 (N.D. Cal. Sept. 9, 2016) .......................................................8

*Sonner v. Premier Nutrition Corp.*,
    971 F.3d 834 (9th Cir. 2020) .............................................................................24

*Sonoda v. Amerisave Mortg. Corp.*,
    2011 WL 2690451 (N.D. Cal. July 8, 2011) .......................................................23

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) .........................................................................13, 14, 16

MOTION TO DISMISS BASED ON FRCP 12(B)

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998)............................................................................................12

*Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*,
    100 Cal. App. 4th 44 (2002)............................................................................20

*TransUnion LLC v. Ramirez*,
    2021 WL 2599472 (U.S. June 25, 2021).............................................13, 14, 16

*Trinh v. Homan*,
    466 F. Supp. 3d 1077 (C.D. Cal. 2020).....................................................19, 21

*United Safeguard Distributors Ass'n, Inc. v. Safeguard Bus. Sys., Inc.*,
    145 F. Supp. 3d 932 (C.D. Cal. 2015)............................................................20

*United States v. State of Wash.*,
    759 F.2d 1353 (9th Cir. 1985).........................................................................21

*Virtualmagic Asia, Inc.*,
    99 Cal. App. 4th 228 (2002)............................................................................10

*Washington Envtl. Council v. Bellon*,
    732 F.3d 1131 (9th Cir. 2013).................................................................13, 15

*Williams v. Yamaha Motor Co.*,
    851 F.3d 1015 (9th Cir. 2017).............................................................................9

*Wilson v. Hewlett-Packard Co.*,
    668 F.3d 1136 (9th Cir. 2012).........................................................................25

*Ziegler v. Indian River Cty.*,
    64 F.3d 470 (9th Cir. 1995)................................................................................7

**Statutes**

Cal. Civ. Code § 1761(a)........................................................................................22

Cal. Civ. Code § 1761(b) .......................................................................................22

Cal. Civ. Code § 1761(d) .......................................................................................21

**Other Authorities**

Fed. R. Civ. P. 12(b)(1)..........................................................................................12

Fed. R. Civ. P. 12(b)(2)............................................................................................7

Fed. R. Civ. P. 12(b)(6)......................................................................................7, 16

MOTION TO DISMISS BASED ON FRCP 12(B)

1

**INTRODUCTION**

2      This lawsuit involves cutting-edge technology, but the issue is age old.  Here, a borrower

3 posts collateral in exchange for credit, and because the value of that collateral precipitously drops,

4 the collateral is subject to a margin call.  If the margin is not maintained, the collateral is subject to

5 liquidation and the proceeds are applied to the balance of the credit line.  In this case, Plaintiff

6 Junhan Jeong ("Jeong") seeks to "rewind the tape" and get his liquidated collateral back, in this

7 case a volatile cryptocurrency known as "XRP," after the value of XRP dropped—and after Jeong

8 failed to maintain the margin that he agreed to maintain.

9      Importantly, Jeong does not and cannot challenge the liquidation of his collateral for

10 failure to maintain the required loan-to-value ("LTV") ratio.  Instead, he asks the Court to turn the

11 contract on its head and suspend his obligation to maintain the LTV ratio, thus shifting the risk of

12 loss from the borrower to the secured lender.  To reach this implausible result, Jeong pleads the

13 following untenable legal theory: (1) that Nexo *must* always accept one *particular* cryptocurrency

14 as a repayment option (XRP)—even when the value of that cryptocurrency is in freefall due to

15 SEC action and when Nexo continues to accept numerous other cryptocurrencies and fiat

16 currencies as a means of repayment (including the U.S. dollar)—and (2) that Nexo has an

17 obligation to notify him an unidentified amount of time in advance when one particular

18 cryptocurrency (XRP) is no longer accepted for repayment, even when the contract expressly

19 states that no such notice is required.  On these two grounds he is asking the Court rewrite the

20 contract, reverse a proper liquidation, and shift his loss to Nexo through the judicial process.

21      All of Jeong's claims should dismissed for the following reasons:

22      *First*, the claims against Nexo Financial Services Ltd., Nexo Services OÜ, Nexo AG, and

23 Nexo Financial LLC should be dismissed because the Court lacks personal jurisdiction over them.

24 None of these entities are incorporated or have their principal place of business in California.

25 Moreover, Jeong does not allege that these entities issued the line of credit disputed in this lawsuit.

26 Instead, Jeong relies solely on the "single-enterprise" theory of personal jurisdiction—which

27 ignores the corporate separateness that lies at the heart of our jurisprudence—but pleads no

28 specific facts plausibly satisfying that notoriously difficult standard. These four entities should be

dismissed for lack of personal jurisdiction.

*Second*, Jeong has failed to establish Article III standing. Article III imposes "traceability" and "concrete injury" requirements. Jeong claims that his injuries flow from Nexo's suspension of XRP and its failure to notify him of the suspension in advance. However, Jeong's losses were caused by his failure to maintain the required margin, resulting in the liquidation of his collateral. With respect to Nexo's suspension of XRP, Jeong fails to plead any facts linking the suspension to his injuries. Jeong does not allege that he attempted to repay his credit line with XRP or add XRP as collateral but was prevented from doing so. Instead, Jeong admits that a variety of repayment methods were available on Nexo's platform allowing him to maintain his LTV, notwithstanding XRP's suspension. Thus, his injuries are not traceable to the suspension of XRP. Likewise, his notice allegations cannot support a traceable injury. Jeong does not identify anything that he would have done or was prevented from doing for lack of notice. He fails to connect a lack of notice to his injuries. Moreover, a mere procedural lack of notice does not satisfy Article III's "concrete injury" requirement. His Complaint fails Article III's standing requirements.

*Third,* Jeong's breach of contract and declaratory judgment claims are not plausibly pled for similar reasons. As an initial matter, he has failed to allege any breach at all. Under the Terms and Conditions, (1) Nexo has the sole discretion to suspend XRP on its platform at any time, whether an SEC action is pending or not, and (2) Nexo has no obligation to notify Jeong of this. These facts are undisputed. Recognizing this fact, Jeong relies on the implied covenant of good faith and fair dealing to rewrite the contract. That doctrine, however, fails to revive Jeong's theory because it does not create existing rights or duties not expressed in the contract. After identifying a breach that is not supported by the plain language of the contract, Jeong then alleges that Nexo's non-existent breach somehow "suspends" his obligation to maintain his LTV ratio, even when ***Jeong*** was the only party who breached the contract by failing to maintain sufficient margin. Nothing in the contract or law plausibly supports this theory of breach, which reverses the risk allocation agreed by the parties and transforms Nexo from a secured creditor to an insurer of Jeong's losses.

*Fourth*, Jeong turns to California's consumer statutes, the CLRA and the UCL, in an effort

MOTION TO DISMISS BASED ON FRCP 12(B)

to establish a viable legal theory.  Neither work.  The CLRA is foreclosed by black letter California law holding that credit transactions are not covered by the CLRA.  Jeong's UCL and CLRA claims fail under binding Ninth Circuit authority because he pleads an adequate remedy at law through his breach of contract claim.  Jeong's UCL claim also fails because he does not plausibly allege any breach of contract or other predicate violation of law.  For these reasons, the Court should grant the motion to dismiss.

## FACTUAL BACKGROUND

Nexo is a full-scale digital finance hub with $15 billion in assets under management and serving millions of users.  *See* Compl. ¶ 45.  Relevant here is Nexo's primary business line in which it extends credit lines secured by cryptocurrency collateral.  *See* Compl. ¶ 45.

Jeong secured credit from Nexo by posting the cryptocurrency "XRP" as collateral.  *See* Compl. ¶¶ 47, 135.  XRP is issued by Ripple Labs Inc. ("Ripple").  *See* Compl. ¶¶ 48, 52.  Ripple and XRP have no affiliation with Nexo.  XRP was one of many cryptocurrencies accepted as collateral on Nexo's platform.  *See* Compl. ¶ 47.  As part of participating in Nexo's platform, Jeong agreed to be bound by a set of General Terms & Conditions ("General Terms").  *See* Compl. ¶ 46; Trenchev Decl. ¶ 4.  All users of the platform sign onto the "Wallet Terms," and subsequently those who have credit lines also agree to the "Borrow Terms."[1]  Trenchev Decl. ¶ 4.  The T&Cs are plainly written and prominently featured on Nexo's website.[2]  Under the T&Cs, Nexo customers can borrow against a line of credit so long as the customer maintains a certain

---

[1]    The relevant T&Cs consist of "General Terms," the "Wallet Terms," and the "Borrow Terms" (collectively, the "T&Cs").  The T&Cs are attached to this Motion.  The T&Cs are not attached to Jeong's Complaint, but should be considered by this Court. *See Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007) ("[A] court can consider a document on which the complaint relies if the document is central to the plaintiff's claim, and no party questions the authenticity of the document.").  The T&Cs are attached as Exhibits A–D. *See* Trenchev Decl. ¶¶ 5–8.

[2]    Jeong describes the T&Cs as "adhesion" contracts, because (as with any other online terms and conditions) there is no negotiation available. *See* Compl. ¶¶ 48–50.  But this fact, standing alone does not render the Nexo T&Cs unenforceable.  Indeed, relative to similar online terms and conditions that have been upheld by other courts in the Ninth Circuit, the Nexo T&Cs are easy to understand. *See In re Holl*, 925 F.3d 1076, 1079 (9th Cir. 2019) (upholding 32 page online terms of usage hyperlinked on webpage of agreement as reasonably conspicuous); *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014) ("[C]ourts have consistently enforced [terms of use] agreements where the user had actual notice of the agreement . . . . [or] where the user is required to affirmatively acknowledge the agreement before proceeding with use of the [service.]").

loan-to-value ("LTV") ratio.  *See* Compl. ¶¶ 48–51.  If the collateral drops in value and the customer's LTV reaches the Nexo Platform LTV threshold of 83.3%, the customer will be required to "top-up" additional collateral or repay the credit line to maintain the LTV ratio below the critical 83.3% threshold.  *See* Compl. ¶¶ 48–51.

Customer deposits can earn interest in cryptocurrency on Nexo's platform because they are used to fund extensions of credit (like the one to Jeong).  Thus, Nexo's business model must balance the interests of both borrowers, like Jeong, and the Nexo customers funding the credit, *i.e.*, Nexo customers who deposited cryptocurrency on the platform.  Nexo does not perform credit checks, so the pledged collateral effectively guarantees the funds of other Nexo customers whose cryptocurrency deposits are funding the extensions of credit.  Margin calls and liquidations tied to LTV represent a sustainable risk management model, which allows Nexo to protect the interests of all stakeholders.[3]  In addition, the T&Cs spelled out the following rights:

- Nexo reserved the right to modify the "Digital Assets" (defined to include cryptocurrencies) accepted on its platform.  Borrow Terms IV.1.

- Nexo retained the sole discretion to modify and remove certain portions, features, or services of its platform as needed.  Borrow Terms III.3; Wallet Terms XII.3 & XII.4.

- Nexo reiterated that cryptocurrency is volatile.  The risk of trading cryptocurrencies was plainly disclosed to Jeong.  Borrow Terms XI; Wallet Terms VIII.

On December 22, 2020, the Securities and Exchange Commission ("SEC") filed a 71-page lawsuit against Ripple and its CEO and Board Chairman alleging that Ripple's cryptocurrency, XRP, was an illegal and unregistered investment contract.[4]  *See* Compl. ¶¶ 5, 52.  The SEC's

---

[3]   Nexo operates in a rapidly developing industry in which the regulatory and market environments are fluid and ambiguous.  Operationally, and for the protection of its customers, it is critical for Nexo to have flexibility to react quickly to regulatory enforcement actions, similar to the SEC investigation and lawsuit against Ripple.

[4]   *See Securities and Exchange Commission v. Ripple Labs, Inc. et al.*, 20-CV-10832, (S.D.N.Y.) (filed Dec. 22, 2020).  A copy of the SEC's complaint against Ripple is attached as Exhibit E.  On December 22, 2020, the SEC also issued a press release outlining its allegations against Ripple, which is attached as Exhibit F.  Nexo requests that the Court take judicial notice of Exhibit E and F under Fed. R. Evid. 201. *See Burbank-Glendale-Pasadena Airport Authority v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998) (taking judicial notice of pleadings filed in other actions); *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1139 (S.D. Cal. 2012) (taking judicial notice of SEC filings, press releases, and call transcripts).

MOTION TO DISMISS BASED ON FRCP 12(B)

1  lawsuit sought an injunction to prevent Ripple from further selling or offering to sell XRP

2  permanently (unless otherwise registered as a security).  For all practical purposes, the SEC seeks

3  to shut down Ripple and the use of XRP as a cryptocurrency.[5]

4         The seriousness of the SEC's allegations about Ripple and XRP was met with a quick and

5  substantial response from the cryptocurrency industry.  By and large, the major trading platforms

6  suspended, and eventually de-listed, XRP as an available cryptocurrency.[6]  Nexo did not go that

7  far.  It removed the option to repay a credit line using XRP, but it did not limit the ability of

8  customers to use XRP to "top up" their collateral.[7]  But even if Jeong's allegation that Nexo

9  suspended its customers' use of XRP to pay down their credit lines or post additional collateral on

10  December 23, 2020 were true, Nexo had the sole discretion to do so under the T&Cs.  *See* Compl.

11  ¶¶ 6, 53, 65 (citing Borrow Terms III.3.).

12         The value of XRP dropped precipitously after the SEC announced the lawsuit and

13  investigation.  *See* Compl. ¶ 5, 52.  This required some Nexo borrowers, including Jeong, to either

14  pay down their credit lines or add collateral to their Nexo accounts to maintain the required LTV.

15  *See* Compl. ¶¶ 56(e), 56(f), 57.  Outside of XRP, Nexo accepts a variety of cryptocurrencies and

16  fiat currencies, *e.g.*, U.S. Dollars, any of which can be used to maintain the LTV, and which Nexo

17  did not disable.  *See* Compl. ¶¶ 47, 58.  With respect to Nexo customers, including Jeong, who

18  failed to maintain the requisite LTV ratios their collateral was subject to liquidation according to

19  Nexo's T&Cs.  *See* Compl. ¶¶ 4, 9, 51.

20         Unhappy with the loss in value and liquidation of his XRP due to the SEC lawsuit, Jeong

21  ─────────────

22   [5]   As of the date of this filing, the SEC-Ripple lawsuit remains pending.  However, although
    XRP is still not accepted by Nexo, the value of XRP has rebounded substantially since its crash in
23   December 2020.  XRP's rebound in value animates this lawsuit; had XRP remained depressed or
    lost additional value, Jeong's claim would also fail for lack of damages.

24   [6]   XRP trading on Coinbase, a large cryptocurrency trading platform was halted.
    (https://www.pymnts.com/blockchain/2020/secs-ripple-lawsuit-prompts-coinbase-to-suspend-xrp-
25   trading/).  Crypto.com delisted and suspended XRP.  https://finance.yahoo.com/news/crypto-com-
    delist-suspend-xrp-200653135.html).  MoneyGram suspended its relationship with Ripple.
26   (https://coingeek.com/moneygram-suspends-ripple-relationship-over-sec-lawsuit/).

27   [7]   Jeong claims that XRP was suspended for all purposes on Nexo's platform.  This is not
    correct.  XRP was suspended as a means of paying down a credit line, but was not suspended as an
28   option for adding to or "topping up" collateral.  In any event, even Jeong's incorrect allegations still
    fail to state a plausible claim.

1   initiated this putative class action lawsuit to recover "the full value of the collateral that Nexo

2   liquidated as a result of the XRP suspension and/or Nexo's failure to give notice of the suspension

3   (less the outstanding loan amounts on that collateral as of breach," alleging a breach of contract, a

4   declaratory judgment claim, and claims under California's consumer remedies statutes, the CLRA

5   and UCL.  *See* Compl. ¶ 173 (contract damages); *see also id.* at ¶ 199 (UCL claim seeking

6   "restitutionary disgorgement for the value of the collateral over which the members retained

7   ownership and that Nexo wrongly liquidated resulting from the suspension of XRP payments (less

8   the outstanding loan amounts on that collateral as of breach)").  Jeong expressly limits his CLRA

9   claim to equitable relief only.  *See id.* at ¶ 213.

10        Three European defendants seek dismissal for lack of personal jurisdiction:  Nexo

11   Financial Services Ltd., Nexo Services OÜ, and Nexo AG (collectively, the "European Nexo

12   Entities").  None of the European Nexo Entities are headquartered or incorporated in California.[8]

13   *See* Trenchev Decl. ¶¶ 13–17.

14        Nexo Financial LLC also seeks dismissal for lack of personal jurisdiction.  Nexo Financial

15   LLC is incorporated in Delaware and has its principal place of business in the United Kingdom.

16   *See* Trenchev Decl. ¶ 20.  Nexo Financial LLC is not the entity that issued the credit line to Jeong.

17   *See id.*  Nexo Financial LLC obtained a California Finance Lender ("CFL") License on February

18   26, 2021—after the December 2020 events referenced in Jeong's lawsuit.  *See id.*  Although Nexo

19   Financial LLC is registered to do business and has a registered agent for service of process in

20   California, these facts alone are insufficient to establish jurisdiction over Nexo Financial LLC.

21   *See id.*

22        Nexo Capital Inc. operates the Nexo platform, issued the credit line to Jeong that is the

23   subject of this lawsuit, and does not challenge the Court's personal jurisdiction.  *See* Trenchev

24   Decl. ¶ 19.

25        Importantly, the Defendants are distinct business entities, have their own directors (though

26   some of those directors overlap), provide different types of services, have maintained corporate

27   ───────────────

28   [8]   The facts pertaining to personal jurisdiction are supported by the Declaration of Antoni
     Trenchev, which is incorporated herein by reference.

formalities, have been adequately capitalized to meet their ongoing operational and financial obligations, have maintained separate bank accounts, have not commingled assets or funds, have maintained separate books and records, and have paid their own taxes, to the extent owed, in compliance with governing accounting standards.  *See* Trenchev Decl. ¶¶ 21–22.  Neither the European Nexo Entities nor Nexo Financial LLC dictate every facet of the business of Nexo Capital Inc., from broad policy decisions to routine matters of day-to-day operation.  *See* Trenchev Decl. ¶ 23.

## ARGUMENT

**I.  THE COURT SHOULD DISMISS THE EUROPEAN NEXO ENTITIES AND NEXO FINANCIAL LLC FOR LACK OF PERSONAL JURISDICTION.**

Nexo Financial Services Ltd., Nexo Services OÜ, and Nexo AG (collectively, the "European Nexo Entities"), along with Nexo Financial LLC, move to dismiss Jeong's claims against them for lack of personal jurisdiction.[9]  *See* Fed. R. Civ. P. 12(b)(2).  None of the European Nexo Entities are subject to general jurisdiction in California.  *See* Trenchev Decl. ¶¶ 13–17.   This is not contested by Jeong.  Nor is there any basis for specific jurisdiction: the European Nexo Entities have no California connection and did not issue the credit line to Jeong. Instead, Jeong attempts a jurisdictional short-cut by adding boilerplate "single-enterprise" allegations to the Complaint. Jeong parrots legal standards with no material facts, which is legally insufficient to assert specific jurisdiction. The European Nexo Entities and Nexo Financial LLC should be dismissed.

### A.  Legal Standard.

**Personal Jurisdiction.** Jeong has the burden to establish jurisdiction over all defendants. *Ziegler v. Indian River Cty.*, 64 F.3d 470, 473 (9th Cir. 1995) (citation omitted).  Under Rule 12(b)(2), a court may consider declarations submitted by the parties. *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001).  The Court must assess the contacts of each defendant separately to determine whether personal jurisdiction exists for each particular defendant. *Harris Rutsky & Co.*

---

[9]    The non-moving Nexo entity under Rule 12(b)(2) is Nexo Capital Inc., which extended the credit line to Jeong. Nexo Capital Inc. joins the Rule 12(b)(1) and (6) portion of this Motion.

1    *Ins. Servs. Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1130 (9th Cir. 2003); *see also Skurkis v.*

2    *Montelongo*, 2016 WL 4719271, at *4 (N.D. Cal. Sept. 9, 2016) (holding plaintiffs failed to

3    establish personal jurisdiction as to each defendant by "group[ing] all defendants together.").

4         **General Jurisdiction.** Corporate defendants are subject to general jurisdiction in their

5    place of incorporation and where their principal place of business is located.  *Ford Motor Co. v.*

6    *Montana Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1025 (2021).  The European Nexo Entities

7    are not incorporated in California and do not have their principal place of business in California

8    (Jeong does not allege that they are).

9         Nexo Financial LLC obtained a California Finance Lender ("CFL") license in February

10   2021—after the events in question took place.  *See* Trenchev Decl. ¶ 21.  Nexo Financial LLC was

11   not involved in any of the disputed transactions, and it has no connection to California other than

12   holding that license.  *See* Trenchev Decl. ¶ 20.  Even if the license were relevant to the events in

13   the lawsuit, it would still be insufficient to confer general jurisdiction over Nexo Financial LLC.

14   *See AM Tr. v. UBS AG*, 681 F. App'x 587 (9th Cir. 2017) ("California does not require

15   corporations to consent to general personal jurisdiction in that state when they . . . register to do

16   business"); *In re Nexus 6P Prods. Liab. Litig.*, 2018 WL 827958 at *3 (N.D. Cal. Feb. 12, 2018)

17   (same).

18        **Specific Jurisdiction.** Specific jurisdiction requires that the plaintiff's claims arise out of

19   or relate to the defendant's contacts with the forum.  *See Ford*, 141 S. Ct. at 1025.  However,

20   Jeong has not pled any specific facts connecting the European Nexo Entities to California or even

21   to his claims at all.  Nexo Financial LLC was not involved in any of the transactions disputed by

22   Jeong in his Complaint and it has no connection to California other than holding that license.  *See*

23   Trenchev Decl. ¶ 20.  Jeong is left to rely on a single-enterprise rule for personal jurisdiction.

24        **Single-enterprise Theory.**  Under the single-enterprise rule, personal jurisdiction may be

25   extended over foreign sister companies under very limited circumstances. *Ranza v. Nike, Inc.*, 793

26   F.3d 1059, 1072 (9th Cir. 2015).  Under the rule, Jeong must establish two prongs:

    (1)    such a unity of interest and ownership that the separate corporate personalities are
merged, so that one corporation is a mere adjunct of another or the two companies
form a single-enterprise; and

(2)   an inequitable result if the acts in question are treated as those of one corporation alone.

*Hamilton Beach Brands, Inc. v. Metric & Inch Tools, Inc.*, 614 F. Supp. 2d 1080, 1083 (C.D. Cal. 2009).  To sufficiently allege the single-enterprise theory for purposes of personal jurisdiction, like the alter ego theory, a plaintiff must offer more than labels and conclusions; factual allegations must be enough to raise a right to relief above the speculative level. *Reynolds v. Binance Holdings Ltd.*, 481 F. Supp. 3d 997, 1005 (N.D. Cal. 2020).  This test envisions *pervasive* control over corporate affiliates, such as when a corporation "dictates every facet" of the affiliate's business— "from broad policy decisions to routine matters of day-to-day operation." *Ranza*, 793 F.3d at 1071 (citations and quotations omitted) (emphasis added).

**B.     Jeong Fails to Plausibly Plead a Single-Enterprise Theory.**

Jeong alleges that Nexo Financial holds a license to operate as a finance lender in California, and that all the Nexo entities should be treated as a single, unified entity.  *See* Compl. ¶¶ 22, 26.  However, as noted above, Nexo Financial LLC has no connection to the allegations described in Jeong's lawsuit.  Jeong alleges that the Court has personal jurisdiction over the European Nexo Entities based on the conclusory allegation that all the Nexo entities have "such a unity and ownership . . . that any separate corporate personalities are merged, such that one corporation is a mere adjunct of another and they form a single enterprise." *See* Compl. ¶ 23. This is insufficient to establish either prong of the single-enterprise theory in this case.

**1.     Unity of Interest.**

First, Jeong cannot prove that the European Nexo Entities and Nexo Financial LLC enjoy "such a unity of interest and ownership that the separate corporate personalities are merged, so that one corporation is a mere adjunct of another or the two companies form a single enterprise." *See* Compl. ¶ 23.  This essentially entails a corporate veil-piercing analysis, which is extremely difficult to plead and prove.  In *Daimler*, the Supreme Court rejected the "agency" theory of personal jurisdiction relied upon by Jeong, holding that it "sweeps too broadly to comport with the requirements of due process." *Ranza*, 793 F.3d at 1071; *see also Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1020-25 (9th Cir. 2017) ("the *Daimler* Court's criticism of the *Unocal* standard

-9-

1   found fault with the [agency] standard's own internal logic, and therefore applies with equal force

2   regardless of whether the standard is used to establish general or specific jurisdiction"); *Daimler*

3   *AG v. Bauman*, 571 U.S. 117, 136 (2014).  While *Ranza* acknowledged that *Daimler* left intact the

4   Ninth Circuit's stringent "alter ego" test for "imputed" general jurisdiction over a parent

5   corporation, Jeong's allegations do not meet that high standard. *See Ranza*, 793 F.3d at 1071.

6          Jeong makes a series of conclusory and immaterial allegations in an effort to establish

7   single-enterprise theory.  *See* Compl. ¶ 23(a)–(h).  The allegation in paragraph 23(a) regarding

8   Credissimo has no apparent connection to Jeong's single-enterprise theory.  The allegations in

9   paragraph 23(b)–(h) are conclusory and boilerplate allegations that need not be accepted by this

10  Court. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The allegations in paragraphs 24, 25, 27,

11  in which Jeong relies on media quotes and press releases to establish his single-enterprise theory,

12  are legally immaterial to the Court's analysis and carry no weight.  *See Virtualmagic Asia, Inc.*, 99

13  Cal. App. 4th 228, 245 (2002).

14         Even under the best light, Jeong's single-enterprise allegations are far less compelling than

15  those in *Ranza*, which held that Nike and its wholly-owned subsidiary, NEON, were not alter

16  egos, despite the fact that "Nike [was] heavily involved in NEON's operations," exercised control

17  over NEON's overall budget and policies, operated a general information tracking system for all

18  subsidiaries, and ensured the Nike brand was marketed consistently throughout the world.  *See id.*

19  at 1074.[10]  Jeong's boilerplate allegations are far less detailed than those in *Ranza* and do not

20  satisfy the first prong of the single-enterprise test as a matter of law.

21

22         [10]   In addition to *Ranza*, many cases reject Jeong's theory. *See Pitt v. Metro Tower Life Ins.*

23  *Co.*, 2020 WL 1557429, at *7 (N.D. Cal. 2020) ("The Ninth Circuit has held that a parent company
    may finance a subsidiary without imputing the subsidiary's contacts to the parent . . . under

24  California law, consolidated reporting, including tax reporting, does not establish agency for
    purposes of jurisdiction."); *see, e.g., Corcoran v. CVS Health*, 169 F. Supp. 3d 970, 983–84 (N.D.

25  Cal. 2016) (rejecting alter ego where "separate corporate entities present[ed] themselves as one
    online" and noting that "it is considered a normal attribute of ownership that officers and directors

26  of the parent serve as officers and directors of the subsidiary" (quotation omitted)); *McGeachy v.*
    *Pinto Valley*, 2017 WL 3130639, at *5 (D. Ariz. 2017) (rejecting alter ego where subsidiary's

27  documents used parent's name and logo; some officers and directors worked for both companies;
    parent's federal filings discussed unified business; parent's documents prescribed general practices

28  and policies); *Pokemon Co. v. Shopify, Inc.*,  2017 WL 697520, at *4 (N.D. Cal. 2017) (one office
    for two entities and shared officers and executives is inadequate to satisfy the alter ego test).

Here, the European Nexo Entities and Nexo Financial LLC maintain their own independent corporate structures.  *See* Trenchev Decl. ¶¶ 21–22.  They are distinct business entities from Nexo Capital Inc., provide different types of services in different geographical regions, have maintained corporate formalities, have been adequately capitalized to meet their ongoing operational and financial obligations, have maintained separate bank accounts, have not commingled assets or funds with the assets or funds of Nexo Capital Inc., have maintained separate books and records, and have paid their own taxes if owed.  *See id.*  Each maintains different officers, committees, and boards to direct their operation (although some may overlap). *See id.*  These sworn facts plainly controvert Jeong's boilerplate assertions. The Court should dismiss the European Nexo Entities and Nexo Financial LLC for lack of personal jurisdiction.

### 2.    Inequitable Result.

Jeong's allegations also do not satisfy the second prong of the single-enterprise test: whether disregarding their separate identities would result in fraud or injustice.  *Unocal*, 248 F.3d at 926.  Jeong does not plausibly allege facts showing that an "injustice" would occur if this Court could not exercise jurisdiction over the European Nexo Entities.  Jeong alleges that, if the foreign entities were not held to be a single-enterprise with Nexo Financial, Jeong would not be able to establish personal jurisdiction over them and might have to bring suits in different jurisdictions. This is patently insufficient.  California courts require evidence of *past* fraudulent conduct or injustice to support a finding of alter ego liability. *Reynolds*, 481 F. Supp. 3d at 1009 (emphasis added). "California courts routinely reject[ ] the view that the potential difficulty a plaintiff faces collecting a judgment is an inequitable result that warrants application of the alter ego doctrine." *Gerritsen v. Warner Bros. Ent. Inc.*, 116 F. Supp. 3d 1104, 1144 (C.D. Cal. 2015) (internal quotations omitted).

In any event, Nexo Capital Inc., the entity which actually operates the Nexo platform and extended the disputed credit to Jeong, is not challenging the Court's personal jurisdiction.  Jeong's effort to invoke the single-enterprise rule is a desperate effort to bring in entities with no connection to California, and it should be rejected.  The presence of Nexo Capital Inc. eliminates any concerns about an "inequitable result."  The Court should dismiss the European Nexo Entities

1    and Nexo Financial LLC for lack of personal jurisdiction.

2    **II.**    **THE COURT SHOULD DISMISS FOR LACK OF SUBJECT MATTER**
3       **JURISDICTION.**

4       Subject to their 12(b)(2) motion, all Defendants move to dismiss Jeong's claims against

5    them for lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). A plaintiff's standing is

6    a constitutional prerequisite to invoking the Court's subject matter jurisdiction. Specifically, a

7    plaintiff must allege specific facts showing a concrete injury that is "fairly traceable to the

8    challenged conduct of the defendant." Jeong has failed to establish that Nexo's alleged conduct—

9    even if wrongful—was the cause of his losses. Jeong's four claims hinge on the allegations that

10    Nexo harmed him by (1) suspending XRP as an acceptable cryptocurrency after the SEC's

11    lawsuit, and (2) by failing to give him notice of the suspension. *See* Compl. ¶¶ 8, 167, 173, 193,

12    199. Neither caused Jeong's damages. Instead, Jeong's damages resulted from the drop in XRP's

13    value and his concomitant failure to maintain the agreed LTV. Jeong does not allege—and cannot

14    allege—any facts establishing Nexo's responsibility for these damages.

      **A.**    **The Rule 12(b)(1) Legal Standard.**

15       A defendant may move to dismiss a lawsuit for lack of subject matter jurisdiction pursuant

16    to Federal Rule of Civil Procedure 12(b)(1). If the plaintiff lacks standing under Article III of the

17    U.S. Constitution, then the court lacks subject matter jurisdiction, and the case must be

18    dismissed. *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 101–02 (1998).

19       Once a party has moved to dismiss for lack of subject matter jurisdiction under Rule

20    12(b)(1), the opposing party bears the burden of establishing the court's jurisdiction, *see Chandler*

21    *v. State Farm Mut. Auto. Ins. Co.,* 598 F.3d 1115, 1122 (9th Cir. 2010), by putting forth

"the manner and degree of evidence required" by whatever stage of the litigation the case has reached. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992).  This requires that the non-movant demonstrate through allegations of "specific facts plausibly explaining" why the standing requirements are met. *Barnum Timber Co. v. Envtl. Prot. Agency,* 633 F.3d 894, 899 (9th Cir. 2011).

## B.      Article III Standing Requirements.

Article III standing requires a plaintiff to plead and prove that he has suffered sufficient injury to satisfy the "case or controversy" requirement of Article III of the United States Constitution. *Clapper v.* Amnesty *Intern. USA*, 568 U.S. 398, 423 (2013).  To meet this requirement, a plaintiff must show that (1) he suffered a concrete injury, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

Importantly, "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek[.]" *TransUnion LLC v. Ramirez*, 2021 WL 2599472, at *10 (U.S. June 25, 2021).  Here, Nexo challenges (1) the traceability element with respect to the suspension of XRP as a repayment option because Jeong cannot show that his injuries-in-fact are "fairly traceable" to the suspension; and, (2) the traceability element and the concrete injury requirement for his lack of notice allegation.

The "fairly traceable" requirement contemplates the plaintiff demonstrating that the injury is "causally linked" to the alleged misconduct and is "not the result of misconduct of some third party not before the court." *Washington Envtl. Council v. Bellon*, 732 F.3d 1131, 1141 (9th Cir. 2013).  A plaintiff must not only connect the defendant's conduct to his injuries, the plaintiff must also show "that there are no *independent* actions of third parties that break the causal link" between the wrongful act and the harm claimed. *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939, 953 (9th Cir. 2013) (emphasis in original).

Importantly, mere lack or delay of notice typically does not satisfy the "fairly traceable" requirement. *In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1211 (N.D. Cal. 2014). In *Adobe*, the named plaintiffs could not establish Article III standing to assert a claim under

-13-

California's data breach disclosure laws because Adobe's failure to give statutory notice of a data breach was not causally connected to the plaintiffs' alleged injuries. *Id.* ("Plaintiffs do not have standing to bring a claim based on Adobe's alleged violation of Section 1798.82 (the notification provision), because Plaintiffs do not allege that they suffered any particular injury stemming from Adobe's failure to reasonably *notify* Plaintiffs of the 2013 data breach.") (emphasis in original); *see also Razuki v. Caliber Home Loans, Inc.*, 2018 WL 6018361, at *2 (S.D. Cal. 2018) (Dismissing plaintiff's claim with prejudice because "unreasonable delay," in giving required notice failed to "cause[] any alleged injury.").

Likewise, the Supreme Court recently reiterated its skepticism towards standing when the claims are based on a mere failure to adhere to procedures. *TransUnion*, 2021 WL 2599472, at *15. A plaintiff cannot "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Spokeo*, 136 S. Ct. at 1549. Both *TransUnion* and *Spokeo* entail the application of Article III standing requirements to bare procedural violations of federal law, but the same rationale undergirds Article III's application to any other dispute—the plaintiff must plausibly plead a concrete injury-in-fact.

### C.     Jeong Fails to Plausibly Plead a Traceable Injury.

Jeong alleges that his injuries flow from (1) Nexo's limited suspension of XRP as a repayment method and (2) Nexo's failure to notify Jeong of the suspension. Neither allegation is "causally linked" to the gravamen of Jeong's economic injury, which is the value lost in his XRP.

***Nexo's Suspension of XRP as one of Many Repayment Options***. Critically, even assuming that Nexo's suspension of XRP was wrongful—which it was not—the suspension did not preclude Jeong from maintaining his LTV to prevent a liquidation event. Jeong admits that outside of XRP, Nexo accepts a variety of repayment options including Bitcoin, Ethereum, Litecoin, Stellar, Bitcoin Cash, or EOS to pay down the credit or increase the collateral. *See* Compl. ¶ 47. In fact, Jeong does not plead that Nexo's suspension of XRP as a repayment option prevented him from converting XRP held off Nexo to any other acceptable cryptocurrency and used the proceeds to pay down his credit line. Jeong also never alleges that he attempted to avail himself of the many other acceptable repayment methods but Nexo prevented him from doing so.

1   There are **no** pleaded facts tending to establish that Nexo's suspension of XRP actually prevented

2   Jeong from maintaining his LTV and causing him financial loss.

3        In this respect, Jeong's lawsuit contains an incurable logical gap between his injuries and

4   Nexo's alleged suspension of XRP.  The unbridgeable gap is that Nexo had no impact on Jeong's

5   losses; the losses were triggered by an independent cause—namely the announcement of an SEC

6   lawsuit and investigation into Ripple—which caused XRP to drop, which in turn caused Jeong's

7   LTV to exceed the 83.3% threshold, which he failed to cure with any number of acceptable

8   cryptocurrencies.  Jeong simply cannot plead a set of facts establishing a causal link between

9   Nexo's suspension of XRP and his losses in the volatile cryptocurrency market.  Jeong fails to

10  establish standing to bring this claim. *Bellon*, 732 F.3d at 1141.

11       ***Nexo's Supposed Lack of Notice of XRP's Suspension***.  In the second-prong of his breach

12  theory, Jeong claims that Nexo had an obligation to give him notice of XRP's suspension and that

13  it failed to do so.  Jeong's notice argument is narrow.  Jeong does not plead that Nexo has a

14  general obligation to notify him that XRP was dropping in value or that the SEC was investigating

15  Ripple for securities fraud.  Jeong simply pleads that when Nexo suspended XRP as one of *many*

16  available repayment options, it was required to give him notice of the suspension.[11]

17       But here is the flaw with Jeong's theory: he does not plead any facts suggesting that had he

18  received notice of the suspension, he would have engaged in some course of action that he

19  otherwise did not engage in to avoid his claimed injury.  In other words, Jeong fails to establish

20  the "fairly traceable" requirement: namely, *how* did a lack of notice actually cause his claimed

21  harm?  Jeong does not plead that prompt notice would not have stopped XRP's loss of value, or

22  that prompt notice would have even allowed him to add collateral to satisfy Nexo's LTV

23

24       [11]   Jeong identifies no express notice requirement in the T&Cs requiring Nexo to give Jeong
        notice of the XRP suspension.  Jeong relies on Borrow Terms VI.1, VI2, *see* Compl. ¶¶ 82–83, but
25      these notice requirements pertain to maintaining LTV, not to the suspension of a payment option.
        Next, Jeong argues that he is entitled to notice of changes to the T&Cs, *see* Compl. ¶¶ 62, 80, but
26      Jeong does not plead that Nexo's suspension of XRP entailed any changes to the T&Cs.  As
        discussed in Nexo's 12(b)(6) Motion to Dismiss Jeong's breach of contract claim, Jeong admits that
27      he agreed to terms and conditions in which Nexo could "suspend . . . all or part of other Nexo
        services" in its "sole and absolute discretion" which can be exercised "at any time." *See* Compl. ¶¶
28      65, 66.

1   requirements.  That is, *assuming arguendo* that Jeong had received notice of the suspension, how

2   would that notice impact any of his losses at all? It would not. Jeong's receiving notice of the XRP

3   suspension would not have allowed him to circumvent the suspension in any way or otherwise be

4   excused from maintaining his LTV.  XRP was in a freefall because of the SEC's lawsuit and

5   investigation, and regardless of Jeong's notice of the XRP suspension he was still obligated to

6   maintain his LTV value.  Jeong's notice argument has an incurable traceability defect.

7           **D.**        **Jeong Fails to Plausibly Plead a Concrete Injury-in-Fact with Respect to his Lack-of-Notice Theory.**

8

9          Jeong fails to explain what specific concrete injury he suffered because of Nexo's

10   supposed lack of notice that XRP was suspended a repayment method.  Jeong's losses resulted

11   from XRP's precipitous loss in value.  Jeong does not explain how Nexo's lack of notice figures

12   into those losses.  The gaps in Jeong's notice theory are why courts are reluctant to ascribe a mere

13   lack of notice, without more, as sufficient to satisfy Article III's "concrete injury" requirement.

14   *See TransUnion*, 2021 WL 2599472, at *15; *Spokeo*, 136 S. Ct. at 1549.  As in *Adobe*, Jeong does

15   not allege any specific injuries from Nexo's failure to notify him of the suspension.  *Adobe*, 66 F.

16   Supp. 3d at 1211.  For this reason, Jeong cannot establish Article III standing.

17   **III.**      **THE COURT SHOULD DISMISS FOR FAILURE TO STATE A CLAIM.**

18           **A.**        **The Court Should Dismiss the Breach of Contract Claim.**

19          Subject to their 12(b)(2) motion, all Defendants move to dismiss Jeong's claims against

20   them for failure to state a claim.  *See* Fed. R. Civ. P. 12(b)(6).  Jeong fails to plead any provisions

21   of the T&Cs that Nexo actually breached.  Therefore, Jeong turns to the implied covenant of good

22   faith and fair dealing as a catch-all claim, which is littered throughout his Complaint.  The implied

23   covenant of good faith and fair dealing does not apply because Nexo's conduct was authorized by

24   the plain language of the T&Cs.  His breach of contract claim fails.

25           **1.**        **Jeong fails to plausibly plead a breach of contract claim.**

26          Jeong alleges that Nexo committed a breach of contract by (1) suspending XRP and (2)

27   failing to notify Jeong of the suspension.  *See* Compl. ¶ 167.  Neither is viable.

28          *First*, there is nothing in the T&Cs precluding Nexo from suspending XRP.  In fact, the

T&Cs expressly authorize Nexo to do so.  The T&Cs provide that Nexo may:

> **At any time, at our sole and absolute discretion, without liability to you, we can . . . suspend the provision of the Nexo Crypto Credit or of all or part of the other Nexo services[.]**

Borrow Terms III.3 (emphasis added).  Under this provision, Nexo can suspend all part of the Nexo services that it provides on its platform. Likewise, Nexo can alter the Digital Assets (defined to include cryptocurrency) offered on its platform:

> **All such Digital Assets are indicated on the Nexo Platform and in the Nexo Account and are subject to revision from time to time.**

Borrow Terms IV.1 (emphasis added).  Likewise, in the Borrow Terms section on repayment and withdrawal, Nexo reserved the right to regulate repayment options:

> **You may repay at any time prior to the Maturity Date and any amount: (i) by transferring into the Nexo Account the same Digital Assets as the Nexo Crypto Credit granted, or other Digital Assets acceptable to Nexo; (ii) with the Collateral; or (iii) by combination of (i) and (ii). <u>Certain rules may apply to repayments from time to time, as indicated on the Nexo Platform.</u>**

Borrow Terms VIII.2 (emphasis added).

To be clear, suspending XRP as a repayment option does not violate a single provision in the T&Cs.  This allegation does not support a breach of contract claim.  To make matters worse, Jeong then argues that Nexo's non-breach somehow excuses Jeong's actual breach in failing to maintain the required LTV ratio, claiming that his contractual obligation to maintain sufficient margin was "suspended."  Nothing in the contract or law supports this implausible breach claim, which turns the agreed risk allocation between borrower and secured lender on its head.

*Second*, there is nothing in the T&Cs requiring Nexo to give Jeong notice of the suspension.  To the contrary, Borrow Terms III.3 provides that Nexo can suspend XRP "at any time" whether Jeong has notice or not.  Borrow Terms III.3.

Jeong is only entitled to notice prior to a liquidation event.  Borrow Terms VI.2.  Jeong, however, does ***not*** claim that the liquidation of his collateral was independently wrongful.  Instead, Jeong claims that collateral liquidation was only wrongful insofar as the suspension of XRP as a repayment option and the failure to give notice of the suspension were preliminary

breaches that "excused any obligation" Nexo's customers "had to maintain their LTV ratios."  *See* Compl. ¶¶ 8, 63, 171.  That is, Jeong theorizes that the initial breaches relating to the suspension of XRP excused him, and all other affected Nexo users, from any further contractual obligations to Nexo, including maintaining their LTV ratios or even paying down their credit at all.  *See* Compl. ¶¶ 1, 6, 8, 10, 63, 171.  Jeong's theory is akin to alleging that a bank's procedural error—which even here did not exist—somehow permanently releases the borrower from paying the remaining principal amount.  There is no authority supporting Jeong's radical theory.  And here, Nexo made no errors at all.

More importantly, Jeong fails to plausibly plead his harm flowed from Nexo's breach. Jeong's claim is that Nexo's suspension of XRP led to his liquidation and thereby caused his financial losses.  But this does not hold up.  The suspension of XRP as a repayment option did not preclude Jeong from using Bitcoin, Ethereum, Litecoin, Stellar, Bitcoin Cash, or EOS to pay down his outstanding credit balance and consequently withdrawing his collateral.  *See* Compl. ¶ 47.[12]  In fact, if Jeong held XRP in a wallet or exchange outside of Nexo, then he could have converted his XRP to any other acceptable cryptocurrency on a variety of currency exchanges and used the proceeds to pay down his credit line.  Similarly, Jeong could have converted U.S. Dollars to an accepted cryptocurrency and repaid his credit line that way.  Nexo's lawful suspension of XRP as a repayment option and the alleged lack of notice about the suspension did not damage Jeong; Jeong was damaged when (1) the announcement of an SEC lawsuit and investigation into Ripple caused the XRP to drop, and (2) Jeong failed to maintain the requisite LTV ratio.

*Third*, Jeong fails to plausibly allege a breach of contract claim even assuming the validity of his breach allegations against Nexo.  As explained above, Jeong does not seek damages traceable to Nexo's non-existent alleged breaches; he pleads a fundamentally different claim—that Nexo's "material breaches of contract excused any obligation by the members of the Damages Class to maintain their LTV ratios."  Compl. ¶ 171; *see also* ¶¶ 8, 10, 63 (same).  This untenable theory converts Nexo from a secured creditor to an insurer of its clients' market losses, and its

---

[12]  In addition to those listed in Jeong's Complaint, Nexo also accepted TrueUSD, USD Coin, Dai, Paxos Standard, Tron, Tether, Binance coin, Chainlink or HUSD.

1   fundamentally alters the risk allocation contemplated by the Terms and Conditions.  Nexo's non-

2   breach with respect to the suspension of one cryptocurrency payment option (XRP) does not give

3   its clients *carte blanche* to breach their distinct margin-maintenance obligations.  Jeong has failed

4   to plausibly plead a breach of contract claim, and it should be dismissed.

### 2. Jeong's allegation of Nexo's "unconscionable ownership" of collateral is immaterial.

7   Jeong argues that the Borrow Terms are unconscionable because the terms provide that

8   "[u]nless prohibited by any Applicable Law, by virtue of this Agreement Nexo acquires the

9   ownership of the Collateral while the Nexo Crypto Credit is outstanding."  *See* Borrow Terms

10  IV.5; Compl. ¶¶ 7, 11, 13, 15, 72, 97, 99–121, 131–132.  Jeong then presents several false

11  *hypothetical* scenarios in which he purports to describe an "unconscionable" application of this

12  provision.  *See* Compl. ¶¶ 103, 105.  None of these scenarios came to fruition with respect to the

13  allegations in Jeong's lawsuit.

14  Borrow Term IV.5 is a basic feature of collateral-based relationships: a secured lender

15  acquires possessory rights over the collateral, and may have to exercise its undisputed contractual

16  right to liquidate the collateral and apply the proceeds against the credit line. In any event, Jeong

17  does ***not*** allege that Nexo wrongfully applied Borrow Term IV.5 to him but instead simply

18  describes the issue as "an important economic and tax-related issue for Nexo and its customers

19  alike."  *See* Compl. ¶ 133.  But Jeong pleads no damages related to taxes and the like, and the

20  problem is imaginary because the T&Cs contain a carve-out if the "ownership" provision is

21  "prohibited by any Applicable Law."  *See* Borrow Terms IV.5.  Jeong's lengthy exposition on

22  these matters, *see* Compl. ¶ 95–133, has no clear point.  He eventually requests declaratory relief

23  with respect to "ownership" of the collateral, but this is plainly a request for an improper advisory

24  opinion based on hypotheticals untethered to any actual damages claimed in this lawsuit.  *See*

25  *Trinh v. Homan*, 466 F. Supp. 3d 1077, 1095 (C.D. Cal. 2020).  The Court should dismiss it.

### 3. Jeong's reliance on the implied covenant of good faith and fair dealing is misplaced.

27  Because the T&Cs foreclose his breach of contract theory, Jeong repeatedly claims that

Nexo's suspension of XRP repayments breached an implied covenant of good faith and fair

dealing. *See* Compl. ¶¶ 55, 60, 66, 70, 81, 88, 149, 169.  This claim fails as a matter of law.

The implied covenant of good faith and fair dealing cannot contradict the express terms of

a contract. *Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*, 100 Cal. App. 4th 44, 55 (2002).

Nor does the implied covenant alter a party's existing rights or duties under a contract. *Enhanced*

*Athlete Inc. v. Google LLC*, 2020 WL 4732209 (N.D. Cal. Aug. 14, 2020).  Critically, "**if**

**defendants were given the right to do what they did by the express provisions of the contract**

**there can be no breach.**" *Storek*, 100 Cal. App. 4th at 56 (emphasis added).  Finally, to state a

claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must identify

the **specific contractual provision that was frustrated**. *In re Facebook, Inc., Consumer Privacy*

*User Profile Litig.*, 402 F. Supp. 3d 767, 802 (N.D. Cal. 2019); *Rockridge Tr. v. Wells Fargo,*

*N.A.*, 985 F. Supp. 2d 1110, 1156 (N.D. Cal. 2013).[13]

**B.     The Court should Dismiss the Declaratory Judgment Claim.**

Generally, declaratory relief will not lie when duplicated in the underlying contract

action.[14]  The gravamen of Jeong's declaratory judgment claim is relief duplicative of his breach

of contract claim: varying shades of declarations regarding Nexo's right to suspend XRP without

---

[13]   Jeong argues that, under "the common law across states," the implied covenant of good faith and fair dealing somehow curtails Nexo's discretion in the T&Cs which expressly allow Nexo to alter or remove features on the platform in its discretion.  But this is not a scenario in which Nexo was granted limited discretion which it abused.  Instead, Nexo suspended XRP as a repayment operation because it had the unfettered and express right to do so, which California law recognizes is not a breach of the implied covenant of good faith and fair dealing. *Storek*, 100 Cal. App. 4th at 56. Under California law, Nexo could have suspended XRP even in the absence of any SEC investigation and lawsuit against Ripple without breaching the implied covenant of good faith. Likewise, Jeong fails to point to any provision that was frustrated by Nexo's conduct.  Instead, Jeong tries to weaponize the implied covenant of good faith and fair dealing and re-write the T&Cs as he wishes them to be.  This is legally incorrect and his claim fails.

[14]   *See United Safeguard Distributors Ass'n, Inc. v. Safeguard Bus. Sys., Inc*., 145 F. Supp. 3d 932, 961 (C.D. Cal. 2015) (dismissing declaratory judgment claim with prejudice because it was "nothing more than a duplication of their breach of contract claim" and was couched as a "remedial measure to address previously alleged breach of contract claims.").   This is based on the longstanding Ninth Circuit rule that "[d]eclaratory relief should be denied when it will neither serve a useful purpose in clarifying and settling the legal relations in issue nor terminate the proceedings and afford relief from the uncertainty and controversy faced with of contract claims." *United States v. State of Wash.*, 759 F.2d 1353, 1357 (9th Cir. 1985); *see also Trinh v. Homan*, 466 F. Supp. 3d 1077, 1095 (C.D. Cal. 2020) ("Because the declaration Petitioners seek would be nothing more than a retrospective opinion that their rights were violated, the Court cannot issue it.").

notice.  *See* Compl. ¶¶ 174–183.  This is an improper regurgitation of his breach of contract claim and should be dismissed.

Jeong also tacks on a series of paragraphs seeking declarations with respect to Nexo's "ownership" of the collateral that its borrowers deposit.  *See* Compl. ¶¶ 184–189.  None of these declarations have any connection to Jeong's damages or claims in this lawsuit.  These declarations would serve no purpose in "clarifying and settling the legal relations in issue nor terminate the proceedings and afford relief from the uncertainty and controversy faced by the parties."  *See United States v. State of Wash.*, 759 F.2d 1353, 1357 (9th Cir. 1985).  Instead, these requests are simply improper requests for a retrospective advisory opinion that Jeong's rights were violated.  *See Trinh*, 466 F. Supp. 3d at 1095.  Jeong's declaratory relief count should be dismissed.

**C.      The Court should Dismiss the CLRA Claim because the CLRA Does Not Apply to Extensions of Credit.**

The CLRA does not apply because Nexo did not provide either a "good" or "service" to Jeong as those terms are defined by the CLRA.  Jeong's CLRA claim should be dismissed with prejudice because, as noted below, there is no viable means of curing the defect in his pleading.

**1.      CLRA does not apply to credit or "virtual currency" transactions.**

The CLRA is a California remedial statute for aggrieved "consumers."  "Consumer" includes any individual who "seeks or acquires, by purchase or lease, any **goods or services** for personal, family, or household purposes." Cal. Civ. Code § 1761(d) (emphasis added).  In turn, the CLRA defines "goods" and "services" as follows:

> "Goods" means tangible chattels bought or leased for use primarily for personal, family, or household purposes, including certificates or coupons exchangeable for these goods, and including goods that, at the time of the sale or subsequently, are to be so affixed to real property as to become a part of real property, whether or not they are severable from the real property.

Cal. Civ. Code § 1761(a).

> "Services" means work, labor, and services for other than a commercial or business use, including services furnished in connection with the sale or repair of goods.

Cal. Civ. Code § 1761(b).

MOTION TO DISMISS BASED ON FRCP 12(B)

1    The CLRA does not apply because Nexo did not offer, and Jeong did not purchase, any

2  "goods" or "services."  Nexo extended credit under a credit line transaction to Jeong, and

3  California law is clear that the act of extending credit to another, including virtual currency

4  transactions, is not a good or service covered by the CLRA.  *Ball v. FleetBoston Fin. Corp.*, 164

5  Cal. App. 4th 794, 798 (2008); *Berry v. Am. Express Publ'g, Inc.*, 147 Cal. App. 4th 224, 230

6  (2007).

7    *Berry's* thorough analysis has been cited widely by Federal and state courts in California.

8  *Berry* considered whether defendant American Express's act of issuing credit to plaintiff Berry

9  was a transaction covered by CLRA.  *Id*. at 227.  Plaintiff Berry argued that the credit constituted

10  a "services furnished in connection with the sale . . . of goods" since she used the credit to

11  purchase tangible chattel.  *Id*. at 230.  *Berry* rejected this argument, noting that "credit, *separate*

12  *and apart from a specific purchase or lease of a good or service,*" is not "covered under the act."

13  *Id.* (emphasis in original).  *Berry* noted that early, unadopted drafts of the CLRA defined

14  "consumer" to include individuals who seek or acquire "any goods, services, *money, or credit* for

15  personal, family or household purposes."  *Id.*  Importantly, *Berry* explained that the "Legislature

16  removed the references to 'money' and 'credit,' before CLRA's enactment, and they do not appear

17  in the current version."  *Id.*  Accordingly, *Berry* easily concluded that extending credit did not

18  constitute a CLRA covered transaction.

19    *Berry* has been extended to similar scenarios.  For example, a loan is not covered by the

20  CLRA.  *Alborzian v. JPMorgan Chase Bank, N.A.*, 235 Cal. App. 4th 29, 40 (2015); *Consumer*

21  *Sols. REO, LLC v. Hillery*, 658 F. Supp. 2d 1002, 1016 (N.D. Cal. 2009) ("loans are intangible

22  goods and that ancillary services provided in the sale of intangible goods do not bring these goods

23  within the coverage of the CLRA").

24    Likewise, virtual currencies—*e.g.*, V-Bucks issued by Fortnite and Facebook Credits

25  issued by Facebook—are neither a good nor a service covered by CLRA.  *Doe v. Epic Games,*

26  *Inc.*, 435 F. Supp. 3d 1024, 1045–46 (N.D. Cal. 2020); *I.B. ex rel. Fife v. Facebook, Inc.*, 905 F.

27  Supp. 2d 989, 1007–08 (N.D. Cal. 2012).  *Epic Games* noted that whether the issue is an extension

28  of credit on a credit card or the granting of a virtual currency, the credit itself is intangible and

MOTION TO DISMISS BASED ON FRCP 12(B)

"exist[s] only as an indicia of the credit extended."  *Epic Games*, 435 F. Supp. 3d at 1046.

Nexo extended a credit line to Jeong in exchange for his cryptocurrency collateral.  This is an intangible good.  Under *Berry* and its progeny, the transaction between Jeong and Nexo is not covered by the CLRA.

### 2.    CLRA's "ancillary services" exception no longer applies.

Jeong may argue that Nexo provides various "ancillary services" which transform an intangible credit line into a "service" covered by the CLRA.  This argument has no merit. Prior to the California Supreme Court's 2009 decision in *Fairbanks v. Superior Court*, 46 Cal. 4th 56 (2009), some California courts swept intangible chattels, including loans, insurance policies, and investment securities, into the CLRA under the premise that many the providers of these items often offered "ancillary services" to their customers.  In *Fairbanks* the Supreme Court unequivocally concluded that the provision of "ancillary services" does not bring intangible chattels within the coverage of the CLRA.  *Id.* at 65.  *Fairbanks*, which applied to insurance policies, also applies to lenders. *Alborzian*, 235 Cal. App. 4th at 40; *Sonoda v. Amerisave Mortg. Corp.*, 2011 WL 2690451, at *4 (N.D. Cal. July 8, 2011).  Nexo extended Jeong credit.  That was the core of the transaction.  Any services that Nexo might have provided (and Jeong identifies none in his Complaint) are merely "ancillary services" which fail to bring the transaction within the purview of the CLRA.

### 3.    The appropriate outcome is dismissal with prejudice.

Jeong cannot salvage his CLRA claim by pleading amendment.  Credit transactions brought under the CLRA are dismissed with prejudice.[15]  This Court should do likewise.

---

[15] *See Mazonas v. Nationstar Mortgage LLC*, 2016 WL 2344196, at *4 (N.D. Cal. May 4, 2016) ("Accordingly, plaintiffs' CLRA claim is dismissed without leave to amend because there appears no viable legal theory for this claim."); I.*B. ex rel. Fife v. Facebook, Inc*., 905 F. Supp. 2d 989, 1007–08 (N.D. Cal. 2012) ("Because amendment of the pleadings would not cure this defect, the CLRA claim is dismissed without leave to amend."); *Reynoso v. Paul Fin., LLC*, 2009 WL 3833298, at *9 (N.D. Cal. Nov. 16, 2009) ("Even if the Complaint could be construed as stating a claim related to 'services' provided in relation to the loan, such ancillary services are not covered by the statute . . . . This cause of action is therefore DISMISSED WITH PREJUDICE.").

### D.     The Court should Dismiss Jeong's UCL and CLRA Claims because Jeong Pleads an Adequate Remedy at Law.

Jeong seeks equitable restitution and an injunction under the UCL.  *See* Compl. ¶¶ 11, 134–137.  Similarly, Jeong exclusively seeks equitable relief in the form of an injunction under the CLRA.  *See id.* ¶ 213.  To prevail on equitable remedies under both, he must show the inadequacy of legal remedies.  Because he cannot—his loss is purely monetary—his UCL and CLRA claims must be dismissed.  When a plaintiff requests equitable relief under the UCL and CLRA, the "traditional principles governing equitable remedies in federal courts, including the requisite inadequacy of legal remedies, apply."  *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020).  The upshot is that Jeong "must establish that [he] lacks an adequate remedy at law before securing equitable restitution for past harm under the UCL[.]"  *Id.*; *see also Schroeder v. United States*, 569 F.3d 956, 963 (9th Cir. 2009) ("[E]quitable relief is not appropriate where an adequate remedy exists at law.").  Jeong is not even entitled to plead equitable restitution as an alternative claim for relief under the UCL or CLRA.[16]

In addition, Jeong must also establish in his pleading how UCL restitution could be different from damages.  *Julian v. TTE Tech., Inc.*, 2020 WL 6743912, at *4 (N.D. Cal. Nov. 17, 2020).  Merely alleging that the same suit would have to be brought repeatedly is insufficient.  *In re MacBook Keyboard Litig.*, 2020 WL 6047253, at *3 (N.D. Cal. Oct. 13, 2020).

Jeong pleads himself out of a UCL claim in paragraphs 134–136 of his Complaint.  In those paragraphs, Jeong outlines his "damages" and provides corresponding market value for his losses.  In paragraph 136, he specifically discusses his failure to receive the "benefit of his bargain" with Nexo.  Because Jeong is seeking the "benefit of his bargain" from Nexo, then by definition, he has an adequate remedy at law.   Likewise, in paragraphs 196–204, Jeong again pleads for disgorgement for the value of the collateral.  However, none of these claims for relief

---

[16] *See In re California Gasoline Spot Mkt. Antitrust Litig*., 2021 WL 1176645, at *8 (N.D. Cal. Mar. 29, 2021); *Sharma v. Volkswagen AG*, 2021 WL 912271, at *8 (N.D. Cal. Mar. 9, 2021) ("Plaintiffs offer for the contention that a plaintiff may plead alternative claims seeking both equitable and legal remedies. The issue is not whether a pleading may seek distinct forms of relief in the alternative, but rather whether a prayer for equitable relief states a claim if the pleading does not demonstrate the inadequacy of a legal remedy. On that point, Sonner holds that it does not.").

establish the inadequacy of legal remedies.  In fact, his losses are already liquidated in his

Complaint.  *See* Compl. ¶¶ 134–137.  All of Jeong's losses can be remedied by monetary award.

Therefore, his UCL and CLRA claims for equitable relief fails.

> **E.      The Court should Dismiss Jeong's UCL claim because he Fails to Plead a Plausible Predicate Violation of Law.**

The UCL is designed to punish "acts or practices which are unlawful, or unfair, or

fraudulent."  *Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163,

180 (1999).  In addition, the UCL "borrows violations of other laws and treats them as unlawful

practices that the unfair competition law makes independently actionable."  *Wilson v. Hewlett-*

*Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012).  Jeong claims that Nexo's alleged breach of

contract constitutes the "unlawful" conduct.  *See* Compl. ¶¶ 192, 193.  Jeong claims that Nexo was

"unfair" for the same reason: it "initiated the suspension [of XRP] in bad faith" and it was "unfair"

for Nexo not to give him notice of the suspension. *See* Compl. ¶¶ 194–195.  However, for the

reasons discussed above, none of this conduct constitutes a predicate violation of the UCL.

Finally, Jeong alleges that Nexo engaged in "deceptive" and "misleading" advertising and

deceived users with respect to "ownership" over the collateral.  *See* Compl. ¶¶ 196, 197.

However, none of his claims are predicated on "deceptive" and "misleading" advertising about

"ownership" and none of his damages flow from any of this alleged conduct.  The allegations in

these paragraphs are superfluous and fail to establish a plausible UCL claim.

## <u>CONCLUSION</u>

The Court should grant the present motion to dismiss.

DATED:   July 12, 2021                        EVERSHEDS SUTHERLAND (US) LLP


                                              By */s/ Ian S. Shelton*
                                              Ian S. Shelton

                                              *Attorneys for Defendants Nexo Financial LLC,*
                                              *Nexo Financial Services Ltd., Nexo Services OÜ,*
                                              *Nexo AG, and Nexo Capital Inc.*