EVERSHEDS SUTHERLAND (US) LLP
Ian S. Shelton (SBN 264863)
ianshelton@eversheds-sutherland.com
500 Capitol Mall, Suite 1750
Sacramento, CA 95814
Telephone:     (916) 844-2965
Facsimile:     (916) 241-0501

EVERSHEDS SUTHERLAND (US) LLP
Michael Bahar (*PHV* pending)
michaelbahar@eversheds-sutherland.com
700 Sixth Street, NW, Suite 700
Washington, DC  20001-3980
Telephone:  (202) 383-0882
Facsimile:   (202) 637-3593

*Attorneys for Defendants Nexo Financial LLC, Nexo
Financial Services Ltd., Nexo Services OÜ, Nexo AG,
and Nexo Capital Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUNHAN JEONG, individually and on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> NEXO FINANCIAL LLC, NEXO FINANCIAL SERVICES LTD., NEXO SERVICES OÜ, NEXO AG, and NEXO CAPITAL INC., <br><br> Defendants. | CASE NO. 5:21-CV-02392-BLF <br><br> The Honorable Beth Labson Freeman <br><br> **NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b) AND BASED ON THE DOCTRINE OF *FORUM NON CONVENIENS*** <br><br> Hearing Date:  November 18, 2021 <br> Hearing Time: 9:00 a.m. <br><br> Courtroom:   No. 3, 5th Floor <br> Address:      U.S. Courthouse <br>                     280 South 1st Street <br>                     San Jose, CA 95113 |

MOTION TO DISMISS

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on November 18, 2021, at 9:00 a.m., or as soon thereafter as the matter may be heard in the above-entitled Court, located at San Jose Courthouse, Courtroom 3 – 5th Floor, 280 South 1st Street, San Jose, California 95113, Defendants Nexo Financial LLC, Nexo Financial Services Ltd., Nexo Services OÜ, Nexo AG, and Nexo Capital Inc. ("Defendants") will move this Court to dismiss the Complaint filed by Plaintiff Juhan Jeong pursuant Federal Rule of Civil Procedure 12(b) and, alternatively to dismiss pursuant to the *forum non conveniens* ("FNC") doctrine.   In particular, Defendants seek the following relief:

1. Defendants seek dismissal of Nexo Financial LLC, Nexo Financial Services Ltd., Nexo Services OÜ, and Nexo AG for lack of personal jurisdiction under Rule 12(b)(2).

2. Defendants seek dismissal of all claims for lack of Article III standing under Rule 12(b)(1).

3. Defendants seek dismissal of the breach of contract and declaratory judgment claims under Rule 12(b)(6) because the Terms and Conditions at issue expressly authorize the complained-of conduct, meaning there was no breach.  These claims are also not plausible because Plaintiff's theory that Nexo's non-existent breach "excused any obligation" for Plaintiff to maintain the required margin on his credit line has no support in the contract or law.

4. Defendants seek dismissal of the declaratory judgment claim under Rule 12(b)(6) because it is duplicative of the breach of contract claim and seeks an advisory opinion on hypothetical issues not properly before the Court.

5. Defendants seek dismissal of the CLRA claim under Rule 12(b)(6) because the CLRA does not apply to extensions of credit or loans.

6. Defendants seek dismissal of the equitable UCL and CLRA claims under Rule 12(b)(6) based on *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020),

because Plaintiff pleads he has an adequate remedy at law through his breach of contract claim.

7. Defendants seek dismissal of the UCL claim under Rule 12(b)(6) because Plaintiff does not plausibly allege breach of contract or any other predicate violation of law.

8. In the strict alternative to their jurisdictional objections, Defendants seek dismissal of the breach of contract and declaratory judgment claims pursuant to the FNC doctrine because Plaintiff agreed that any dispute shall be referred to the competent court in London, England.

This Motion is based on this Notice, the accompanying Memorandum of Points and Authorities, the Declaration of Antoni Trenchev; the pleadings and other papers on file in this action; and such other declarations, evidence and argument as may be presented before or at the hearing.

DATED:   July 19, 2021                              EVERSHEDS SUTHERLAND (US) LLP

By */s/ Ian S. Shelton*
—————————————————————
Ian S. Shelton

*Attorneys for Defendants Nexo Financial LLC,*
*Nexo Financial Services Ltd., Nexo Services OÜ,*
*Nexo AG, and Nexo Capital Inc.*

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................... 1

FACTUAL BACKGROUND .................................................................................... 3

ARGUMENT............................................................................................................. 6

    I.    THE COURT SHOULD DISMISS THE EUROPEAN NEXO ENTITIES AND NEXO FINANCIAL LLC FOR LACK OF PERSONAL JURISDICTION. ........................................................................................ 6

        A.    Legal Standard. ........................................................................ 7

        B.    Jeong Fails to Plausibly Plead a Single-Enterprise Theory. ........................ 8

    II.    THE COURT SHOULD DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION. ......................................................................... 10

        A.    Article III and the Rule 12(b)(1) Legal Standard...................................... 10

        B.    Jeong Fails to Plausibly Plead a Traceable Injury. .................................... 12

        C.    Jeong Fails to Plausibly Plead a Concrete Injury-in-Fact with Respect to his Lack-of-Notice Theory. ....................................................... 14

    III.    THE COURT SHOULD DISMISS FOR FAILURE TO STATE A CLAIM. ....... 14

        A.    The Court Should Dismiss the Breach of Contract Claim. ........................ 14

        B.    The Court Should Dismiss the Declaratory Judgment Claim.................... 18

        C.    The Court Should Dismiss the CLRA Claim because the CLRA does not Apply to Extensions of Credit...................................................... 19

        D.    The Court Should Dismiss Jeong's UCL and CLRA Claims under *Sonner v. Premier Nutrition Corp.* Because Jeong Pleads an Adequate Remedy at Law.............................................................................. 21

        E.    The Court Should Dismiss Jeong's UCL claim Because he Fails to Plead a Plausible Predicate Violation of Law........................................... 22

    IV.    THE COURT SHOULD DISMISS THE BREACH OF CONTRACT AND DECLARATORY JUDGMENT CLAIMS UNDER THE *FORUM NON CONVENIENS* DOCTRINE............................................................................... 23

        A.    Jeong Fails to Plead Contravention of a Strong Public Policy. ................. 23

        B.    Jeong Fails to Plead that London Courts Will Afford Him No Remedies. .................................................................................................... 24

CONCLUSION ....................................................................................................... 25

-iii-

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Adobe Sys., Inc. Privacy Litig.*,
    66 F. Supp. 3d 1197 (N.D. Cal. 2014) ............................................................................11, 14

*Alborzian v. JPMorgan Chase Bank, N.A.*,
    235 Cal. App. 4th 29 (2015) ...........................................................................................20, 21

*AM Tr. v. UBS AG*,
    681 F. App'x 587 (9th Cir. 2017) ............................................................................................ 7

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..............................................................................................................9, 14

*Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*,
    733 F.3d 939 (9th Cir. 2013) ................................................................................................ 11

*Ball v. FleetBoston Fin. Corp.*,
    164 Cal. App. 4th 794 (2008) .............................................................................................. 19

*Barnum Timber Co. v. Envtl. Prot. Agency*,
    633 F.3d 894 (9th Cir. 2011) ................................................................................................ 11

*Berry v. Am. Express Publ'g, Inc.*,
    147 Cal. App. 4th 224 (2007) ...........................................................................................19, 20

*Burbank-Glendale-Pasadena Airport Authority v. City of Burbank*,
    136 F.3d 1360 (9th Cir. 1998) ............................................................................................... 4

*In re California Gasoline Spot Mkt. Antitrust Litig.*,
    2021 WL 1176645 (N.D. Cal. Mar. 29, 2021) .................................................................... 21

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*,
    20 Cal. 4th 163 (1999) .......................................................................................................... 22

*Chandler v. State Farm Mut. Auto. Ins. Co.*,
    598 F.3d 1115 (9th Cir. 2010) ............................................................................................. 10

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) .............................................................................................................. 11

*Consumer Sols. REO, LLC v. Hillery*,
    658 F. Supp. 2d 1002 (N.D. Cal. 2009) .............................................................................. 20

*Corcoran v. CVS Health*,
    169 F. Supp. 3d 970 (N.D. Cal. 2016) ................................................................................... 9

*Doe v. Epic Games, Inc.*,
    435 F. Supp. 3d 1024 (N.D. Cal. 2020) ................................................................ 20

*Doe v. Unocal Corp.*,
    248 F.3d 915 (9th Cir. 2001) .......................................................................... 7, 9

*Enhanced Athlete Inc. v. Google LLC*,
    2020 WL 4732209 (N.D. Cal. Aug. 14, 2020) .................................................. 17

*In re Facebook, Inc., Consumer Privacy User Profile Litig.*,
    402 F. Supp. 3d 767 (N.D. Cal. 2019) ............................................................... 18

*Fairbanks v. Superior Court*,
    46 Cal. 4th 56 (2009) ................................................................................ 20, 21

*I.B. ex rel. Fife v. Facebook, Inc.*,
    905 F. Supp. 2d 989 (N.D. Cal. 2012) .............................................................. 20, 21

*Ford Motor Co. v. Montana Eighth Judicial Dist. Court*,
    141 S. Ct. 1017 (2021) ..................................................................................... 7

*Hamilton Beach Brands, Inc. v. Metric & Inch Tools, Inc.*,
    614 F. Supp. 2d 1080 (C.D. Cal. 2009) .............................................................. 8

*Harris Rutsky & Co. Ins. Servs. Inc. v. Bell & Clements Ltd.*,
    328 F.3d 1122 (9th Cir. 2003) .......................................................................... 7

*In re Holl*,
    925 F.3d 1076 (9th Cir. 2019) ........................................................................ 14

*Julian v. TTE Tech., Inc.*,
    2020 WL 6743912 (N.D. Cal. Nov. 17, 2020) ................................................. 21

*In re MacBook Keyboard Litig.*,
    2020 WL 6047253 (N.D. Cal. Oct. 13, 2020) .................................................. 22

*Mallen v. Alphatec Holdings, Inc.*,
    861 F. Supp. 2d 1111 (S.D. Cal. 2012) ............................................................. 4

*Mazonas v. Nationstar Mortgage LLC*,
    2016 WL 2344196 (N.D. Cal. May 4, 2016) ..................................................... 21

*In re Nexus 6P Prods. Liab. Litig.*,
    2018 WL 827958 (N.D. Cal. Feb. 12, 2018) ..................................................... 7

*Nguyen v. Barnes & Noble Inc.*,
    763 F.3d 1171 (9th Cir. 2014) ........................................................................ 14

*Ranza v. Nike, Inc.*,
    793 F.3d 1059 (9th Cir. 2015) ................................................................. 7, 8, 9

*Razuki v. Caliber Home Loans, Inc.*,
    2018 WL 6018361 (S.D. Cal. 2018) ....................................................................... 11

*Reynolds v. Binance Holdings Ltd.*,
    481 F. Supp. 3d 997 (N.D. Cal. 2020) ............................................................... 8, 10

*Reynoso v. Paul Fin., LLC*,
    2009 WL 3833298 (N.D. Cal. Nov. 16, 2009) ..................................................... 21

*Sanders v. Brown*,
    504 F.3d 903 (9th Cir. 2007) ................................................................................. 3

*Sharma v. Volkswagen AG*,
    2021 WL 912271 (N.D. Cal. Mar. 9, 2021) ......................................................... 21

*Sonner v. Premier Nutrition Corp.*,
    971 F.3d 834 (9th Cir. 2020) ............................................................................... 21

*Sonoda v. Amerisave Mortg. Corp.*,
    2011 WL 2690451 (N.D. Cal. July 8, 2011) ........................................................ 21

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ........................................................................... 11, 12, 14

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ............................................................................................... 10

*Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*,
    100 Cal. App. 4th 44 (2002) .......................................................................... 17, 18

*TransUnion LLC v. Ramirez*,
    2021 WL 2599472 (U.S. June 25, 2021) ....................................................... 11, 12, 14

*Trinh v. Homan*,
    466 F. Supp. 3d 1077 (C.D. Cal. 2020) .......................................................... 17, 19

*United Safeguard Distributors Ass'n, Inc. v. Safeguard Bus. Sys., Inc.*,
    145 F. Supp. 3d 932 (C.D. Cal. 2015) .................................................................. 18

*United States v. State of Wash.*,
    759 F.2d 1353 (9th Cir. 1985) ............................................................................. 18

*Virtualmagic Asia, Inc.*,
    99 Cal. App. 4th 228 (2002) .................................................................................. 9

*Washington Envtl. Council v. Bellon*,
    732 F.3d 1131 (9th Cir. 2013) ........................................................................ 11, 13

*Wilson v. Hewlett-Packard Co.*,
    668 F.3d 1136 (9th Cir. 2012) ............................................................................. 22

MOTION TO DISMISS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Ziegler v. Indian River Cty.*,
   64 F.3d 470 (9th Cir. 1995) ................................................................................... 7

**Statutes**

Cal. Civ. Code § 1761(a) ........................................................................................ 19

Cal. Civ. Code § 1761(b) ........................................................................................ 19

Cal. Civ. Code § 1761(d) ........................................................................................ 19

**Other Authorities**

Fed. R. Civ. P. 12(b)(1) .......................................................................................... 10

Fed. R. Civ. P. 12(b)(2) ........................................................................................ 6, 7

Fed. R. Civ. P. 12(b)(6) ...................................................................................... 6, 14

Fed. R. Evid. 201 ..................................................................................................... 4

MOTION TO DISMISS

**INTRODUCTION**

This lawsuit involves cutting-edge technology, but the issue is age old.  Here, a borrower posts collateral in exchange for credit, and because the value of that collateral precipitously drops, the collateral is subject to a margin call.  If the margin is not maintained, the collateral is subject to liquidation and the proceeds are applied to the balance of the credit line.  In this case, Plaintiff Junhan Jeong ("Jeong") seeks to "rewind the tape" and get his liquidated collateral back, in this case a volatile cryptocurrency known as "XRP," after the value of XRP dropped—and after Jeong failed to maintain the margin that he agreed to maintain.

Importantly, Jeong does not and cannot challenge the liquidation of his collateral for failure to maintain the required loan-to-value ("LTV") ratio.  Instead, he asks the Court to turn the contract on its head and suspend his obligation to maintain the LTV ratio, thus shifting the risk of loss from the borrower to the secured lender.  To reach this implausible result, Jeong pleads the following untenable legal theory: (1) that Nexo *must* always accept one *particular* cryptocurrency as a repayment option (XRP)—even when the value of that cryptocurrency is in freefall due to SEC action and when Nexo continues to accept numerous other cryptocurrencies and fiat currencies as a means of repayment (including the U.S. dollar)—and (2) that Nexo has an obligation to notify him an unidentified amount of time in advance when one particular cryptocurrency (XRP) is no longer accepted for repayment, even when the contract expressly states that no such notice is required.  On these two grounds he is asking the Court rewrite the contract, reverse a proper liquidation, and shift his loss to Nexo through the judicial process.

All of Jeong's claims should dismissed for the following reasons:

*First*, the claims against Nexo Financial Services Ltd., Nexo Services OÜ, Nexo AG, and Nexo Financial LLC should be dismissed because the Court lacks personal jurisdiction over them. None of these entities are incorporated or have their principal place of business in California. Moreover, Jeong does not allege that these entities issued the line of credit disputed in this lawsuit. Instead, Jeong relies solely on the "single-enterprise" theory of personal jurisdiction—which ignores the corporate separateness that lies at the heart of business jurisprudence—but pleads no specific facts plausibly satisfying that notoriously difficult standard. These four entities should be

-1-

1   dismissed for lack of personal jurisdiction.

2        *Second*, Jeong has failed to establish Article III standing.  Article III imposes "traceability"

3   and "concrete injury" requirements.  Jeong claims that his injuries flow from Nexo's suspension of

4   XRP and its failure to notify him of the suspension in advance.  However, Jeong's losses were

5   caused by his failure to maintain the required margin, resulting in the liquidation of his collateral.

6   With respect to Nexo's suspension of XRP, Jeong fails to plead any facts linking the suspension to

7   his injuries.  Jeong does not allege that he attempted to repay his credit line with XRP or add XRP

8   as collateral but was prevented from doing so.  Instead, Jeong admits that a variety of repayment

9   methods were available on Nexo's platform allowing him to maintain his LTV, notwithstanding

10  XRP's suspension.  Thus, his injuries are not traceable to the suspension of XRP.  Likewise, his

11  notice allegations cannot support a traceable injury.  Jeong does not identify anything that he

12  would have done or was prevented from doing for lack of notice.  He fails to connect a lack of

13  notice to his injuries.  Moreover, a mere procedural lack of notice does not satisfy Article III's

14  "concrete injury" requirement.  His Complaint fails Article III's standing requirements.

15       *Third,* Jeong's breach of contract and declaratory judgment claims are not plausibly pled

16  for similar reasons.  As an initial matter, he has failed to allege any breach at all.  Under the Terms

17  and Conditions, (1) Nexo has the sole discretion to suspend XRP on its platform at any time,

18  whether an SEC action is pending or not, and (2) Nexo has no obligation to notify Jeong of this.

19  These facts are undisputed.  Recognizing this fact, Jeong relies on the implied covenant of good

20  faith and fair dealing to rewrite the contract.  That doctrine, however, fails to revive Jeong's theory

21  because it does not change existing rights and duties or create new rights or duties not expressed in

22  the contract.  After identifying a breach that is not supported by the plain language of the contract,

23  Jeong then alleges that Nexo's non-existent breach somehow "suspends" his obligation to

24  maintain his LTV ratio, even when ***Jeong*** was the only party who breached the contract by failing

25  to maintain sufficient margin.  Nothing in the contract or law plausibly supports this theory of

26  breach, which reverses the risk allocation agreed by the parties and transforms Nexo from a

27  secured creditor to an insurer of Jeong's market losses.

28       *Fourth*, Jeong turns to California's consumer statutes, the CLRA and the UCL, in an effort

-2-
MOTION TO DISMISS

1  to establish a viable legal theory.  Neither work.  The CLRA is foreclosed by black letter

2  California law holding that credit transactions are not covered by the CLRA.  Jeong's UCL and

3  CLRA claims fail under binding Ninth Circuit authority because he pleads an adequate remedy at

4  law through his breach of contract claim.  Jeong's UCL claim also fails because he does not

5  plausibly allege any breach of contract or other predicate violation of law.  For these reasons, the

6  Court should grant the motion to dismiss.

7      *Fifth*, Jeong agreed to a set of terms and conditions ("T&Cs"), which requires that any

8  claims "shall" be brought in London and adjudicated under the laws of England and Wales.  Under

9  the FNC doctrine, courts may only refuse to enforce a mandatory forum selection clause under

10  "extraordinary circumstances," none of which are present here.  Jeong's contract and declaratory

11  judgment claims should be dismissed on this basis as well.

## FACTUAL BACKGROUND

13      Nexo is a full-scale digital finance hub with $15 billion in assets under management and

14  serving millions of users.  *See* Compl. ¶ 45.  Relevant here is Nexo's primary business line in

15  which it extends credit lines secured by cryptocurrency collateral.  *See* Compl. ¶ 45.

16      Jeong secured credit from Nexo by posting the cryptocurrency "XRP" as collateral.  *See*

17  Compl. ¶¶ 47, 135.  XRP is issued by Ripple Labs Inc. ("Ripple").  *See* Compl. ¶¶ 48, 52.  Ripple

18  and XRP have no affiliation with Nexo.  XRP was one of many cryptocurrencies accepted as

19  collateral on Nexo's platform.  *See* Compl. ¶ 47.  As part of participating in Nexo's platform,

20  Jeong agreed to be bound by a set of General Terms & Conditions ("General Terms").  *See*

21  Compl. ¶ 46; Trenchev Decl. ¶¶ 4–8 (Ex. A–D).  All users of the platform sign onto the "Wallet

22  Terms," and subsequently those who have credit lines also agree to the "Borrow Terms."

23  Trenchev Decl. ¶ 4.  The relevant T&Cs are attached are attached as Exhibits A–D and should be

24  considered by this Court.  *See Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007) ("[A] court can

25  consider a document on which the complaint relies if the document is central to the plaintiff's

26  claim, and no party questions the authenticity of the document.").

27      Under the T&Cs, Nexo customers can borrow against a line of credit so long as the

28  customer maintains a certain loan-to-value ("LTV") ratio.  *See* Compl. ¶¶ 48–51.  If the collateral

drops in value and the customer's LTV reaches the Nexo Platform LTV threshold of 83.3%, the customer will be required to "top-up" additional collateral or repay the credit line to maintain the LTV ratio below the critical 83.3% threshold.  *See* Compl. ¶¶ 48–51.  Margin calls and liquidations tied to LTV represent a sustainable risk management model, which allows Nexo to protect the interests of all stakeholders.  In addition, the T&Cs spelled out the following rights:

- Nexo reserved the right to modify the "Digital Assets" (defined to include cryptocurrencies) accepted on its platform.  Ex. D, Borrow Terms IV.1 (all exhibit citations refer to the exhibits of the Declaration of Antoni Trenchev).

- Nexo retained the sole discretion to modify and remove certain portions, features, or services of its platform as needed.  Ex. D, Borrow Terms III.3; Ex. B, Wallet Terms XII.3 & XII.4.

- Nexo reiterated that cryptocurrency is volatile.  The risk of trading cryptocurrencies was plainly disclosed to Jeong.  Ex. D, Borrow Terms XI; Ex. B, Wallet Terms VIII.

- Any dispute is governed by the substantive law of England and Wales and "shall" be referred to the competent court in London, England. Ex. B, Wallet Terms XVIII.1–.2.

On December 22, 2020, the Securities and Exchange Commission ("SEC") filed a 71-page lawsuit against Ripple and its CEO and Board Chairman alleging that Ripple's cryptocurrency, XRP, was an illegal and unregistered investment contract.  *See* Compl. ¶¶ 5, 52; *Securities and Exchange Commission v. Ripple Labs, Inc. et al.,* 20-CV-10832, (S.D.N.Y.) (filed Dec. 22, 2020). A copy of the SEC's complaint against Ripple is attached as Exhibit E. On December 22, 2020, the SEC also issued a press release outlining its allegations against Ripple, which is attached as Exhibit F.  Nexo requests that the Court take judicial notice of Exhibit E and F under Fed. R. Evid. 201. *See Burbank-Glendale-Pasadena Airport Authority v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998) (taking judicial notice of pleadings filed in other actions); *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1139 (S.D. Cal. 2012) (taking judicial notice of SEC filings, press releases, and call transcripts).

The SEC's lawsuit sought an injunction to prevent Ripple from further selling or offering to sell XRP permanently (unless otherwise registered as a security).  For all practical purposes, the SEC seeks to shut down Ripple and the use of XRP as a cryptocurrency.  As of the date of this filing, the SEC-Ripple lawsuit remains pending.

Nexo removed the option to repay a credit line using XRP, but it did not limit the ability of customers to use XRP to "top up" their collateral.  Nexo denies Jeong's allegation that XRP was suspended for all purposes on the platform.  But even if true, Nexo had the sole discretion to do so under the T&Cs. *See* Compl. ¶¶ 6, 53, 65 (citing Ex. D, Borrow Terms III.3.).

The value of XRP dropped precipitously after the SEC announcement. *See* Compl. ¶ 5, 52. This required some Nexo borrowers, including Jeong, to either pay down their credit lines or add collateral to their Nexo accounts to maintain the required LTV.  *See* Compl. ¶¶ 56(e), 56(f), 57. Outside of XRP, Nexo accepts a variety of cryptocurrencies and fiat currencies, *e.g.*, U.S. Dollars, which can be used to maintain the LTV, and which Nexo did not disable.  *See* Compl. ¶¶ 47, 58. With respect to Nexo customers, including Jeong, who failed to maintain the requisite LTV ratios their collateral was subject to liquidation according to Nexo's T&Cs.  *See* Compl. ¶¶ 4, 9, 51.

Jeong initiated this putative class action lawsuit to recover "the full value of the collateral that Nexo liquidated as a result of the XRP suspension and/or Nexo's failure to give notice of the suspension (less the outstanding loan amounts on that collateral as of breach)," alleging a breach of contract claim, a declaratory judgment claim, and two claims under California's consumer remedies statutes, the CLRA and UCL.  *See* Compl. ¶ 173 (contract damages); *see also id.* at ¶ 199 (UCL claim seeking "restitutionary disgorgement for the value of the collateral over which the members retained ownership and that Nexo wrongly liquidated resulting from the suspension of XRP payments (less the outstanding loan amounts on that collateral as of breach)").  Jeong expressly limits his CLRA claim to equitable relief only.  *See id.* at ¶ 213.

Three European defendants seek dismissal for lack of personal jurisdiction:  Nexo Financial Services Ltd., Nexo Services OÜ, and Nexo AG (collectively, the "European Nexo Entities").  None are headquartered or incorporated in California.  *See* Trenchev Decl. ¶¶ 13–17.

Nexo Financial LLC also seeks dismissal for lack of personal jurisdiction.  Nexo Financial LLC is **not** the entity that issued the credit line to Jeong.  *See* Trenchev Decl. ¶ 20.  Nexo Financial LLC is incorporated in Delaware, has its principal place of business in the United Kingdom, and obtained a California Finance Lender ("CFL") License on February 26, 2021—after the December 2020 events referenced in Jeong's lawsuit.  *See id.*

MOTION TO DISMISS

Nexo Capital Inc. issued the credit line to Jeong that is the subject of this lawsuit, and does not challenge the Court's exercise of specific personal jurisdiction. *See* Trenchev Decl. ¶ 19.

Importantly, the Defendants are distinct business entities, have their own directors (though some of those directors overlap), provide different types of services, have maintained corporate formalities, have been adequately capitalized to meet their ongoing operational and financial obligations, have maintained separate bank accounts, have not commingled assets or funds, have maintained separate books and records, and have paid their own taxes, to the extent owed, in compliance with governing accounting standards. *See* Trenchev Decl. ¶¶ 21–22.  Neither the European Nexo Entities nor Nexo Financial LLC dictate the business of Nexo Capital Inc., from broad policy decisions to routine matters of day-to-day operation. *See* Trenchev Decl. ¶ 23.

Finally, Jeong agreed that any dispute is governed by the laws of England and Wales and must be brought in London, England.  Ex. B, Wallet Terms XVIII.1–.2.  Defendants seek to enforce that provision and dismiss Jeong's contract and declaratory judgment claims under the FNC doctrine.

## ARGUMENT

### I.   THE COURT SHOULD DISMISS THE EUROPEAN NEXO ENTITIES AND NEXO FINANCIAL LLC FOR LACK OF PERSONAL JURISDICTION.

Nexo Financial Services Ltd., Nexo Services OÜ, and Nexo AG (collectively, the "European Nexo Entities"), along with Nexo Financial LLC, move to dismiss Jeong's claims against them for lack of personal jurisdiction.[1]  *See* Fed. R. Civ. P. 12(b)(2).  None of the European Nexo Entities are subject to general jurisdiction in California. *See* Trenchev Decl. ¶¶ 13–17.   Nor is there any basis for specific jurisdiction: the European Nexo Entities have no California connection and did not issue the credit line to Jeong.  Instead, Jeong attempts a jurisdictional short-cut by alleging a "single-enterprise" theory.  But his factual allegations are insufficient and the European Nexo Entities and Nexo Financial LLC should be dismissed.

---

[1]    Nexo Capital Inc. concedes specific personal jurisdiction in California for purposes of this matter only but joins the Rule 12(b)(1), Rule 12(b)(6) and FNC portions of this Motion.

1

A.      **Legal Standard.**

2

**Personal Jurisdiction.** Jeong has the burden to establish jurisdiction over all defendants.

3

*Ziegler v. Indian River Cty.*, 64 F.3d 470, 473 (9th Cir. 1995) (citation omitted).  Under Rule

4

12(b)(2), a court may consider declarations submitted by the parties.  *Doe v. Unocal Corp.*, 248

5

F.3d 915, 922 (9th Cir. 2001).  The Court must assess the contacts of each defendant separately to

6

determine whether personal jurisdiction exists for each particular defendant.  *Harris Rutsky & Co.*

7

*Ins. Servs. Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1130 (9th Cir. 2003).

8

**General Jurisdiction.** Corporate defendants are subject to general jurisdiction in their

9

place of incorporation and where their principal place of business is located.  *Ford Motor Co. v.*

10

*Montana Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1025 (2021).  The European Nexo Entities

11

are not incorporated in California and do not have their principal place of business in California

12

(Jeong does not allege that they are).  Nexo Financial LLC obtained a California Finance Lender

13

("CFL") license in February 2021—after the events in question took place.  *See* Trenchev Decl. ¶

14

21.  Nexo Financial LLC was not involved in any of the disputed transactions, and it has no

15

connection to California other than holding that license.  *See* Trenchev Decl. ¶ 20.  Even if the

16

license were relevant to the events in the lawsuit, it would still be insufficient to confer general

17

jurisdiction over Nexo Financial LLC.  *See AM Tr. v. UBS AG*, 681 F. App'x 587 (9th Cir. 2017);

18

*In re Nexus 6P Prods. Liab. Litig.*, 2018 WL 827958 at *3 (N.D. Cal. Feb. 12, 2018).

19

**Specific Jurisdiction.** Specific jurisdiction requires that the plaintiff's claims arise out of

20

or relate to the defendant's contacts with the forum.  *See Ford*, 141 S. Ct. at 1025.  However,

21

Jeong has not pled any specific facts connecting the European Nexo Entities to California.  Nexo

22

Financial LLC was not involved in any of the transactions disputed by Jeong in his Complaint and

23

it has no connection to California other than holding that license.  *See* Trenchev Decl. ¶ 20.  Jeong

24

is left to rely on a single-enterprise rule for personal jurisdiction.

25

**Single-enterprise Theory.**  Under the single-enterprise rule, personal jurisdiction may be

26

extended over foreign sister companies under very limited circumstances. *Ranza v. Nike, Inc.*, 793

27

F.3d 1059, 1072 (9th Cir. 2015).  Under the rule, Jeong must establish two prongs:

28

(1)      such a unity of interest and ownership that the separate corporate personalities are

-7-

merged, so that one corporation is a mere adjunct of another or the two companies form a single-enterprise; and

(2)   an inequitable result if the acts in question are treated as those of one corporation alone.

*Hamilton Beach Brands, Inc. v. Metric & Inch Tools, Inc.*, 614 F. Supp. 2d 1080, 1083 (C.D. Cal. 2009).  To sufficiently allege the single-enterprise theory for purposes of personal jurisdiction, like the alter ego theory, a plaintiff must offer more than labels and conclusions; factual allegations must be enough to raise a right to relief above the speculative level.  *Reynolds v. Binance Holdings Ltd.*, 481 F. Supp. 3d 997, 1005 (N.D. Cal. 2020).  This test envisions *pervasive* control over corporate affiliates, such as when a corporation "dictates every facet" of the affiliate's business— "from broad policy decisions to routine matters of day-to-day operation." *Ranza*, 793 F.3d at 1071 (citations and quotations omitted) (emphasis added).

**B.      Jeong Fails to Plausibly Plead a Single-Enterprise Theory.**

Jeong alleges that Nexo Financial LLC holds a license to operate as a finance lender in California, and that all the Nexo entities should be treated as a single, unified entity.  *See* Compl. ¶¶ 22, 26.  However, as noted above, Nexo Financial LLC has no connection to the allegations described in Jeong's lawsuit.  Jeong alleges that the Court has personal jurisdiction over the European Nexo Entities based on the conclusory allegation that all the Nexo entities have "such a unity and ownership . . . that any separate corporate personalities are merged, such that one corporation is a mere adjunct of another and they form a single enterprise."  *See* Compl. ¶ 23. This is insufficient to establish either prong of the single-enterprise theory in this case.

**1.      Unity of Interest.**

First, Jeong failed to plead that the European Nexo Entities and Nexo Financial LLC enjoy "such a unity of interest and ownership that the separate corporate personalities are merged, so that one corporation is a mere adjunct of another or the two companies form a single enterprise."  *See* Compl. ¶ 23.  The Ninth Circuit employs a stringent "alter ego" test for "imputed" general jurisdiction over a parent corporation, and Jeong's allegations do not meet that high standard. *See Ranza*, 793 F.3d at 1071.

Jeong makes a series of conclusory and immaterial allegations in an effort to establish single-enterprise theory. *See* Compl. ¶ 23(a)–(h). The allegation in paragraph 23(a) regarding Credissimo has no apparent connection to Jeong's single-enterprise theory. The allegations in paragraph 23(b)–(h) are conclusory and boilerplate allegations that need not be accepted by this Court. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The allegations in paragraphs 24, 25, 27, in which Jeong relies on media quotes and press releases to establish his single-enterprise theory, are legally immaterial to the Court's analysis and carry no weight. *See Virtualmagic Asia, Inc.*, 99 Cal. App. 4th 228, 245 (2002).

Even viewed in the best light, Jeong's single-enterprise allegations are far less compelling than those in *Ranza*, which held that Nike and its wholly-owned subsidiary, NEON, were ***not*** alter egos, despite the fact that "Nike [was] heavily involved in NEON's operations," exercised control over NEON's overall budget and policies, operated a general information tracking system for all subsidiaries, and ensured the Nike brand was marketed consistently throughout the world. *See id.* at 1074; *Corcoran v. CVS Health*, 169 F. Supp. 3d 970, 983–84 (N.D. Cal. 2016) (rejecting alter ego where "separate corporate entities present[ed] themselves as one online" and noting that "it is considered a normal attribute of ownership that officers and directors of the parent serve as officers and directors of the subsidiary" (quotation omitted)).

Here, the European Nexo Entities and Nexo Financial LLC maintain their own independent corporate structures. *See* Trenchev Decl. ¶¶ 21–22. They are distinct business entities from Nexo Capital Inc., provide different types of services in different geographical regions, have maintained corporate formalities, have been adequately capitalized to meet their ongoing operational and financial obligations, have maintained separate bank accounts, have not commingled assets or funds with the assets or funds of Nexo Capital Inc., have maintained separate books and records, and have paid their own taxes if owed. *See id.* Each maintains different officers, committees, and boards to direct their operation (although some may overlap). *See id.* These sworn facts plainly controvert Jeong's boilerplate assertions. The Court should dismiss the European Nexo Entities and Nexo Financial LLC for lack of personal jurisdiction.

### 2.    Inequitable Result.

Jeong's allegations also do not satisfy the second prong of the single-enterprise test: whether disregarding their separate identities would result in fraud or injustice. *Unocal*, 248 F.3d at 926. Jeong alleges that, if the foreign entities were not held to be a single-enterprise with Nexo Financial LLC, Jeong would not be able to establish personal jurisdiction over them and might have to bring suits in different jurisdictions. But California courts require evidence of *past* fraudulent conduct or injustice to support a finding of alter ego liability. *Reynolds*, 481 F. Supp. 3d at 1009 (emphasis added). In any event, Nexo Capital Inc., the entity which actually operates the Nexo platform and extended the credit line to Jeong, is not challenging the Court's specific personal jurisdiction. Jeong's effort to invoke the single-enterprise rule is an effort to lasso Nexo entities with no connection to California or this lawsuit, and it should be rejected. The presence of Nexo Capital Inc. eliminates any concerns about an "inequitable result." The Court should dismiss the European Nexo Entities and Nexo Financial LLC for lack of personal jurisdiction.

## II.    THE COURT SHOULD DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION.

Subject to their 12(b)(2) motion, all Defendants move to dismiss Jeong's claims against them for lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). A plaintiff must allege specific facts showing a concrete injury that is fairly traceable to the challenged conduct of the defendant. Jeong has failed to establish that Nexo's alleged conduct—even if wrongful—was the cause of his losses. Jeong's four claims hinge on the allegations that Nexo harmed him by (1) suspending XRP as an acceptable cryptocurrency after the SEC's lawsuit, and (2) by failing to give him notice of the suspension. *See* Compl. ¶¶ 8, 167, 173, 193, 199. Neither caused Jeong's damages. Instead, Jeong's damages resulted from the drop in XRP's value and his concomitant failure to maintain the agreed LTV. Jeong does not allege—and cannot allege—any facts establishing Nexo's responsibility for these damages.

### A.    Article III and the Rule 12(b)(1) Legal Standard.

If the plaintiff lacks standing under Article III of the U.S. Constitution, then the court lacks subject matter jurisdiction, and the case must be dismissed. *Steel Co. v. Citizens for a Better*

*Env't,* 523 U.S. 83, 101–02 (1998). Once a party has moved to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the opposing party bears the burden of establishing the court's jurisdiction. *Chandler v. State Farm Mut. Auto. Ins. Co.,* 598 F.3d 1115, 1122 (9th Cir. 2010). This requires that the non-movant demonstrate through allegations of "specific facts plausibly explaining" why the standing requirements are met. *Barnum Timber Co. v. Envtl. Prot. Agency,* 633 F.3d 894, 899 (9th Cir. 2011).

Article III standing requires a plaintiff to plead and prove that he has suffered sufficient injury to satisfy the "case or controversy" requirement of Article III of the United States Constitution. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 423 (2013). To meet this requirement, a plaintiff must show that (1) he suffered a concrete injury, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Here, Nexo challenges (1) the traceability element with respect to the suspension of XRP as a repayment option because Jeong cannot show that his injuries-in-fact are "fairly traceable" to the suspension; and, (2) the traceability element and the concrete injury requirement for his lack of notice allegation.

The "fairly traceable" requirement contemplates the plaintiff demonstrating that the injury is "causally linked" to the alleged misconduct and is "not the result of misconduct of some third party not before the court." *Washington Envtl. Council v. Bellon*, 732 F.3d 1131, 1141 (9th Cir. 2013). A plaintiff must not only connect the defendant's conduct to his injuries, the plaintiff must also show "that there are no *independent* actions of third parties that break the causal link" between the wrongful act and the harm claimed. *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939, 953 (9th Cir. 2013) (emphasis in original).

Importantly, mere delay of notice typically does not satisfy the "fairly traceable" requirement. *In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1211 (N.D. Cal. 2014). In *Adobe*, the named plaintiffs could not establish Article III standing to assert a claim under California's data breach disclosure laws because Adobe's failure to give statutory notice of a data breach was not causally connected to the plaintiffs' alleged injuries. *Id.*; *see also Razuki v. Caliber Home Loans, Inc.*, 2018 WL 6018361, at *2 (S.D. Cal. 2018) (dismissing claim because

1 "unreasonable delay," in giving required notice failed to "cause[] any alleged injury.").

2      Likewise, the Supreme Court recently reiterated its skepticism towards standing when the

3 claims are based on a mere failure to adhere to procedures.  *TransUnion LLC v. Ramirez*, 2021

4 WL 2599472, at *15 (U.S. June 25, 2021).  A plaintiff cannot "allege a bare procedural violation,

5 divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III."

6 *Spokeo*, 136 S. Ct. at 1549.  Both *TransUnion* and *Spokeo* entail the application of Article III

7 standing requirements to bare procedural violations of federal law, but the same rationale

8 undergirds Article III's application to any other dispute—plaintiffs must plausibly plead a concrete

9 injury-in-fact, and for each claim and prayer for relief.  *TransUnion*, 2021 WL 2599472, at *10.

10      **B.      Jeong Fails to Plausibly Plead a Traceable Injury.**

11      Jeong alleges that his injuries flow from (1) Nexo's limited suspension of XRP as a

12 repayment method and (2) Nexo's failure to notify Jeong of the suspension.  Neither allegation is

13 "causally linked" to the gravamen of Jeong's economic injury, which is the lost value of his XRP.

14      ***Nexo's Suspension of XRP as one of Many Repayment Options***.  Critically, even

15 assuming that Nexo's suspension of XRP was wrongful—which it was not—the suspension did

16 not preclude Jeong from maintaining his LTV to prevent a liquidation event.  Jeong admits that

17 outside of XRP, Nexo accepts a variety of repayment options including Bitcoin, Ethereum,

18 Litecoin, Stellar, Bitcoin Cash, or EOS to pay down the credit or increase the collateral.  *See*

19 Compl. ¶ 47.  In fact, Jeong does not plead that Nexo's suspension of XRP as a repayment option

20 prevented him from converting XRP held off Nexo to any other acceptable cryptocurrency and

21 used the proceeds to pay down his credit line.  Jeong also never alleges that he attempted to avail

22 himself of the many other acceptable repayment methods but Nexo prevented him from doing so.

23 There are **no** pleaded facts tending to establish that Nexo's suspension of XRP actually prevented

24 Jeong from maintaining his LTV and causing him financial loss.

25      In this respect, Jeong's lawsuit contains an incurable logical gap between his injuries and

26 Nexo's alleged suspension of XRP.  The unbridgeable gap is that Nexo had no impact on Jeong's

27 losses; the losses were triggered by an independent cause—namely SEC's announcement of its

28 lawsuit and investigation into Ripple—which caused XRP to drop, which in turn caused Jeong's

LTV to exceed the 83.3% threshold, which he failed to cure with any number of acceptable cryptocurrencies.  Jeong simply cannot plead a set of facts establishing a causal link between Nexo's suspension of XRP and his market losses in the volatile cryptocurrency market.  Jeong fails to establish standing to bring this claim. *Bellon*, 732 F.3d at 1141.

*Nexo's Supposed Lack of Notice of XRP's Suspension.*  In the second-prong of his breach theory, Jeong claims that Nexo had an obligation to give him notice of XRP's suspension and that it failed to do so.  Jeong's notice argument is narrow.  Jeong does not plead that Nexo has a general obligation to notify him that XRP was dropping in value or that the SEC was investigating Ripple for securities violations.  Jeong simply pleads that when Nexo suspended XRP as one of *many* available repayment options, it was required to give him notice of the suspension.

Jeong identifies no notice requirement in the T&Cs requiring Nexo to give Jeong notice of the XRP suspension.  Jeong relies on Exhibit D, Borrow Terms VI.1, VI2, *see* Compl. ¶¶ 82–83, but these notice requirements pertain to maintaining LTV, not to the suspension of a payment option.  Jeong argues that he is entitled to notice of changes to the T&Cs, *see* Compl. ¶¶ 62, 80, but Jeong does not plead that Nexo's suspension of XRP entailed any changes to the T&Cs. Instead, Jeong agreed that Nexo could "suspend . . . all or part of other Nexo services" in its "sole and absolute discretion" which can be exercised "at any time." *See* Compl. ¶¶ 65, 66.

In any event, Jeong fails to plead any facts suggesting that had he received notice of the suspension, he would have engaged in some course of action that he otherwise did not engage in to avoid his claimed injury.  In other words, Jeong fails to establish the "fairly traceable" requirement: namely, *how* did a lack of notice actually cause his claimed harm?  Jeong does not plead that notice would not have stopped XRP's loss of value, or that notice would have even allowed him to add collateral to satisfy Nexo's LTV requirements and prevent liquidation.  That is, *assuming arguendo* that Jeong had received notice of the suspension, how would that notice impact any of his losses at all? It would not.  XRP was in a freefall because of the SEC's action, and regardless of Jeong's notice of the XRP suspension he was still obligated to maintain his LTV value.  Jeong's notice argument has an incurable traceability defect.

**C.    Jeong Fails to Plausibly Plead a Concrete Injury-in-Fact with Respect to his Lack-of-Notice Theory.**

Jeong fails to explain what specific concrete injury he suffered because of Nexo's supposed lack of notice that XRP was suspended a repayment method.  Jeong's losses resulted from XRP's precipitous loss in value.  Jeong does not explain how Nexo's lack of notice figures into those losses.  The gaps in Jeong's notice theory are why courts are reluctant to ascribe a mere lack of notice, without more, as sufficient to satisfy Article III's "concrete injury" requirement. *See TransUnion*, 2021 WL 2599472, at *15; *Spokeo*, 136 S. Ct. at 1549.  As in *Adobe*, Jeong does not allege any specific injuries from Nexo's failure to notify him of the suspension. *Adobe*, 66 F. Supp. 3d at 1211.  For this reason, Jeong cannot establish Article III standing.

**III.    THE COURT SHOULD DISMISS FOR FAILURE TO STATE A CLAIM.**

**A.    The Court Should Dismiss the Breach of Contract Claim.**

Subject to their 12(b)(2) motion, all Defendants move to dismiss Jeong's claims against them for failure to state a claim.  *See* Fed. R. Civ. P. 12(b)(6).  Jeong fails to plead any provisions of the T&Cs that Nexo actually breached.  Therefore, Jeong turns to the implied covenant of good faith and fair dealing as a catch-all claim, which is littered throughout his Complaint.  The implied covenant of good faith and fair dealing does not apply because Nexo's conduct was authorized by the plain language of the T&Cs.  His breach of contract claim fails.

Jeong describes the T&Cs as "adhesion" contracts, because (as with any other online terms and conditions) there is no negotiation available.  *See* Compl. ¶¶ 48–50.  But this contention, standing alone, does not render the Nexo T&Cs unenforceable.  Indeed, similar online terms and conditions have been upheld by other courts in the Ninth Circuit. *See In re Holl*, 925 F.3d 1076, 1079 (9th Cir. 2019) (upholding 32 page online terms of usage hyperlinked on webpage of agreement as reasonably conspicuous); *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014) ("[C]ourts have consistently enforced [terms of use] agreements where the user had actual notice of the agreement . . . . [or] where the user is required to affirmatively acknowledge the agreement before proceeding with use of the [service.]").  Jeong's bald assertion that the T&Cs are unconscionable need not be accepted as true by this Court. *See Iqbal*, 556 U.S. at 678.

1.      **Jeong fails to plausibly plead a breach of contract claim.**

Jeong alleges that Nexo committed a breach of contract by (1) suspending XRP and (2) failing to notify Jeong of the suspension.  *See* Compl. ¶ 167.  Neither is viable.

*First*, there is nothing in the T&Cs precluding Nexo from suspending XRP.  In fact, the T&Cs expressly authorize Nexo to do so.  The T&Cs provide that Nexo may:

> **At any time, at our sole and absolute discretion, without liability to you, we can . . . suspend the provision of the Nexo Crypto Credit or of all or part of the other Nexo services[.]**

Ex. D, Borrow Terms III.3 (emphasis added).  Under this provision, Nexo can suspend all part of the Nexo services that it provides on its platform. Likewise, Nexo can alter the Digital Assets (defined to include cryptocurrency) offered on its platform:

> **All such Digital Assets are indicated on the Nexo Platform and in the Nexo Account and are subject to revision from time to time.**

Ex. D, Borrow Terms IV.1 (emphasis added).  Likewise, in the Borrow Terms section on repayment and withdrawal, Nexo reserved the right to regulate repayment options:

> **You may repay at any time prior to the Maturity Date and any amount: (i) by transferring into the Nexo Account the same Digital Assets as the Nexo Crypto Credit granted, or other Digital Assets acceptable to Nexo; (ii) with the Collateral; or (iii) by combination of (i) and (ii). Certain rules may apply to repayments from time to time, as indicated on the Nexo Platform.**

Ex. D, Borrow Terms VIII.2 (emphasis added).

To be clear, suspending XRP as a repayment option does not violate a single provision in the T&Cs.  This allegation does not support a breach of contract claim.  To make matters worse, Jeong then argues that Nexo's non-breach somehow excuses Jeong's actual breach in failing to maintain the required LTV ratio, claiming that his contractual obligation to maintain sufficient margin was "suspended."  Nothing in the contract or law supports this implausible breach claim, which turns the agreed risk allocation between borrower and secured lender on its head.

*Second*, there is nothing in the T&Cs requiring Nexo to give Jeong notice of the suspension.  To the contrary, Borrow Terms III.3 provides that Nexo can suspend XRP "at any time" whether Jeong has notice or not.  Ex. D, Borrow Terms III.3.

1   Jeong is only entitled to notice prior to a liquidation event.  Ex. D, Borrow Terms VI.2.

2  Jeong, however, does ***not*** claim that the liquidation of his collateral was independently wrongful.

3  Instead, Jeong claims that collateral liquidation was only wrongful insofar as the suspension of

4  XRP as a repayment option and the failure to give notice of the suspension were preliminary

5  breaches that "excused any obligation" Nexo's customers "had to maintain their LTV ratios."  *See*

6  Compl. ¶¶ 8, 63, 171.  Jeong theorizes that the initial breaches relating to the suspension of XRP

7  excused him, and all other affected Nexo users, from any further contractual obligations to Nexo,

8  including maintaining their LTV ratios or even paying down their credit at all.  *See* Compl. ¶¶ 1, 6,

9  8, 10, 63, 171.  Jeong's theory is akin to alleging that a bank's procedural error—which even here

10  did not exist—somehow permanently releases the borrower from paying the remaining principal

11  amount.  There is no authority supporting Jeong's radical theory.  And here, Nexo made no errors.

12   Jeong also fails to plausibly plead his harm flowed from Nexo's breach.  Jeong's claim is

13  that Nexo's suspension of XRP led to his liquidation and thereby caused his financial losses.  But

14  this does not hold up.  The suspension of XRP as a repayment option did not preclude Jeong from

15  using Bitcoin, Ethereum, Litecoin, Stellar, Bitcoin Cash, or EOS to pay down his outstanding

16  credit balance and consequently withdrawing his collateral.  *See* Compl. ¶ 47.  In fact, if Jeong

17  held XRP in a wallet or exchange outside of Nexo, then he could have converted his XRP to any

18  other acceptable cryptocurrency on a variety of currency exchanges and used the proceeds to pay

19  down his credit line.  Similarly, Jeong could have converted U.S. Dollars to an accepted

20  cryptocurrency and repaid his credit line that way.  Nexo's lawful suspension of XRP as a

21  repayment option and the alleged lack of notice about the suspension did not damage Jeong; Jeong

22  was damaged when (1) the announcement of an SEC lawsuit and investigation into Ripple caused

23  the XRP to drop, and (2) Jeong failed to maintain the requisite LTV ratio.

24   ***Third***, Jeong does not seek damages connected to Nexo's alleged breaches; he pleads a

25  fundamentally different claim—that Nexo's "material breaches of contract excused any obligation

26  by the members of the Damages Class to maintain their LTV ratios."  Compl. ¶ 171; *see also* ¶¶ 8,

27  10, 63 (same).  This untenable theory converts Nexo from a secured creditor to an insurer of its

28  clients' market losses, and fundamentally alters the risk allocation contemplated by the T&Cs.

-16-

MOTION TO DISMISS

Nexo's suspension of XRP repayments does not give its clients *carte blanche* to breach their LTV obligations.  Jeong has failed to plausibly plead a breach of contract claim.

### 2.      Jeong's "unconscionable ownership" allegations are immaterial.

Jeong argues that the Borrow Terms are unconscionable because the terms provide that "[u]nless prohibited by any Applicable Law, by virtue of this Agreement Nexo acquires the ownership of the Collateral while the Nexo Crypto Credit is outstanding."  *See* Ex. D, Borrow Terms IV.5; Compl. ¶¶ 7, 11, 13, 15, 72, 97, 99–121, 131–132.  Jeong then presents several false *hypothetical* scenarios in which he purports to describe an "unconscionable" application of this provision.  *See* Compl. ¶¶ 103, 105.  None of these scenarios came to fruition with respect to the allegations in Jeong's lawsuit.

Borrow Term IV.5 is a basic feature of collateral-based relationships: a secured lender acquires possessory rights over the collateral, and may have to exercise its undisputed contractual right to liquidate the collateral and apply the proceeds against the credit line.  In any event, Jeong does ***not*** allege that Nexo wrongfully applied Borrow Term IV.5 to him but instead simply describes the issue as "an important economic and tax-related issue for Nexo and its customers alike."  *See* Compl. ¶ 133.  But Jeong pleads no damages related to taxes and the like, and the problem is imaginary because the T&Cs contain a carve-out if the "ownership" provision is "prohibited by any Applicable Law."  *See* Ex. D, Borrow Terms IV.5.  Jeong's lengthy exposition on these matters, *see* Compl. ¶ 95–133, has no clear point.  He eventually requests declaratory relief with respect to "ownership" of the collateral, but this is plainly a request for an improper advisory opinion based on hypotheticals untethered to any actual damages claimed in this lawsuit. *See Trinh v. Homan*, 466 F. Supp. 3d 1077, 1095 (C.D. Cal. 2020).  The Court should dismiss it.

### 3.      Jeong improperly relies on the implied covenant to alter contract terms.

Because the T&Cs foreclose his breach of contract theory, Jeong repeatedly claims that Nexo's suspension of XRP repayments breached an implied covenant of good faith and fair dealing. *See* Compl. ¶¶ 55, 60, 66, 70, 81, 88, 149, 169.  This claim fails as a matter of law. The implied covenant of good faith and fair dealing cannot contradict the express terms of a contract. *Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*, 100 Cal. App. 4th 44, 55 (2002).  Nor does the

MOTION TO DISMISS

1   implied covenant alter a party's existing rights or duties under a contract.  *Enhanced Athlete Inc. v.*

2   *Google LLC*, 2020 WL 4732209 (N.D. Cal. Aug. 14, 2020).  Critically, "if defendants were given

3   the right to do what they did by the express provisions of the contract there can be no breach."

4   *Storek*, 100 Cal. App. 4th at 56 (emphasis added).  Finally, to state a claim for breach of the

5   implied covenant of good faith and fair dealing, a plaintiff must identify the specific contractual

6   provision that was frustrated.  *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F.

7   Supp. 3d 767, 802 (N.D. Cal. 2019).

8          Jeong argues that, under "the common law across states," the implied covenant of good

9   faith and fair dealing curtails Nexo's discretion in the T&Cs to alter or remove features on the

10  platform in its discretion.  But this is not a scenario in which Nexo was granted limited discretion

11  which it abused.  Instead, Nexo suspended XRP as a repayment operation because it had the

12  unfettered and express right to do so, which is not a breach of the implied covenant of good faith

13  and fair dealing.  *Storek*, 100 Cal. App. 4th at 56.  Nexo could have suspended XRP repayments

14  even in the absence of any SEC action without breaching the implied covenant of good faith.

15  Likewise, Jeong fails to point to any provision that was frustrated by Nexo's conduct.  Instead,

16  Jeong tries to weaponize the implied covenant of good faith and fair dealing and re-write the

17  T&Cs as he wishes them to be.  This is legally incorrect and his theory fails.

18         **B.      The Court Should Dismiss the Declaratory Judgment Claim.**

19         Declaratory relief will not lie when duplicated in the underlying contract action.  *United*

20  *Safeguard Distributors Ass'n, Inc. v. Safeguard Bus. Sys., Inc*., 145 F. Supp. 3d 932, 961 (C.D.

21  Cal. 2015).  The gravamen of Jeong's declaratory judgment claim is relief duplicative of his

22  breach of contract claim: varying shades of declarations regarding Nexo's right to suspend XRP

23  without notice.  *See* Compl. ¶¶ 174–183.  This is an improper regurgitation of his breach of

24  contract claim and should be dismissed.

25         Jeong also tacks on a series of paragraphs seeking declarations with respect to Nexo's

26  "ownership" of the collateral that its borrowers deposit.  *See* Compl. ¶¶ 184–189.  None of these

27  declarations have any connection to Jeong's damages or claims in this lawsuit.  These declarations

28  would serve no purpose in "clarifying and settling the legal relations in issue nor terminate the

proceedings and afford relief from the uncertainty and controversy faced by the parties."  *See United States v. State of Wash.*, 759 F.2d 1353, 1357 (9th Cir. 1985).  Instead, these requests are simply improper requests for a retrospective advisory opinion that Jeong's rights were violated.  *See Trinh*, 466 F. Supp. 3d at 1095.  Jeong's declaratory relief count should be dismissed.

> **C.**     **The Court Should Dismiss the CLRA Claim because the CLRA does not Apply to Extensions of Credit.**

The CLRA does not apply because Nexo did not provide either a "good" or "service" to Jeong as those terms are defined by the CLRA.  Jeong's CLRA claim should be dismissed with prejudice because, as noted below, there is no viable means of curing the defect in his pleading.

> **1.**     **CLRA does not apply to credit or "virtual currency" transactions.**

The CLRA is a California remedial statute for aggrieved "consumers."  "Consumer" includes any individual who "seeks or acquires, by purchase or lease, any **goods or services** for personal, family, or household purposes."  Cal. Civ. Code § 1761(d) (emphasis added).  In turn, the CLRA defines "goods" and "services" as follows:

> "Goods" means tangible chattels bought or leased for use primarily for personal, family, or household purposes, including certificates or coupons exchangeable for these goods, and including goods that, at the time of the sale or subsequently, are to be so affixed to real property as to become a part of real property, whether or not they are severable from the real property.

Cal. Civ. Code § 1761(a).

> "Services" means work, labor, and services for other than a commercial or business use, including services furnished in connection with the sale or repair of goods.

Cal. Civ. Code § 1761(b).

The CLRA does not apply because Nexo did not offer, and Jeong did not purchase, any "goods" or "services."  Nexo extended credit under a transaction to Jeong, and California law is clear that the act of extending credit to another, including virtual currency transactions, is not a good or service covered by the CLRA.  *Ball v. FleetBoston Fin. Corp.*, 164 Cal. App. 4th 794, 798 (2008); *Berry v. Am. Express Publ'g, Inc.*, 147 Cal. App. 4th 224, 230 (2007).

*Berry's* thorough analysis has been cited widely by federal and state courts in California.

*Berry* considered whether defendant American Express's act of issuing credit to plaintiff Berry was a transaction covered by CLRA. *Id*. at 227. Plaintiff Berry argued that the credit constituted a "services furnished in connection with the sale . . . of goods" since she used the credit to purchase tangible chattel. *Id*. at 230. *Berry* rejected this argument, noting that "credit, *separate and apart from a specific purchase or lease of a good or service,*" is not "covered under the act." *Id.* (emphasis in original). *Berry* noted that early, unadopted drafts of the CLRA defined "consumer" to include individuals who seek or acquire "any goods, services, *money, or credit* for personal, family or household purposes." *Id.* Importantly, *Berry* explained that the "Legislature removed the references to 'money' and 'credit,' before CLRA's enactment, and they do not appear in the current version." *Id.* Accordingly, *Berry* easily concluded that extending credit did not constitute a CLRA covered transaction.

*Berry* has been extended to similar scenarios. For example, a loan is not covered by the CLRA. *Alborzian v. JPMorgan Chase Bank, N.A.*, 235 Cal. App. 4th 29, 40 (2015); *Consumer Sols. REO, LLC v. Hillery*, 658 F. Supp. 2d 1002, 1016 (N.D. Cal. 2009). Likewise, virtual currencies—*e.g.*, V-Bucks issued by Fortnite and Facebook Credits issued by Facebook—are neither a good nor a service covered by CLRA. *Doe v. Epic Games, Inc.*, 435 F. Supp. 3d 1024, 1045–46 (N.D. Cal. 2020); *I.B. ex rel. Fife v. Facebook, Inc.*, 905 F. Supp. 2d 989, 1007–08 (N.D. Cal. 2012). *Epic Games* noted that whether the issue is an extension of credit on a credit card or the granting of a virtual currency, the credit itself is intangible and "exist[s] only as an indicia of the credit extended." *Epic Games*, 435 F. Supp. 3d at 1046.

Nexo extended a credit line to Jeong in exchange for his cryptocurrency collateral. Under *Berry* and its progeny, the transaction between Jeong and Nexo is not covered by the CLRA.

### 2.  CLRA's "ancillary services" exception no longer applies.

Jeong may argue that Nexo provides various "ancillary services" which transform an intangible credit line into a "service" covered by the CLRA. This argument has no merit. Prior to the California Supreme Court's 2009 decision in *Fairbanks v. Superior Court*, 46 Cal. 4th 56 (2009), some California courts swept intangible chattels, including loans, insurance policies, and investment securities, into the CLRA under the premise that many the providers of these items

-20-

often offered "ancillary services" to their customers.  In *Fairbanks* the Supreme Court unequivocally concluded that the provision of "ancillary services" does not bring intangible chattels within the coverage of the CLRA.  *Id.* at 65.  *Fairbanks*, which applied to insurance policies, also applies to lenders.  *Alborzian*, 235 Cal. App. 4th at 40; *Sonoda v. Amerisave Mortg. Corp.*, 2011 WL 2690451, at *4 (N.D. Cal. July 8, 2011).  Nexo extended Jeong credit.  That was the core of the transaction.  Any services that Nexo might have provided (and Jeong identifies none in his Complaint) are merely "ancillary services" which fail to bring the transaction within the purview of the CLRA.

        **3.**      **The appropriate outcome is dismissal with prejudice.**

Jeong cannot salvage his CLRA claim by pleading amendment.  Credit transactions brought under the CLRA are dismissed with prejudice.  *Mazonas v. Nationstar Mortgage LLC*, 2016 WL 2344196, at *4 (N.D. Cal. May 4, 2016) (dismissing CLRA claim without leave to amend); I.*B. ex rel. Fife v. Facebook, Inc.*, 905 F. Supp. 2d 989, 1007–08 (N.D. Cal. 2012) (same); *Reynoso v. Paul Fin., LLC*, 2009 WL 3833298, at *9 (N.D. Cal. Nov. 16, 2009) (same).

    **D.**      **The Court Should Dismiss Jeong's UCL and CLRA Claims under *Sonner v. Premier Nutrition Corp.* Because Jeong Pleads an Adequate Remedy at Law.**

Jeong seeks equitable restitution and an injunction under the UCL.  *See* Compl. ¶¶ 11, 134–137.  Similarly, Jeong exclusively seeks equitable relief in the form of an injunction under the CLRA.  *See id.* ¶ 213.  To prevail on equitable remedies under both, he must show the inadequacy of legal remedies.  Because he cannot—his loss is purely monetary—his UCL and CLRA claims must be dismissed pursuant to *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020). When a plaintiff requests equitable relief under the UCL and CLRA, the "traditional principles governing equitable remedies in federal courts, including the requisite inadequacy of legal remedies, apply." *Id.* at 844.  The upshot is that Jeong "must establish that [he] lacks an adequate remedy at law before securing equitable restitution for past harm under the UCL[.]" *Id.* Jeong is not even entitled to plead equitable restitution as an alternative claim for relief under the UCL or CLRA.  *See In re California Gasoline Spot Mkt. Antitrust Litig.*, 2021 WL 1176645, at *8 (N.D. Cal. Mar. 29, 2021); *Sharma v. Volkswagen AG*, 2021 WL 912271, at *8 (N.D. Cal. Mar. 9, 2021).

In addition, Jeong must also establish in his pleading how UCL restitution could be different from damages.  *Julian v. TTE Tech., Inc.*, 2020 WL 6743912, at *4 (N.D. Cal. Nov. 17, 2020).  Merely alleging that the same suit would have to be brought repeatedly is insufficient.  *In re MacBook Keyboard Litig.*, 2020 WL 6047253, at *3 (N.D. Cal. Oct. 13, 2020).

Jeong pleads himself out of a UCL claim in paragraphs 134–136 of his Complaint.  In those paragraphs, Jeong outlines his "damages" and provides corresponding market value for his losses.  In paragraph 136, he specifically discusses his failure to receive the "benefit of his bargain" with Nexo.  Because Jeong is seeking the "benefit of his bargain" from Nexo, then by definition, he has an adequate remedy at law.   Likewise, in paragraphs 196–204, Jeong again pleads for disgorgement for the value of the collateral.  However, none of these claims for relief establish the inadequacy of legal remedies.  His losses are already liquidated and can be remedies by monetary award.  *See* Compl. ¶¶ 134–137.  Under *Sonner*, the UCL and CLRA claims fail.

**E.    The Court Should Dismiss Jeong's UCL claim Because he Fails to Plead a Plausible Predicate Violation of Law.**

The UCL is designed to punish "acts or practices which are unlawful, or unfair, or fraudulent."  *Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).  In addition, the UCL "borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable."  *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012).  Jeong claims that Nexo's alleged breach of contract constitutes the "unlawful" conduct.  *See* Compl. ¶¶ 192, 193.  Jeong claims that Nexo was "unfair" for the same reason: it "initiated the suspension [of XRP] in bad faith" and it was "unfair" for Nexo not to give him notice of the suspension. *See* Compl. ¶¶ 194–195.  However, for the reasons discussed above, none of this conduct constitutes a predicate violation of the UCL.

Finally, Jeong alleges that Nexo engaged in "deceptive" and "misleading" advertising and deceived users with respect to "ownership" over the collateral.  *See* Compl. ¶¶ 196, 197.  However, none of his claims are predicated on "deceptive" and "misleading" advertising about "ownership" and none of his damages flow from any of this alleged conduct.  The allegations in these paragraphs are superfluous and fail to establish a plausible UCL claim.

MOTION TO DISMISS

IV.   **THE COURT SHOULD DISMISS THE BREACH OF CONTRACT AND DECLARATORY JUDGMENT CLAIMS UNDER THE FNC DOCTRINE.**

In the strict alternative to their jurisdictional objections, Defendants seek dismissal of the breach of contract and declaratory judgment claims under the FNC doctrine.  Defendants do not seek dismissal of the CLRA and UCL claims under the FNC doctrine, both of which fail as a matter of law for the reasons explained above.  In the Wallet Terms, Jeong agreed that any disputes "shall be referred to the competent court in London, England, determined as per the procedural law of England and Wales" and governed by the substantive law of England and Wales. Ex. B, Wallet Terms § XVIII.1–.2.

A forum-selection clause pointing to a foreign forum is enforced through the doctrine of *forum non conveniens*.  *Atl. Marine Constr. Co. v. U.S. Dist. Court for the W. Dist. of Tex.*, 571 U.S. 49, 60 (2013).  A contractual forum-selection clause is "given controlling weight" in a *forum non conveniens* analysis "in all but the most **exceptional cases**" and the plaintiff's choice-of-forum is given "no weight."  *Finsa Portafolios, S.A. DE C.V. v. OpenGate Capital, LLC*, 769 F. App'x 429, 430–31 (9th Cir. 2019) (emphasis added).  The "exceptional case" exception is only recognized in limited circumstances: (1) the clause is invalid due to "fraud or overreaching," (2) "enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision," or (3) "trial in the contractual forum will be so gravely difficult and inconvenient that [the litigant] will for all practical purposes be deprived of his day in court." *Yei A. Sun v. Advanced China Healthcare, Inc.*, 901 F.3d 1081, 1088 (9th Cir. 2018).  There is no allegation of fraud or overreaching in Jeong's Complaint.  Only the latter two exceptions are potentially at issue in this dispute.  Each is discussed below.

A.   **Jeong Fails to Plead Contravention of a Strong Public Policy.**

A plaintiff "must point to a statute or judicial decision that clearly states such a strong public policy" against enforcing the forum-selection clause.  *Id.* at 1090.  This requires the plaintiff to make a "strong showing" with respect to the applicable public policy.  *HSM Holdings, LLC v. Mantu I.M. Mobile Ltd.*, 2020 WL 7220462, at *4 (N.D. Cal. Jan. 30, 2020).

Jeong has not identified any compelling public policy that justifies violating the

contractually mandated choice of forum.  Any public policy argument premised on California's consumer protection statutes fails because Defendants do not seek FNC dismissal of the UCL and CLRA claims, and those claims fail as a matter of law in any event.  Nor can Jeong avoid the mandatory forum selection clause by arguing this is a small consumer dispute.  Jeong is seeking to recover approximately $280,000 from Nexo.  *See* Compl. ¶¶ 16, 135.  No California public policy precludes resolution of a six-figure breach of contract claim in London pursuant to the laws of England and Wales, The parties' agreement should be enforced as written.

### B.      Jeong Fails to Plead that London Courts Will Afford Him No Remedies.

A *forum non conveniens* dismissal motion should be granted even if the law in the alternative forum is less favorable to the plaintiff's chance of recovery.  *Lewis v. Liberty Mut. Ins. Co.*, 953 F.3d 1160, 1168 (9th Cir. 2020); *see also Creative Tech., Ltd. v. Aztech Sys. Pte, Ltd.*, 61 F.3d 696, 701–02 (9th Cir. 1995).  Instead, the Court must enforce a forum-selection clause unless the contractually selected forum affords the plaintiffs "no remedies whatsoever."  *Lewis*, 953 F.3d at 1168.  As *Lewis* explains, "[i]t is the *availability* of a remedy that matters, not predictions of the likelihood of a win on the merits." *Id.* (emphasis in original); *see also Lee v. Fisher*, 2021 WL 1659842, at *5 (N.D. Cal. Apr. 27, 2021); *In re Facebook, Inc. S'holder Derivative Privacy Litig.*, 367 F. Supp. 3d 1108, 1120 (N.D. Cal. 2019).  Higher litigation costs are not a necessarily basis to establish that a plaintiff's day in court will be denied.  *Maroon Soc'y, Inc. v. Unison Consulting, Inc.*, 2019 WL 8108717, at *6 (C.D. Cal. July 26, 2019).  Instead, the plaintiff resisting dismissal must show that he "will be effectively deprived of a meaningful day in court." *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972).  This is a high bar and one that Jeong does not meet here.

Jeong's alternative forum is a court in London, England.  Ex. B, Wallet Terms XVIII.1-.2. English courts have long been recognized as an available alternative forum which affords remedies to aggrieved parties.  *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972) (enforcing forum selection clause designating a London court as the exclusive forum); *Richards v. Lloyd's of London*, 135 F.3d 1289, 1296 (9th Cir. 1998) (upholding a forum selection clause requiring that the lawsuit be brought in England despite the fact that English law immunized the defendant from potential claims); *Am. Home Assurance Co. v. TGL Container Lines, Ltd.*, 347 F. Supp. 2d 749,

MOTION TO DISMISS

766 (N.D. Cal. 2004) (holding that "the High Court of Justice in London is an adequate alternative forum for litigating plaintiffs' claims.").  English courts are plainly a valid, alternative legal forum for litigating this matter.  English courts recognize common law claims similar to those advanced by Jeong, and Jeong will be able to have a "meaningful day in court."

Moreover, courts in the Ninth Circuit have granted *forum non conveniens* dismissal motions to far less favorable jurisdictions than London.  *See Color Switch LLC v. Fortafy Games DMCC*, 818 F. App'x 694, 696 (9th Cir. 2020) (affirming dismissal to litigate in the Court of Dubai); *Loya v. Starwood Hotels & Resorts Worldwide, Inc.*, 583 F.3d 656, 666 (9th Cir. 2009) (affirming dismissal to litigate in Mexico); *Miave, LLC v. Pitech Plus, SRL*, 2021 WL 2333097, at *4 (C.D. Cal. May 5, 2021) (dismissing case to litigate in Romania).  English courts pose a fair, accessible alternative relative to these far-flung forum.

Finally, Courts may consider choice-of-law provisions in evaluating whether a forum selection clause should be enforced.  *Yei A. Sun*, 901 F.3d at 1088 n.4; *Spread Your Wings, LLC v. AMZ Group LLC*, 2020 WL 5749085, at *6 (N.D. Cal. Sept. 25, 2020).  That is, a court may "consider the clauses' impact together" to determine whether to grant the *forum non conveniens* dismissal motion.  *Yei A. Sun*, 901 F.3d at 1088 n.4.  The governing law in this matter is the substantive law of England and Wales. Ex. B, Wallet Terms XVIII.1.  An English court is better equipped to decide this matter.  This factor also strongly weighs in favor of dismissal.

## **CONCLUSION**

The Court should dismiss the European Nexo Entities and Nexo Financial LLC for lack of person jurisdiction and all claims under Rules 12(b)(1), 12(b)(6) and/or the FNC doctrine.

DATED:   July 19, 2021                          EVERSHEDS SUTHERLAND (US) LLP


By */s/ Ian S. Shelton*
Ian S. Shelton

*Attorneys for Defendants Nexo Financial LLC,*
*Nexo Financial Services Ltd., Nexo Services OÜ,*
*Nexo AG, and Nexo Capital Inc.*