Kyle W. Roche (*pro hac vice*)
Edward Normand (*pro hac vice*)
Alex Potter (*pro hac vice*)
Stephen Lagos (*pro hac vice*)
ROCHE FREEDMAN LLP
99 Park Avenue, 19th Floor
New York, NY 10016
Tel.: 646-970-7509
Email: kyle@rcfllp.com

Katherine Eskovitz (SBN 255105)
ROCHE FREEDMAN LLP
1158 26th Street No. 175
Santa Monica, CA 90403
Tel.: 646-791-6883
Email: keskovitz@rcfllp.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUNHAN JEONG, individually and on behalf of all others similarly situated, | Case Number: 5:21-CV-02392-BLF |
| Plaintiff, | **MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS COMPLAINT PURSUANT TO RULE 12(b) AND BASED ON *FORUM NON CONVENIENS*** |
| vs. | |
| NEXO FINANCIAL LLC, NEXO FINANCIAL SERVICES LTD., NEXO SERVICES OÜ, NEXO AG, and NEXO CAPITAL INC. | Date: November 18, 2021 |
| | Time: 9:00 a.m. |
| | Judge: Hon. Beth Labson Freeman |
| Defendant(s). | Courtroom: No. 3, 5th Floor |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

ISSUES TO BE DECIDED ........................................................................................... 1

FACTUAL BACKGROUND ...................................................................................... 1

ARGUMENT ............................................................................................................... 3

    I.   The Court Has Personal Jurisdiction .............................................................. 3

        A.   The Court Has Specific Personal Jurisdiction ...................................... 3

             1.   The Moving Defendants' Purposeful Availment ....................... 3

             2.   Nexo's Conduct Arises Out of Its California-Related Activities ................ 5

             3.   The Exercise of Personal Jurisdiction Over Defendants Is Reasonable ........ 5

        B.   The Court Also Has Alter Ego/Single-Enterprise Jurisdiction ........................... 5

             1.   The Nexo Entities Have a Unity of Interest and Ownership ........................ 6

             2.   Plaintiff Alleges Prospective Inequitable Results ........................................ 7

         C.   In the Alternative, Plaintiff Is Entitled to Jurisdictional Discovery .................... 8

    II.   The Court Has Subject Matter Jurisdiction ..................................................... 9

        A.   Plaintiff's Standing to Seek Equitable Relief Is Undisputed .............................. 9

        B.   Plaintiff Has Standing to Bring His Claim for Breach of Contract ................... 10

             1.   Nexo's Breach for Suspending XRP Payments ........................................ 10

             2.   Nexo's Breach for Failure to Provide Notice .......................................... 12

    III.   Plaintiff States all of his Claims ..................................................................... 12

        A.   Plaintiff States a Claim for Breach of Contact.................................................. 12

        B.   Plaintiff States a Claim for Declaratory Judgment ........................................... 15

        C.   Plaintiff States a Claim Under the CLRA ....................................................... 16

        D.   Plaintiff States Claims for Equitable Relief Under the UCL and CLRA .......... 17

        E.   Plaintiff States a Claim Under the UCL .......................................................... 18

    IV.   *Forum Non Conveniens* Is No Basis for Dismissal .................................................. 19

        A.   The Borrow Terms Apply to Plaintiff's Claims ............................................... 19

        B.   The Forum-Selection Clause in the Borrow Terms Is Unenforceable .............. 22

CONCLUSION ........................................................................................................... 23

i

# TABLE OF AUTHORITIES

**Cases**

*Abernathy v. Church of God*,
  2011 WL 13135284 (N.D. Ala. Nov. 28, 2011) ........................................................................ 4

*ADVSR, LLC v. Magisto Ltd.*,
  2021 WL 3604729 (N.D. Cal. Aug. 13, 2021) ........................................................................ 20

*Arthur v. Louis Vuitton N. Am. Inc.*,
  2009 WL 10656847 (C.D. Cal. June 17, 2009) ...................................................................... 14

*Bartel v. Tokyo Elec. Power Co., Inc.*,
  371 F. Supp. 3d 769 (S.D. Cal. 2019) ...................................................................................... 5

*Bellagio, LLC v. Bellagio Shoes, Inc.*,
  571 F. App'x 619 (9th Cir. 2014) ............................................................................................ 8

*Berry v. Am. Express Publ'g, Inc.*,
  147 Cal. App. 4th 224 (2007) ................................................................................................ 17

*Brice v. Stinson*,
  2020 WL 10618212 (N.D. Cal. Aug. 12, 2020) ...................................................................... 4

*Byton N. Am. Co. v. Breitfeld*,
  2020 WL 3802700 (C.D. Cal. Apr. 28, 2020) ........................................................................ 17

*Circle Click Media LLC v. Regus Mgmt. Grp. LLC*,
  2015 WL 8477293 (N.D. Cal. Dec. 10, 2015) ...................................................................... 10

*City & Cnty. of San Francisco v. Purdue Pharma L.P.*,
  491 F. Supp. 3d 610 (N.D. Cal. 2020) ...................................................................................... 6

*Clear Connection Corp. v. Comcast Cable Commc'ns Mgmt., LLC*,
  501 F. Supp. 3d 886 (E.D. Cal. 2020) ...................................................................................... 7

*Commerce Capital, L.P. v. The PrivateBank*,
  2005 WL 1544798 (N.D. Tex. June 30, 2005) ........................................................................ 4

*Coughlin v. Blair*,
  262 P.2d 305 (Cal. 1953) ...................................................................................................... 11

*Daewoo Elecs. Am. Inc. v. Opta Corp.*,
  875 F.3d 1241 (9th Cir. 2017) .................................................................................................. 7

*Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*,
  557 F.2d 1280 (9th Cir. 1977) .................................................................................................. 8

*Dodd v. iGATE Techs., Inc.*,
  2015 WL 1843036 (N.D. Cal. Apr. 8, 2015) ........................................................................ 21

*Fantastic Sams Salons Corp. v. Moassesfar*,
  2016 WL 7197917 (C.D. Cal. Mar. 8, 2016) ........................................................................ 14

*Freeman v. Indochino Apparel, Inc.*,
  443 F. Supp. 3d 1107 (N.D. Cal. 2020) ................................................................................ 17

ii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*iCall, Inc. v. Reliance Commc'ns Ltd.*,
    2010 WL 11583236 (N.D. Cal. Sept. 16, 2010) ........................................................ 3

*In re Adobe Sys., Inc. Priv. Litig.*,
    66 F. Supp. 3d 1197 (N.D. Cal. 2014) ...................................................................... 9

*In re Estate of Ferdinand E. Marcos Human Rights Litig.*,
    978 F.2d 493 (9th Cir. 1992) .................................................................................. 4

*In re Google Assistant Priv. Litig.*,
    457 F. Supp. 3d 797 (N.D. Cal. 2020) .................................................................... 18

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
    2010 WL 5141861 (N.D. Cal. Dec. 13, 2010) ........................................................ 10

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
    313 F. Supp. 3d 1113 (N.D. Cal. 2017) ........................................................... 16, 17

*Jones v. Moss*,
    2020 WL 5517232 (N.D. Cal. Sept. 14, 2020) ........................................................ 4

*Krause-Pettai v. Unilever United States, Inc.*,
    2021 WL 1597931 (S.D. Cal. Apr. 23, 2021) ........................................................ 17

*Laub v. United States Dep't of Interior*,
    342 F.3d 1080 (9th Cir. 2003) ................................................................................ 9

*Limestone Memory Sys. LLC v. Micron Tech., Inc.*,
    2019 WL 8690217 (C.D. Cal. Dec. 26, 2019) ......................................................... 7

*Lloyd v. Sjoblom*,
    2014 WL 2880473 (N.D. Cal. June 24, 2014) ........................................................ 9

*Lyons State Bank v. Bracht Feedyards, Inc.*,
    2009 WL 2591318 (D. Kan. Aug. 21, 2009) .......................................................... 4

*Merrell v. Renier*,
    2006 WL 1587414 (W.D. Wash. June 6, 2006) .................................................... 21

*Moore v. Mars Petcare US, Inc.*,
    966 F.3d 1007 (9th Cir. 2020) .............................................................................. 19

*Moua v. Optum Servs., Inc.*,
    320 F. Supp. 3d 1109 (C.D. Cal. 2018) ................................................................ 13

*N. Cal. Dist. Council of Laborers v. Pittsburg-Des Moines Steel Co.*,
    69 F.3d 1034 (9th Cir. 1995) ................................................................................ 21

*Politte v. United States*,
    2009 WL 10672898 (S.D. Cal. July 31, 2009) ........................................................ 8

*Ranza v. Nike, Inc.*,
    793 F.3d 1059 (9th Cir. 2015) ................................................................................ 5

*Rhapsody Int'l Inc. v. Lester*,
    2014 WL 709899 (N.D. Cal. Feb. 24, 2014) .......................................................... 3

*Roper v. Big Heart Pet Brands, Inc.*,
    510 F. Supp. 3d 903 (E.D. Cal. 2020) ................................................................. 18

*Sagastume v. Psychemedics Corp.*,
    2020 WL 8175597 (C.D. Cal. Nov. 30, 2020) ..................................................... 17

*Schwarzenegger v. Fred Martin Motor Co.*,
    374 F.3d 797 (9th Cir. 2004) ......................................................................... 3, 4, 5

*Shivkov v. Artex Risk Sols., Inc.*,
    974 F.3d 1051 (9th Cir. 2020) ............................................................................ 20

*Siano Mobile Silicon, Inc. v. Mavcom, Inc.*,
    2011 WL 1483706 (N.D. Cal. Apr. 19, 2011) ....................................................... 8

*Sonner v. Premier Nutrition Corp.*,
    971 F.3d 834 (9th Cir. 2020) .............................................................................. 17

*Starlight Int'l, Ltd. v. Lifeguard Health, LLC*,
    2008 WL 2899903 (N.D. Cal. July 22, 2008) ................................................... 3, 5

*Stewart v. Screen Gems-EMI Music, Inc.*,
    81 F. Supp. 3d 938 (N.D. Cal. 2015) .................................................................... 7

*Storek & Storek, Inc. v. Citicorp Real Est., Inc.*,
    100 Cal. App. 4th 44 (2002) ............................................................................... 13

*StreamCast Networks, Inc. v. IBIS LLC*,
    2006 WL 5720345 (C.D. Cal. May 2, 2006) ....................................................... 15

*Summit Est., Inc. v. United Healthcare Ins. Co.*,
    2020 WL 5436655 (N.D. Cal. Sept. 10, 2020) ................................................... 17

*Teague v. Biotelemetry, Inc.*,
    2018 WL 5310793 (N.D. Cal. Oct. 25, 2018) ..................................................... 15

*Tevra Brands LLC v. Bayer Healthcare LLC*,
    2020 WL 6149714 (N.D. Cal. Oct. 20, 2020) ....................................................... 8

*Third Story Music, Inc. v. Waits*,
    41 Cal. App. 4th 798 (1995) ............................................................................... 13

*Twentieth Century Fox Intern. Corp. v Scriba*,
    385 F. App'x 651 (9th Cir. 2010) ......................................................................... 9

*Updateme Inc. v. Axel Springer SE*,
    2018 WL 1184797 (N.D. Cal. Mar. 7, 2018) ......................................................... 7

*Warner Bros. Int'l Television Distribution v. Golden Channels & Co.*,
    2004 WL 7336853 (C.D. Cal. Nov. 17, 2004) ..................................................... 14

*Zeiger v. WellPet LLC*,
    2021 WL 756109 (N.D. Cal. Feb. 26, 2021) ....................................................... 18

*Zeiger v. WellPet LLC*,
    304 F. Supp. 3d 837 (N.D. Cal. 2018) ................................................................ 18

**Other Authorities**

Cal. Bus. & Prof. Code § 17200 ............................................................................................. 19

Cal. Bus. & Prof. Code § 17205 ............................................................................................. 17

Cal. Civ. Code § 1708(a) ........................................................................................................ 17

Cal. Civ. Code § 1752 ............................................................................................................. 17

Cal. Civ. Code § 1760 ............................................................................................................. 17

Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss
Case No. 5:21-CV-02392-BLF

**ISSUES TO BE DECIDED**

1.      Whether the Court has personal jurisdiction over Defendants. Yes. (Part I.)

2.      Whether the Court has subject matter jurisdiction. Yes. (Part II.)

3.      Whether Plaintiff states all of his claims. Yes. (Part III.)

4.      Whether this is the appropriate forum for the action. Yes. (Part IV.)

**FACTUAL BACKGROUND**

Operating as a single enterprise through common ownership and management, Defendants (collectively, "Nexo") maintain and operate a highly interactive website through which customers can use their cryptoassets as collateral to borrow money—a service Nexo calls "Crypto Credit." Compl. ¶¶ 2, 22-23, 32. Nexo advertises this service as allowing customers to benefit from the value of their cryptoassets without having to sell them, including to avoid taxes on capital gains. *Id*. ¶ 45. Crypto Credit customers must maintain a certain loan-to-value ("LTV") ratio, at least 83.3%, between their collateral and their loan. *Id*. ¶¶ 3, 50-51. Otherwise, as Nexo promised in its terms and conditions, the customer would receive notice of the issue. At that point Nexo may sell the customer's collateral to maintain the required LTV ratio, even if that means liquidating a customer's entire collateral, including what is held in a customer's "Savings Wallet." *Id*. ¶¶ 4, 47.

In providing this service, Nexo had long accepted the cryptoasset "XRP" (or "Ripple") as collateral, and Plaintiff had used XRP as his collateral on his loan from Nexo. *Id*. ¶ 2. On December 22, 2020, the Securities and Exchange Commission ("SEC") publicly announced an action against the creator of Ripple and its executives alleging that they were engaged in an ongoing $1.3 billion unregistered securities offering of XRP. *Id*. ¶ 5. The price of XRP proceeded to drop more than 50% over the course of the next day; and as the price drop began, and without providing notice to its customers, Nexo suspended the use of XRP to pay down loans. *Id*. ¶ 6.

Nexo insists in its motion (at 4) that it suspended the use of XRP because the SEC was seeking "to shut down Ripple and the use of XRP as a cryptocurrency." Nexo thus seeks to base its motion on its unfounded *disagreement* with Plaintiff's detailed allegations that Nexo's suspension of XRP was *not* legally required. *Id*. ¶¶ 53-54, 77-79. Indeed, demonstrating that Nexo

simply wanted to avoid holding XRP at its falling price even though XRP remained a viable, transferrable store of value, *id*. ¶¶ 71, 73, 75, Nexo proceeded to *sell* massive quantities of XRP that had been held as collateral, *id*. ¶¶ 53-54. In doing so, Nexo claimed to have acquired the "*ownership*" of the collateral that customers posted to borrow money—precisely the *opposite* of Nexo's advertisements that its service did *not* involve the transfer of ownership of the customer's assets. *Id*. ¶¶ 7, 11, 13, 72. For both Nexo and its customers, the tax consequences of any such change in ownership would be widespread, substantial, and very complex. *Id*. Nexo's claimed "ownership" of customer collateral, and its public invocation of the supposed unfettered contractual right to suspend the use of any cryptoasset for any purpose and for any reason at all, gives rise to Plaintiff's claims for declaratory judgment and for violation of California's UCL and CLRA.

A centerpiece of this litigation is thus the adhesion contract that Nexo imposes on Crypto Credit customers (the "Borrow Terms") and that purports to govern the terms of that service. *Id*. ¶¶ 8, 46, 56-94, 95-133, 134-40, 149, 167-73, 175-89, 192-93, 196-97, 210-12. Nexo's suspension of XRP as a means of repayment on December 23, 2020, and failure to give notice of that suspension, breached the Borrow Terms and the implied covenant of good faith and fair dealing thereunder, regarding customer maintenance of LTV ratios. *Id*. ¶ 55. Nexo's material breaches excused any obligation these customers had to maintain their LTV ratios. *Id*. ¶ 63. Nexo thus acted unlawfully in liquidating the collateral of customers who, but for the wrongful suspension of such use, could have used XRP to pay down on their loans. *Id*. ¶ 95.

After Nexo's improper suspension of XRP, Plaintiff was not required to spend his cryptoassets to try to maintain his LTV ratio—but he did; and Nexo was not entitled to keep liquidating his collateral towards maintaining his LTV ratio—but it did. The result was that Plaintiff lost the value of the additional collateral he posted and the then-current value of his collateral, at the time of breach, less his outstanding loan amount. The straightforward—the logical, mathematical—conclusion from Plaintiff's allegations are that Nexo would have to pay

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

him more than $100,000 to return him to his position at the time Nexo's materially breached the agreement and thereby excused Plaintiff's obligation to maintain his LTV ratio. *Id.* ¶¶ 15-16, 51-52, 57, 94.

## ARGUMENT

## I.   THE COURT HAS PERSONAL JURISDICTION

"Where, as here, the motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). Under the applicable "three-prong test," below, Plaintiff alleges more than sufficient facts to confer specific jurisdiction. *Id.* at 802.

### A.  The Court Has Specific Personal Jurisdiction

#### 1.   The Moving Defendants' Purposeful Availment

A showing of purposeful availment "consists of evidence of the defendant's actions in the forum, such as executing or performing a contract there." *Id.* "By taking such actions, a defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* (internal quotations omitted).

*First*, Defendants have *all* purposefully availed themselves of doing business in California through Nexo's highly interactive website, which "Nexo made and makes readily available in California and that California residents, including Plaintiff and Class and Subclass members, accessed and heavily interacted with in using Nexo Crypto Credit." Compl. ¶ 32; *see also id*. ¶¶ 33-35. "[T]he operation of an interactive website has been interpreted by courts as subjecting the operator to specific jurisdiction." *iCall, Inc. v. Reliance Commc'ns Ltd.*, 2010 WL 11583236, at *4 (N.D. Cal. Sept. 16, 2010). "The more 'interactive' a defendant's website is, the greater the 'purposeful availment' of the forum state for purposes of determining specific personal jurisdiction." *Id.*; *accord Rhapsody Int'l Inc. v. Lester*, 2014 WL 709899, at *5 (N.D. Cal. Feb. 24, 2014).

Defendants are "collectively operating and maintaining the Nexo website and offering the Nexo services advertised on that website and through the Nexo whitepaper." Compl. ¶ 22. Nexo Services OÜ "has been the headquarters for Nexo's Crypto Credit services," *id*. ¶ 19, and "Nexo Financial Services since May 2020 has supported Nexo Services OÜ in offering and maintaining the 'Nexo' services advertised and available on the Nexo website and through the Nexo website platform," *id*. ¶ 18. Nexo does *not* dispute these allegations—and has thus waived any argument in that regard. *See, e.g.*, *In re Estate of Ferdinand E. Marcos Human Rights Litig.*, 978 F.2d 493, 495 (9th Cir. 1992) (re personal jurisdiction argument); *Jones v. Moss*, 2020 WL 5517232, at *5 (N.D. Cal. Sept. 14, 2020) (the general rule). Nor could Nexo dispute that its website is highly interactive. Nexo users input information critical to using Nexo's services, post collateral, take a loan, monitor the need to pay down a loan or post more collateral, and close out an account, transfer funds, and otherwise engage in commercial transactions through its website. Compl. ¶¶ 33(e), (f). Nexo also advertises to California consumers through its website in a variety of ways including by linking to its whitepaper, terms and conditions, and other forms of advertisement. *Id*. ¶¶ 33(a)-(d).

*Second*, Nexo Financial LLC is a licensed finance lender and money services business in California. *Id*. ¶ 17. And Nexo Financial's specific contacts, as the federal courts have long recognized, are similarly sufficient to confer specific jurisdiction. *See, e.g.*, *Abernathy v. Church of God*, 2011 WL 13135284, at *3 (N.D. Ala. Nov. 28, 2011) ("[T]he extensive scope of the Alabama lenders involved in the financing arrangements satisfy the requirements of specific jurisdiction."); *Lyons State Bank v. Bracht Feedyards, Inc.*, 2009 WL 2591318, at *4 (D. Kan. Aug. 21, 2009) ("Lending money to a resident of a forum state for a business project amounts to 'purposeful availment.'"); *Commerce Capital, L.P. v. The PrivateBank*, 2005 WL 1544798, at *4 (N.D. Tex. June 30, 2005) (PrivateBank "purposefully directed its activities at Texas" by lending money to a Texas corporation). Indeed, Trenchev himself connects Nexo Financial to targeting California consumers, referring to Nexo's CFL License as relevant to "the next generation of crypto adopters within California State's regulatory framework." Compl. ¶ 27(b). These

allegations further compel the conclusion that Nexo Financial "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Schwarzenegger*, 374 F.3d at 802; *see also Brice v. Stinson*, 2020 WL 10618212, at *4 (N.D. Cal. Aug. 12, 2020) (court had specific jurisdiction over critical stakeholders in entity that originated usurious loans in California and "aimed at the California loan market and Californians").

### 2.   Nexo's Conduct Arises Out of Its California-Related Activities

"If the plaintiff would not have suffered loss 'but for' the defendant's activities, this element is satisfied." *Bartel v. Tokyo Elec. Power Co., Inc.*, 371 F. Supp. 3d 769, 787 (S.D. Cal. 2019); *accord Starlight Int'l, Ltd. v. Lifeguard Health, LLC*, 2008 WL 2899903, at *6 (N.D. Cal. July 22, 2008). Plaintiff's claims arise out of Nexo's maintenance of the highly interactive Nexo website and out of Nexo Financial's practice of lending money in California: "[B]ut for Nexo's advertising and maintenance of a highly interactive website made available in California, Plaintiff would not have used Nexo's services and would not have suffered the losses he did." Compl. ¶ 35.

### 3.   The Exercise of Personal Jurisdiction Over Defendants Is Reasonable

Plaintiff has shifted to Nexo the burden, which it cannot meet, to "present a compelling case that the exercise of jurisdiction would be unreasonable." *Schwarzenegger*, 374 F.3d at 802. There is nothing unjust in having California courts adjudicate the conduct of companies that are— and that publicly tout that they are—licensed to do business in California; that target California residents and facilitate the residents' use of the companies' services through a highly interactive website; that thereby loan millions of dollars to California residents; and that thereby extensively avail themselves of the benefit of initiating and maintaining a significant presence in California.

### B.   The Court Also Has Alter Ego/Single-Enterprise Jurisdiction

The Court's personal jurisdiction extends to related entities where a plaintiff "make[s] out a prima facie case (1) that there is such unity of interest and ownership that the separate personalities [of the entities] no longer exist and (2) that failure to disregard [their separate

identities] would result in fraud or injustice." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073 (9th Cir. 2015).

### 1.  The Nexo Entities Have a Unity of Interest and Ownership

Certain facts (the "*Daewoo* factors") indicate "that two entities have a unity of interest and ownership," including "(1) inadequate capitalization, (2) commingling of funds and other assets, (3) disregard of corporate formalities and failure to maintain an arm's length relationship, (4) holding out by one entity that is liable to the debts of the other, (5) identical equitable ownership, (6) use of the same offices and employees, (7) lack of segregation of corporate records, (8) manipulating assets between entities so as to concentrate the assets in one and the liabilities in another, and (9) identical directors and officers." *City & Cnty. of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 635 (N.D. Cal. 2020). Where "several of the factors" are implicated, a unity of interest may be found. *Id.* at 637 (finding satisfaction of three factors sufficient to establish prima facie case of unity of interest). Plaintiff's allegations implicate several *Daewoo* factors.

Nexo does *not* dispute that (1) Nexo principals Kantchev, Shulev, and Trenchev identify themselves, and are publicly identified, as "co-founders" and "managing partners" of "Nexo," without distinguishing among the Nexo corporate entities, Compl. ¶ 23(b); the Nexo entities share similar if not effectively identical supervision and management, in that some combination of Kantchev, Shulev, and Trenchev is responsible for such oversight for each of the entities, *id.* ¶ 23(f); the Nexo entities share similar equitable ownership, in that Nexo co-founders Kantchev, Shulev, and Trenchev collectively hold most of the equity in each entity, *id.* ¶ 23(e); Nexo Capital and Nexo Financial Services share the same principal place of business, *id.* ¶ 21; and the Nexo Entities "treat the employees of any particular entity as working for 'Nexo' as a whole," *id.* ¶ 23(h).

The Trenchev Declaration that Nexo has submitted makes the merely conclusory assertion that "[n]either the European Nexo Entities nor Nexo Financial LLC dictate every facet of the business of Nexo Capital Inc." This unsupported assertion cannot be dispositive—including because it flies in the face of the undisputed fact that although the California finance lender license

Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss
Case No. 5:21-CV-02392-BLF

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

that Nexo has touted "specifies Nexo Financial as the Nexo lending entity, Nexo Capital is the Nexo entity that recently brought suit in the United States against a customer for allegedly defaming 'Nexo' in criticizing Nexo's online lending platform and overall operations." *Id*. ¶ 28. This fact shows Nexo Capital to be a literal substitute for, and tantamount to, Nexo Financial. The Trenchev Declaration also does *not* dispute Nexo's public statements, *id*. ¶¶ 24-25, or that Kantchev, Shulev, and Trenchev maintain "oversight for each of the entities," Compl. ¶ 23(f), or that they "treat the employees of any particular entity as working for 'Nexo' as a whole," *id*. ¶ 23(h), such that the common and "pervasive control" of the Nexo Entities is not truly disputed in fact.

### 2.  Plaintiff Alleges Prospective Inequitable Results

A plaintiff identifies inequitable results by alleging "some evidence of bad faith conduct on the part of defendants." *Daewoo Elecs. Am. Inc. v. Opta Corp.*, 875 F.3d 1241, 1250 (9th Cir. 2017). Plaintiff alleges such conduct in at least four main ways.

*First*, Nexo acted in bad faith. It "imposed the suspension in bad faith and dishonestly," Compl. ¶ 70, "carried out a scheme to deliberately cheat large numbers of customers out of individually small sums of money," *id*. ¶ 164, and engaged in the fraudulent bait-and-switch of extensively advertising that customers could borrow money without having to sell their cryptocurrency, but then imposed an adhesion contract through which Nexo claims to have acquired "ownership" of the customer's posted collateral, *id*. ¶¶ 7, 112-24, 196. These allegations are more than sufficient to establish the requisite inequitable results. *See Clear Connection Corp. v. Comcast Cable Commc'ns Mgmt., LLC*, 501 F. Supp. 3d 886, 897 (E.D. Cal. 2020) (a "willful breach of contract alone is sufficient to establish inequitable result for purposes of an alter ego claim).

*Second*, because Plaintiff alleges that multiple Defendants participated in the operation of the Crypto Credit Platform, Compl. ¶¶ 17-19, 28, the dismissal of some of those entities could frustrate meritorious claims against Defendants and would thus enable them to escape liability for

the above-referenced bad-faith conduct. *See Updateme Inc. v. Axel Springer SE*, 2018 WL 1184797, at \*10 (N.D. Cal. Mar. 7, 2018); *Limestone Memory Sys. LLC v. Micron Tech., Inc.*, 2019 WL 8690217, at \*18 (C.D. Cal. Dec. 26, 2019).

*Third*, the Nexo entities would be unjustly enriched from their misconduct. *See, e.g.*, Compl. ¶¶ 198-99. The moving Defendants' prospective retention of this ill-gotten gain, as a result of evading jurisdiction, qualifies as an inequitable result for purposes of the alter ego analysis. *See Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 963 (N.D. Cal. 2015).

*Fourth*, as noted, Nexo Capital recently brought suit in the United States against a customer for allegedly defaming 'Nexo' in criticizing Nexo's online lending platform and overall operations," Compl. ¶ 28, and Nexo has repeatedly represented that it is a single entity, *id.* ¶¶ 24-25, 27. Indeed, *none* of the relevant agreements, *see* Trenchev Decl. Exs. A-D, specific *which Nexo entity* contracted with Plaintiff. It would be unjust for these entities thus to represent themselves as a single entity but, at the same time, to have this Court to treat those same entities separately. *See Politte v. United States*, 2009 WL 10672898, at \*4-\*5 (S.D. Cal. July 31, 2009) (listing "misrepresentation of the corporate structure" as an example of an "inequitable result").

## C.  In the Alternative, Plaintiff Is Entitled to Jurisdictional Discovery

If the Court were to conclude that Plaintiff has not made out a *prima facie* case for personal jurisdiction, Plaintiff respectfully requests leave to conduct jurisdictional discovery. *See, e.g.*, *Siano Mobile Silicon, Inc. v. Mavcom, Inc.*, 2011 WL 1483706, at \*2-\*3 (N.D. Cal. Apr. 19, 2011) (noting "the broad scope of discovery applicable to claims of alter ego and agency" in granting plaintiff's motion to compel documents from defendants).

*First*, it has long been true that jurisdictional discovery is particularly appropriate where, as here, "pertinent facts bearing on the question of jurisdiction are controverted." *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 n.1 (9th Cir. 1977). Defendants cite the Trenchev Declaration to dispute allegations that bear on commingling of funds, failure to distinguish among corporate funds, failure to maintain corporate record or follow corporate formalities, and failure to

maintain arm's length relationships. Compl. ¶ 23. Plaintiff is entitled to discovery sufficient to challenge Nexo's contrary assertions. *See Bellagio, LLC v. Bellagio Shoes, Inc.*, 571 F. App'x 619, 620 (9th Cir. 2014) (ordering jurisdictional discovery).

*Second*, as repeatedly shown above, Plaintiff has alleged more than a "colorable basis" for personal jurisdiction over the Nexo entities. *Tevra Brands LLC v. Bayer Healthcare LLC*, 2020 WL 6149714, at *1–*2 (N.D. Cal. Oct. 20, 2020). To do so, the plaintiff need only allege "'some evidence' tending to establish personal jurisdiction over the defendant." *Id.*; *see also Twentieth Century Fox Intern. Corp. v Scriba*, 385 F. App'x 651, 653 (9th Cir. 2010) (vacating and remanding district court's decision to deny jurisdictional discovery when plaintiff's "alter ego allegations, if supported by some evidence, would provide a strong argument for the exercise of jurisdiction").

*Third*, in light of Plaintiff's allegations, Nexo's efforts to dispute some of those allegations do not remotely establish that "it is clear that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction." *Laub v. United States Dep't of Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003) (internal citation omitted). The district court should grant discovery "when, as here, the jurisdictional facts are contested or more facts are needed." *Id.*

## II.     THE COURT HAS SUBJECT MATTER JURISDICTION

### A.  Plaintiff's Standing to Seek Equitable Relief Is Undisputed

Nexo does *not* address Plaintiff's standing to bring his claim for declaratory judgment concerning the Borrow Terms, because Plaintiff is entitled to seek the clarification of contractual rights over which he and Nexo disagree. *See, e.g.*, *Lloyd v. Sjoblom*, 2014 WL 2880473, at *3 (N.D. Cal. June 24, 2014). Similarly, for purposes of California's consumer-protection statutes, plaintiffs seeking equitable relief satisfy any "injury" requirement by plausibly alleging "that they face a substantial, certainly impending risk of harm" from defendant's enforcement of the contract at issue. *In re Adobe Sys., Inc. Priv. Litig.*, 66 F. Supp. 3d 1197, 1220, 1223 (N.D. Cal. 2014). Plaintiff plausibly alleges such facts. *See, e.g.*, Compl. ¶¶ 175-89, 200-04, 210-13.

**B. Plaintiff Has Standing to Bring His Claim for Breach of Contract**

**1. Nexo's Breach for Suspending XRP Payments**

Nexo contends that its suspension of XRP payments did not cause Plaintiff's injury. This argument is not only wrong with respect to Plaintiff's out-of-pocket loss, but also fails even to try to account for Plaintiff's lost benefit of his bargain under the contract at issue.

*Plaintiff Suffered Substantial Damages*. In arguing (at 10-11) that Plaintiff's losses were solely the result of market conditions, Nexo misapprehends both Plaintiff's allegations and the law. Nexo's unlawful actions on December 23, 2020, caused Plaintiff to suffer a loss that he otherwise would not have suffered. When Nexo precluded Nexo customers from using XRP to pay down their loans, on December 23, Plaintiff's XRP was worth at least $269,300 (which, it bears noting, is a conservative estimate of the value of his collateral as of that date), before the XRP price crash, and his outstanding loan was approximately $164,400. Compl. ¶¶ 16, 52. That is, but for Nexo's suspension of the use of XRP, Plaintiff could have paid off his loan at XRP's relatively higher value and then retained over $100,000 worth of XRP ($269,300 - $164,400).

Plaintiff's ability to do so, under his theory of the case, was the benefit of his bargain with Nexo. Plaintiff, typical of the other Class members, suffered the liquidation of his collateral. *Id.* ¶ 137. The price of XRP proceeded to drop beginning on December 23, from $0.45 down to $0.17 on December 29, 2020. *Id.* ¶¶ 52, 94. As a result of Nexo's suspension of XRP payments, as Plaintiffs' allegations make clear, at least two consequences followed. One, Plaintiff was forced to use non-XRP cryptoassets to try to maintain his LTV ratio as the price of XRP dropped, in the amount of approximately $11,615. *Id.* ¶ 16. Two, when Plaintiff's LTV exceeded the applicable limit of 83.3% (which he *could* have met by using his XRP to pay down his loan), *id.* ¶ 51, Nexo liquidated over $100,000 worth of his collateral, *id.* ¶¶ 16, 57, 83-84, 93, 118.e, 135.

In other words, if Plaintiff had received the benefit of his bargain, he would have retained over $100,000 worth of XRP that was liquidated and avoided spending over $11,000 worth of other cryptoassets in an attempt to maintain his LTV ratio. Plaintiff is happy to provide further

details in an amended complaint, including based on discovery, but for standing purposes, he need not identify his damages with mathematical precision. *See Circle Click Media LLC v. Regus Mgmt. Grp. LLC*, 2015 WL 8477293, at *2 (N.D. Cal. Dec. 10, 2015); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2010 WL 5141861, at *3 (N.D. Cal. Dec. 13, 2010).

Nexo's arguments (at 12-13) about the market conditions for XRP from December 23 to December 29 do not change any of this analysis. This is true because damages are measured at the time of breach and because Plaintiff's loss of that value, measured at the time of breach, was plainly foreseeable to Nexo. Nor is Nexo permitted to argue, under the relevant law, that Plaintiff might not have paid down his loan just before Nexo suspended the use of XRP for that purpose. Plaintiff's bargain was the right to use his XRP to pay down his loan when its value was relatively higher. In precluding Plaintiff from exercising that right, Nexo is liable to Plaintiff for the value of his foreseeable benefit from the exercise of that right. *See Coughlin v. Blair*, 262 P.2d 305, 314 (Cal. 1953) (benefit-of-bargain damages for breach of contract). Plaintiff thus has standing.

*Defendants' "Mitigation" Arguments Are Mistaken*. Nexo mistakenly argues (at 12) that Plaintiff was required to plead that using XRP was the only way he could have repaid his loans. For one thing, as shown, Plaintiff *does* allege that he used other cryptoassets to try to maintain his LTV ratio. Compl. ¶¶ 16, 135. These costs "constitute additional cognizable injury" sufficient to confer standing. *Adobe*, 66 F. Supp. 3d at 1217. These efforts did not succeed in allowing Plaintiff to avoid his injury, including his lost benefit of the bargain. Just as fundamental, Nexo's interpretation of the doctrine of mitigation is incoherent—if *Plaintiff* could have easily exchanged XRP for other cryptocurrencies, this would necessarily mean that in the first instance *Nexo* could have accepted XRP payments and then *itself* have easily exchanged the XRP for other cryptocurrencies. Under these facts, no sensible theory of causation would suggest that Plaintiff had somehow "caused" his own injuries. In this regard, Nexo also conflates the doctrine of mitigation of damages with the doctrine of standing. If mitigation principles apply at all, they mean only that the amount of loss the plaintiff could have avoided "is simply subtracted from the amount

that would otherwise have been recoverable as damages." *Restatement (Second) of Contracts* § 350, comment b (1981).

### 2.  Nexo's Breach for Failure to Provide Notice

Plaintiff has alleged injury in fact, traceable to Nexo's breach, from Nexo's failure to provide notice that it was suspending XRP payments, as well as notice that it would liquidate customers' collateral. Customers like Plaintiff "who *could have used XRP* to post as supplemental collateral or to pay down their loans were unable to do so." Compl. ¶ 9 (emphasis added). The "Damages Class" includes, with respect to the "notice" prong of the claim, customers "who suffered damages . . . from Nexo's failure to give notice of the suspension." *Id*. ¶ 167. This proposed Class by definition thus comprises those customers who, like Plaintiff, held sufficient XRP such that, had Defendants given the requisite notice, as explained above, these customers would have been able to liquidate their XRP at a higher price and pay down their loans. *Id*. ¶ 89.

In asking rhetorically (at 13) how notice would have impacted Plaintiff's losses, Nexo ignores that as the price of XRP fell on December 23, 2020, the sooner a Class member learned of the suspension, the greater the value he could have obtained for his XRP. This would have included, at the time of Nexo's breach—at which point each Class member, by definition, was in compliance with the requisite LTV ratio—the customer's ability to pay down his loan entirely and thereby avoid the out-of-pocket costs of trying to maintain his LTV ratio, and to retain the differential between his collateral value and the amount of the outstanding loan.

## III.   PLAINTIFF STATES ALL OF HIS CLAIMS

### A.  Plaintiff States a Claim for Breach of Contact

*First*, Nexo's main argument (at 15), that "nothing" in their terms and conditions prevent the suspension of XRP as repayment and that "suspending XRP as a repayment option does not violate a single provision in the T&Cs," is wrong. The Borrow Terms state in relevant part:

> You may repay at any time prior to the Maturity Date and any amount: (i) by transferring into the Nexo Account the same Digital Assets as the Nexo Crypto Credit granted, or other Digital Assets

1
2

> acceptable to Nexo; (ii) with the Collateral; or (iii) by combination
> of (i) and (ii). Certain rules may apply to repayments from time to
> time, as indicated on the Nexo Platform.

3    Compl. ¶ 61. Nexo's suspension precluded Class members from repaying their loans "with the
4    Collateral" or "by combination" of a transfer and the Collateral, and thus failed to afford these
5    customers the forgoing contractual rights.

6         Nexo therefore has to contend that it could suspend the use of "the Collateral" for any
7    reason at all, without having to satisfy any implied covenant of good faith and fair dealing.
8    California law (and the common law across jurisdictions) says otherwise. The fundamental
9    problem with Nexo's interpretation of the Borrow Terms is that it would render the agreement
10   illusory. "Generally, a contract is unenforceable as illusory when one of the parties has the
11   unfettered or arbitrary right to modify or terminate the agreement or assumes no obligations
12   thereunder." *Moua v. Optum Servs., Inc.*, 320 F. Supp. 3d 1109, 1113 (C.D. Cal. 2018) (internal
13   citation omitted). This is precisely the right that Nexo claims, arguing (at 18) that its discretion to
14   "alter or remove features on the platform" is completely "unfettered." Nexo even contends (at 15)
15   that "Nexo can suspend *all part* of the Nexo services that it provides on its platform" or "alter the
16   Digital Assets

17   . . . offered on its platform." This claimed right is so expansive that it would "reflect that the
18   counterparty had given no consideration at all" and would be plainly illusory. Compl. ¶ 66.

19        In these circumstances, the law applies an implied covenant of good faith and fair dealing
20   to preserve an otherwise illusory contract. Indeed, in a decision that Nexo cites, the court explained
21   that "when a party is given absolute discretion by express contract language, the courts will imply
22   a covenant of good faith and fair dealing to limit that discretion in order to create a binding contract
23   and avoid a finding that the promise is illusory." *Storek & Storek, Inc. v. Citicorp Real Est., Inc.*,
24   100 Cal. App. 4th 44, 57 (2002). This implied covenant applies *regardless* of whether it would
25   change the operation of the express language of the contract. *See Third Story Music, Inc. v. Waits*,
26   41 Cal. App. 4th 798, 806 (1995) ("[T]he implied covenant of good faith is also applied to

27
28

contradict an express contractual grant of discretion when necessary to protect an agreement which otherwise would be rendered illusory and unenforceable.").

*Second*, on this procedural posture, Nexo cannot take issue with Plaintiff's eminently plausible allegations that Nexo imposed the suspension and failed to give notice in bad faith and dishonestly. Compl. ¶¶ 70, 92. Acting in good faith, Nexo would not have, for example, suspended XRP payments and then itself proceeded to sell off XRP for substantial value to reduce its own loan exposure, *id*. ¶¶ 71-73; suspended transactions for international consumers, *id*. ¶ 76; or sought to justify its conduct through false statements that it would somehow be unlawful or legally risky for Nexo to permit XRP payments or for customers to initiate them—but somehow lawful and legally riskless for *Nexo* to *sell* XRP, *id*. ¶¶ 78-79, which it further belies in its motion by arguing (at 18) it could have suspended XRP "even in the absence" of any SEC action.

*Third*, Nexo wrongly argues (at 16-17) that Plaintiff's theory of the case "converts Nexo from a secured creditor to an insurer of its clients' market losses" because it "fundamentally alters the risk allocation contemplated by the Terms and Conditions." The first part of this argument is nonsense: Nexo need not insure its clients for "market losses"; it must only act in good faith to afford customers their right, for example, to pay down their loans with their existing Collateral. The second part of Nexo's argument accurately, and unironically, describes how the courts use the implied covenant. The law does not allow a party like Nexo to rely on even express contractual rights that make its counterparty's supposed rights simply illusory.

*Fourth*, Nexo unsuccessfully repackages its standing argument, which Plaintiff refutes above, to contend (at 16) that Plaintiff could have paid down his loan with other cryptocurrency. This argument first fails because it improperly seeks to shift onto Plaintiff *Nexo's* duty to plead mitigation of damages. The *defendant* "bears the burden of pleading and proving a defense based on mitigation of damages." *Warner Bros. Int'l Television Distribution v. Golden Channels & Co.*, 2004 WL 7336853, at *7 (C.D. Cal. Nov. 17, 2004) (collecting authority).

Nexo's rehashed standing argument further fails because it attempts to transform mitigation from an issue of *calculation* of damages into an issue of liability, which it is not. *See id.*; *Fantastic Sams Salons Corp. v. Moassesfar*, 2016 WL 7197917, at *1 (C.D. Cal. Mar. 8, 2016) (allowing contract claim to proceed and recognizing factual issues on "the *amount* of damages caused by Defendants' breach based on Plaintiff's failure to mitigate its damages." (emphasis in original)); *Arthur v. Louis Vuitton N. Am. Inc.*, 2009 WL 10656847, at *5 (C.D. Cal. June 17, 2009) (denying motion to dismiss where "the fact that plaintiff did not accept defendant's offer to correct the certificates or refund the purchase price may be relevant to issues of mitigation of damages, but it does not support defendant's claim that plaintiff suffered no harm").

Nexo's rehashed standing argument further fails because it misapprehends Plaintiff's allegations. The relevant proposed class here is this: "All persons who reside in the United States who suffered damages from breach of contract arising from Nexo's suspension of XRP payments on December 23, 2020, and thereafter." Compl. ¶ 142. These are Nexo customers who were liquidated because they could not use their XRP collateral to pay down their loans or else were unable (because of lack of notice) to convert their XRP into fiat currency or another cryptoasset at a sufficiently high value to post sufficient collateral or pay down their loans.

*Fifth*, Nexo mistakenly concludes (at 17) that Plaintiff alleges that Nexo breached the contract by claiming ownership of Plaintiff's collateral. That is not what Plaintiff alleges. Instead, as discussed both above and further below, Plaintiff disputes Nexo's entitlement to such asserted "ownership" and seeks a declaratory judgment to clarify the parties' rights in that regard.

### B.  Plaintiff States a Claim for Declaratory Judgment

*First*, Plaintiff's claim for declaratory judgment is not merely duplicative of his contract claim. Plaintiff does not allege, as shown above, that Nexo breached the contract by claiming to have acquired "ownership" of its customers' collateral.

*Second*, as to any overlap in the claims, declaratory relief is appropriate "where a breach of contract claim will not settle all of the contractual issues concerning which plaintiff seeks

declaratory relief." *StreamCast Networks, Inc. v. IBIS LLC*, 2006 WL 5720345, at *4 (C.D. Cal. May 2, 2006); *see also Teague v. Biotelemetry, Inc.*, 2018 WL 5310793, at *13 (N.D. Cal. Oct. 25, 2018) (declaratory permissible where prior court action did "not resolve all the contractual issues between the parties"). The Court could resolve Plaintiff's claims of breach without resolving any number of issues on which Plaintiff seeks declaratory relief. The Court could conclude, for example, that Nexo breached by suspending XRP trading and that therefore the Court need not resolve whether Nexo breached by failing to give timely notice of the suspension. This would leave as a ripe issue—indeed, Nexo argues that it is *not* required to give any notice of such a suspension—whether Nexo must give timely notice of the suspension of trading in any given Digital Asset.

*Third*, contrary to Nexo's mistaken contention (at 18-19), the ownership-of-collateral issue is relevant to Plaintiff's UCL claim, in which he alleges that "Nexo also engaged in 'deceptive' and 'misleading' advertising." Compl. ¶¶ 7, 112, 196. Nexo even recognizes (at 22) the connection between Nexo's ownership of customer assets and Plaintiff's UCL claims. The issue is also relevant to Plaintiff's CLRA claim. *Id*. ¶ 212 (based on unconscionable contractual provisions regarding purported "ownership" of collateral). The resolution of the ownership of Plaintiff's collateral bears directly on the tax consequences for Plaintiff and Nexo's customers. *Id*. ¶¶ 120, 124-25, 127, 129, 133. A real controversy therefore exists between the parties as to whether Nexo acquired and continues to maintain "ownership" of Plaintiff's collateral.

### C.  Plaintiff States a Claim Under the CLRA

Nexo provides and maintains an online platform that Nexo continually updates and through which Nexo's customers open accounts and thereby engage in a variety of activity, including the maintenance of their LTV ratios that occurs both through customers' own acts and through automatic transfers that Nexo oversees and implements, and the utilization of a cryptocurrency exchange. Under these facts, Nexo provides a "service" under the CLRA. *See In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 313 F. Supp. 3d 1113, 1142 (N.D. Cal. 2017) (Yahoo provides

a "service" where its customers sign up for accounts on a web-based platform to engage in email, banking, and stock-trading activities on a system that Yahoo! continually upkeeps and updates).

In particular where the CLRA "shall be liberally construed and applied to promote its underlying purposes," Cal. Civ. Code § 1760, the conclusion that Nexo offers a "service" follows from Nexo's own admissions. Nexo styles itself as offering a "leading credit line *service* for digital assets"; a customer's "Nexo Account" allows them to "use the Nexo Crypto Credit and other Nexo *services*"; Nexo may "suspend the provision of the Nexo *service* to you"; Nexo may "suspend the provision of the Nexo Crypto Credit or of all or part of the other Nexo *services*"; and Nexo refers to the customer's "use of the Nexo Crypto Credit or any of our *services*." *Id*. ¶ 208 (emphasis added). These facts underscore that Nexo does offer a "service." *See Yahoo!*, 313 F. Supp. 3d at 1142 (plaintiff's allegation that Yahoo provides a service is supported by the fact that Yahoo describes itself as offering "Yahoo Services"). In short, the CLRA applies because Nexo has not extended "credit, *separate and apart from a specific purchase or lease of a good or service*." *Berry v. Am. Express Publ'g, Inc*., 147 Cal. App. 4th 224, 230 (2007) (emphasis in original).

### D.  Plaintiff States Claims for Equitable Relief Under the UCL and CLRA

*First*, contrary to the premise of Nexo's argument, the remedies that the CLRA and UCL afford are in *addition* to any remedies at law. *See* Cal. Bus. & Prof. Code § 17205 (UCL); Cal. Civ. Code §§ 1752, 1708(a) (CLRA); *see, e.g.*, *Freeman v. Indochino Apparel, Inc*., 443 F. Supp. 3d 1107, 1114 (N.D. Cal. 2020) ("The equitable remedies afforded by the UCL and CLRA are expressly stated to be in addition to other available remedies at law.").

*Second*, if restitution would overlap with contract damages, the UCL claim is properly brought in the alternative, because the primary claim may not produce a legal remedy. *See, e.g.*, *Freeman*, 443 F. Supp. 3d at 1114; *Summit Est., Inc. v. United Healthcare Ins. Co.*, 2020 WL 5436655, at *9 (N.D. Cal. Sept. 10, 2020); *Byton N. Am. Co. v. Breitfeld*, 2020 WL 3802700, at *9 (C.D. Cal. Apr. 28, 2020). Nexo's reliance on *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 841 (9th Cir. 2020), is misplaced, because "*Sonner* does not hold that plaintiffs may not seek

alternative remedies at the pleading stage." *Sagastume v. Psychemedics Corp.*, 2020 WL 8175597, at *7 (C.D. Cal. Nov. 30, 2020); *accord Krause-Pettai v. Unilever United States, Inc.*, 2021 WL 1597931, at *4 (S.D. Cal. Apr. 23, 2021) (rejecting the application of *Sonner* to bar such alternative pleading as both factually distinguishable and legally questionable). Sensibly applied, *Sonner* stands for the proposition that whether pleaded in the alternative or not, a plaintiff must sufficiently allege she "lacks an adequate legal remedy." *Sagastume*, 2020 WL 8175597, at *7. Plaintiff has so pleaded. *See* Compl. ¶¶ 201-02.

 *Third*, the relief that Plaintiff seeks under these statutes is *not* merely redundant of the relief for breach of contract. Unlike his contract claim for damages, Plaintiff's claims under the UCL and CLRA are his only claims to enjoin Nexo from acting on the basis of unreasonable and unconscionable interpretations of its terms and conditions. That is a distinct remedy, and *Sonner* does not bar it. *See Zeiger v. WellPet LLC*, 2021 WL 756109, at *22 (N.D. Cal. Feb. 26, 2021) (distinguishing the application of *Sonner* to forward-looking injunctions, since "California's consumer protection laws permit courts to issue injunctions that serve different purposes and remedy different harms than retrospective monetary damages").

### E.  Plaintiff States a Claim Under the UCL

 Plaintiff has properly alleged "unlawful" conduct stating a claim under the UCL for the predicate violation of the CLRA. Compl. ¶¶ 192-93; *see Roper v. Big Heart Pet Brands, Inc.*, 510 F. Supp. 3d 903, 922 (E.D. Cal. 2020) (violation of CLRA serves as predicate for claim under UCL); *Zeiger v. WellPet LLC*, 304 F. Supp. 3d 837, 852 (N.D. Cal. 2018) (same). In addition, Plaintiff has properly alleged that Nexo engaged in "unfair" business acts under the UCL since its suspension of XRP payments and failure to give notice of that suspension was substantially injurious to its customers, including Plaintiff, and for its own financial benefit. Compl. ¶¶ 191, 194-95; *see In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 843 (N.D. Cal. 2020) (discussing unfairness test as in flux but at least involving the weighing of the utility of conduct against gravity of harm to consumers). Further, the UCL prohibits "misleading advertising" within

Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss
Case No. 5:21-CV-02392-BLF

its restriction on "unlawful, unfair, or fraudulent" business acts and practices. Cal. Bus. & Prof. Code § 17200. Nexo has engaged in false advertising regarding the operation of its service, by claiming that customers need not part with the ownership of their cryptoassets, when in fact— under the terms and conditions—Nexo claims to acquire "ownership" over the collateral. Compl. ¶¶ 196-97.

Nexo mistakenly argues (at 17) that Plaintiff does not present any actual "problem" regarding ownership "because the T&Cs contain a carve-out if the 'ownership' provision is 'prohibited by any Applicable Law.'" This argument first fails because, absent formal judicial action, Nexo has falsely advertised a right that as a default matter its contract does *not* afford. As to this bait-and-switch, moreover, Nexo's agreement "fails to permit a reasonable customer even to discern what Nexo regards as such law," *id*. ¶ 197, and thus does not remotely correct or cure the false advertising. Nexo's argument further fails because the UCL claim is a very *means* by which Plaintiff seeks to have the contractual assertion of collateral ownership prohibited by the applicable law.

Nexo further and inexplicably argues (at 22) that none of Plaintiff's claims "are predicated on 'deceptive' and 'misleading' advertising about 'ownership.'" It is unclear what Nexo means. Plaintiff does not assert other *claims* based on deceptive advertising; he alleges that Nexo's false advertising *is* the violation. Nexo's argument that Plaintiff's damages do not "flow from any of this alleged conduct," is meritless, *see* Compl. ¶¶ 33-35, 112, 196-97 (alleging that Plaintiff read and relied on materials); *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1021 (9th Cir. 2020) (at motion to dismiss stage, reliance "inferred from the misrepresentation" itself), and, as shown above, Plaintiff properly alleges prospective damage as a basis for the equitable relief he seeks.

## IV.   *FORUM NON CONVENIENS* IS NO BASIS FOR DISMISSAL

### A.  The Borrow Terms Apply to Plaintiff's Claims

Nexo defines the Borrow Terms as the "General Terms"—the "Nexo Crypto Credit General Terms and Conditions ('General Terms')." Compl. ¶ 40. The "Governing Law and

Jurisdiction" clause of the Borrow Terms refers to "the competent court or other dispute resolution authority, determined as per the procedural law of Nexo jurisdiction." *Id.* Nowhere do the Borrow Terms define the "Nexo jurisdiction." *Id.* ¶ 41. The Wallet Terms also define themselves as the "General Terms." (Trenchev Decl. Ex. B at I.) The "Governing Law and Jurisdiction" clause of the Wallet Terms states that "any dispute arising out of or in connection with the Agreement (the General Terms) . . . shall be referred to the competent court in London, England, determined as per the procedural law of England and Wales." (*Id.* at XVIII.2.)

The Borrow Terms, not the Wallet Terms, apply to this dispute. The "Governing Law and Jurisdiction" provisions in the Borrow Terms and the Wallet Terms each purport to apply to disputes arising out of *that* agreement—that is, they are mutually exclusive. The Borrow Terms state that they are "governed exclusively by the substantive law of Nexo jurisdiction," Compl. ¶ 108, which the Borrow Terms do *not* define as England or Switzerland. This is a "dispute arising out of or in connection with" the Borrow Terms. *Id.* ¶ 40. This dispute proximately arises out of Nexo's "Crypto Credit" service and alleges "material breaches of the Nexo 'Borrow Terms and Conditions'" governing that service. *See, e.g.*, *id.* ¶¶ 8, 46, 56-94, 95-133, 134-40, 149, 167-73, 175-89, 192-93, 196-97, 210-12.

Indeed, any Nexo customer will use a "wallet," but as Nexo concedes (at 3, quoting Trenchev Decl. ¶ 4), Nexo's Crypto Credit customers *must* agree to the "Borrow Terms." If the Borrow Terms did not apply to these customers, they would never apply. Any such interpretation of how the Borrow Terms operate would thus be unreasonable. Similarly, the Borrow and Wallet Terms do not cross-reference each other, and Nexo *could* have but conspicuously did *not* identify London as the selected forum for disputes arising out of the Borrow Terms. In sum, interpreting the Borrow Terms to say that any dispute arising under thereunder will be resolved in the forum that governs the Wallet Terms is simply nonsensical—both textually and contextually.

If there is any ambiguity here, moreover, the Court would construe these terms against Nexo, which drafted them, in a "rule that applies with particular force in the case of a contract of

adhesion." *ADVSR, LLC v. Magisto Ltd.*, 2021 WL 3604729, at *16 (N.D. Cal. Aug. 13, 2021). The Court would also apply the "standard rule of contract interpretation that specific terms control over general ones." *Shivkov v. Artex Risk Sols., Inc.*, 974 F.3d 1051, 1063 (9th Cir. 2020). The Borrow Terms are indisputably the more specific terms as to the issues of governing law and dispute resolution with respect to Nexo's Crypto Credit service.

In this regard, moreover, Nexo cites its terms and conditions as of July 2021. (E. Normand Decl. ¶¶ 3-4.) This is misleading, because they were not in place as of December 2020 and therefore do not apply to Plaintiff's claims for breach. In addition, although the revised language remains ambiguous, after December 2020, Nexo attempted to add a definitional cross-reference between the Borrow and Wallet Terms. *Id.* This underscores that Nexo itself recognized the ambiguity in any relationship between the Borrow Terms and Wallet Terms as of December 2020.

Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss
Case No. 5:21-CV-02392-BLF

**B.  The Forum-Selection Clause in the Borrow Terms Is Unenforceable**

A forum-selection clause "must contain language that clearly designates a forum as the exclusive one." *N. Cal. Dist. Council of Laborers v. Pittsburg-Des Moines Steel Co.*, 69 F.3d 1034, 1037 (9th Cir. 1995). Accordingly, where "the forum selection clause is facially ambiguous," it is unenforceable. *Dodd v. iGATE Techs., Inc.*, 2015 WL 1843036, at *1 (N.D. Cal. Apr. 8, 2015); *see also Merrell v. Renier*, 2006 WL 1587414, at *3 (W.D. Wash. June 6, 2006) (forum-selection clause unenforceable "to the extent it does not 'clearly designate'" the forum).

The forum-selection clause in the Borrow Terms is facially, and indisputably, ambiguous. The clause does not specify any forum, referring instead to "the competent court or other dispute resolution authority, determined as per the procedural law of Nexo jurisdiction." Compl. ¶ 40. The Borrow Terms do not define "Nexo jurisdiction" (and nor do the Wallet Terms). Nor, as noted, do the Borrow Terms cross-reference the Wallet Terms or, as Nexo easily could have done if it so intended, specify the forum identified in the Wallet Terms. The forum-selection clause is therefore unenforceable. This is particularly so because "[i]f  a forum selection clause  is ambiguous, the ambiguity must be resolved against the drafter." *Dodd v. iGATE Techs., Inc.*, 2015 WL 1843036, at *1 (N.D. Cal. Apr. 8, 2015). Indeed, under this standard, the Court may reasonably interpret "Nexo jurisdiction" to refer to any jurisdiction in which Nexo is subject to suit—and Nexo concedes personal jurisdiction against Nexo Capital, and Plaintiff has shown that Defendants are all subject to jurisdiction in this Court. *See* Part I, above.

## CONCLUSION

Plaintiff respectfully requests, for the all the foregoing reasons, that the Court deny Nexo's Motion to Dismiss in its entirety. Plaintiff further requests, in the alternative, if the Court were not to deny Nexo's motion with respect to personal jurisdiction, that as explained above the Court permit jurisdictional discovery.

Dated: September 2, 2021

Respectfully submitted,

*/s/ Kyle W. Roche*
Kyle W. Roche
Edward Normand
Alex Potter
Stephen Lagos
ROCHE FREEDMAN LLP
99 Park Avenue, Suite 1910
New York, NY 10016
Tel.: 646-970-7509
kyle@rcfllp.com
tnormand@rcfllp.com
apotter@rcfllp.com
slagos@rcfllp.com

Katherine Eskovitz (SBN 255105)
ROCHE FREEDMAN LLP
1158 26th Street No. 175
Santa Monica, CA 90403
Tel.: 646-791-6883
keskovitz@rcfllp.com

*Counsel for Plaintiff*

Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss
Case No. 5:21-CV-02392-BLF